EC24WALH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    GARY WALPERT,

4                    Plaintiff,

5           v.                              13-CV-5006 (PGG)

6    SYED JAFFREY, *et al.*,

7                    Defendants.

8    ------------------------------x

9                                           New York, N.Y.
                                            December 2, 2014
10                                          3:30 p.m.

11
     Before:
12
                        HON. PAUL G. GARDEPHE,
13
                                            District Judge
14

15                         APPEARANCES

16   FENSTERSTOCK & PARTNERS LLP
          Attorneys for Plaintiff
17   BY:  THOMAS A. BROWN II, ESQ.
          MICHAEL T. PHILLIPS II, ESQ.
18
     MESSNER REEVES LLP
19        Attorneys for Defendants
     BY:  DEBORAH J. DENENBERG, ESQ.
20

21

22

23

24

25

EC24WALH

1          (Case called)

2               THE COURT:   We are here for purposes of conducting the

3     cross-examination of Mr. Walpert, the plaintiff.   So please

4     proceed.

5      GARY WALPERT,

6          called as a witness by the Plaintiff,

7          having been previously duly sworn, testified as follows:

8     CROSS-EXAMINATION

9     BY MS. DENENBERG:

10    Q    Good afternoon.

11    A    Good afternoon.

12    Q    Yesterday we were reviewing your work history.   Do you

13    recall?

14    A    My work history?

15    Q    Your work history.

16    A    Yes, ma'am.

17    Q    How long were you at K&L Gates?

18    A    Two years.

19    Q    What is the exact time frame?

20    A    About February 2008 to May 2010.

21    Q    Why did you leave K&L Gates?

22    A    I found a better opportunity, I thought, with Mr. Jaffrey;

23    and at the same time, I had an essentially two-year contract

24    with K&L Gates, and that ended.

25    Q    You said you thought you had a better opportunity with

1    Mr. Jaffrey?

2    A   I did.

3    Q   Then, how come you started working at Byrne Poh in May of

4    2010, as well?

5    A   That was, as Mr. Jaffrey called it, an insurance policy in

6    case the opportunity with Mr. Jaffrey did not positively occur.

7    Q   So you're saying it was Mr. Jaffrey's idea?

8    A   He suggested that, yes.

9    Q   I have an extensive disclosure of your emails.  Where was

10   that ever reflected in any of your emails?

11   A   I wouldn't know since I haven't reviewed them recently.

12   Q   Isn't it true, though, that you started at Byrne Poh almost

13   immediately after you started working at K&L Gates?

14   A   That's correct.

15   Q   The partners at Byrne Poh, you knew them from your days

16   back at Wilmer Pickering?

17   A   I think you mean Wilmer Hale.

18   Q   Sorry.  Wilmer Hale.

19   A   Yes, ma'am.

20   Q   When did you start talking with them about starting to work

21   with them?

22   A   After I had started or had accepted the idea of going with

23   Mr. Jaffrey.

24   Q   So in a matter of two days, you became a partner or of

25   counsel at Byrne Poh?

1    A    I'm sorry.  Two days?

2    Q    You left K&L Gates in May 2010, and you started at

3    Byrne Poh in May 2010.  I don't know how much overlap there was

4    but not much.

5    A    There was no overlap between Byrne Poh and K&L Gates.  I

6    had talked with the attorneys at Byrne Poh at a time prior to

7    starting with Mr. Jaffrey.

8    Q    Okay.  Just referring to Exhibit Number 1, which you claim

9    is the employment agreement --

10             MR. BROWN:  Your Honor, I have the original exhibits

11   here.  You want me to give them to him?

12             MS. DENENBERG:  Sure.

13             THE WITNESS:  Yes, ma'am.

14   BY MS. DENENBERG:

15   Q    Presumably, this document is accurate.  You say it was

16   signed --

17             THE COURT:  If you can just ask a question and not

18   comment.

19   BY MS. DENENBERG:

20   Q    What is the date on the document?

21   A    The effective date of the document is 17 June 2010.

22   Q    You were already working at Byrne Poh when this was

23   allegedly signed?

24   A    That's correct.

25   Q    I believe yesterday you said you prepared this document?

1   A   I had it prepared, yes.

2   Q   Where are the prior versions of it?

3   A   If there were any prior versions left, they would either be

4   in the attorney's office who prepared the document or perhaps

5   in my own computer system.

6   Q   We have requested all of your documents, and your attorneys

7   have not provided any prior versions.

8   A   Then there may not be any prior versions in their files.  I

9   do not know.

10          THE COURT:  Let me ask a question.  Did you have a

11   computer in the offices of Wingate?

12          THE WITNESS:  I did.

13          THE COURT:  What happened to that computer?

14          THE WITNESS:  That computer was disposed of at the

15   same time that everything else was taken out of the offices.

16          THE COURT:  All right.  Is that the computer you used

17   to prepare this employment agreement, or did you use some other

18   computer?

19          THE WITNESS:  I'm not sure.  I did have a personal

20   computer.

21          THE COURT:  But as you sit here today, you don't know

22   which computer you used to prepare this?

23          THE WITNESS:  I don't recall.  No.

24          THE COURT:  All right.  Go ahead.

25          THE WITNESS:  Excuse me.  I didn't prepare it.

EC24WALH                    Cross – Walpert

1              THE COURT:  You had somebody prepare this document for

2    you?

3              THE WITNESS:  That's right.  An outside law firm.

4              THE COURT:  Go ahead.

5    BY MS. DENENBERG:

6    Q    Who prepared this document for you?

7    A    I don't remember the name of the law firm.  Lawyer Laurie

8    Burke-Weiss.

9              THE COURT:  Was she at a law firm or practiced alone?

10             THE WITNESS:  No, there was a small law firm,

11   Burke-Weiss and someone.  Maybe Pechman.

12   BY MS. DENENBERG:

13   Q    Did you have any email communications with her with respect

14   to preparing this document?

15   A    I believe I did.

16   Q    Where are those?  They have not been exchanged in

17   discovery.

18   A    If they're not in discovery, the likelihood is they don't

19   exist anymore.  They were probably in my Wingate account.

20   Q    You had a habit of emailing yourself at your Gmail account.

21   A    No, I did not.

22             MS. DENENBERG:  Okay.  May I take a moment to find

23   some exhibits here?

24             THE COURT:  Yes.

25

EC24WALH                           Cross - Walpert

1    BY MS. DENENBERG:

2    Q    So you're saying you did not email yourself to your Gmail

3    account from the Wingate account?

4    A    Ever?

5    Q    Frequently.

6    A    Not frequently, no.

7    Q    Did you frequently use your Gmail account?

8    A    Not so much in that time frame, no.

9           MS. DENENBERG:  Your Honor, may I mark some documents

10   for exhibits?

11          THE COURT:  Yes.

12          MS. DENENBERG:  May I approach?

13          THE COURT:  Yes.

14          MR. BROWN:  Your Honor, apparently there aren't copies

15   for --

16          MS. DENENBERG:  I made three.  I didn't know to make

17   four.  I'm sorry.

18          THE COURT:  We have one for the witness, one for

19   yourself, and one for opposing counsel, but not one for the

20   Court?

21          MS. DENENBERG:  I'm sorry.

22          THE COURT:  I will deal without it.  So you can

23   proceed in that fashion.  You can make copies later and provide

24   them to the Court.  All right, Ms. Denenberg?

25          MS. DENENBERG:  Certainly.

EC24WALH                    Cross - Walpert

1          THE COURT:  Do you have an exhibit number?

2          MS. DENENBERG:  It will be three exhibits, for

3   expediency, to mark them.

4          THE COURT:  All right.  How are they marked?

5          THE DEPUTY CLERK:  A, B, and C.

6          THE COURT:  These will be Defense Exhibits A, B,

7   and C.

8          All right.  Go ahead.

9   BY MS. DENENBERG:

10  Q   Starting with the document marked Exhibit A --

11  A   Yes, ma'am.

12  Q   -- is that an email from your Wingate account?

13  A   It does not appear to be.

14  Q   It doesn't say gwalpert@wingate?  Exhibit A.

15  A   No, ma'am.

16         MS. DENENBERG:  May I see them, your Honor, please?

17         THE COURT:  Sure.  You may approach.

18         MS. DENENBERG:  It is backwards.  That's okay.

19  BY MS. DENENBERG:

20  Q   So Exhibit A is an email from February 28, 2012,

21  10:07 a.m.?

22  A   Yes.

23  Q   Is that from your Gmail account?

24  A   It is.

25  Q   Does that refresh your recollection that you used your

EC24WALH                          Cross - Walpert

1   Gmail account?

2   A    I never said I didn't use the Gmail account.

3   Q    You used your Gmail account for communications with

4   Mr. Jaffrey?

5   A    Sometimes, but typically no.

6   Q    Okay.  By the way, what is this email?

7   A    Could you be more specific?

8   Q    Well, judging from the attachment, can you tell what this

9   email is?

10  A    It is an email to Mr. Jaffrey, attaching what is the

11  attachment.  I'm not sure --

12  Q    Did you prepare this attachment?

13  A    I believe I did, yes.

14  Q    And this attachment, again, is 10:07 a.m., and you write,

15  "Apologies" --

16              THE COURT:  Wait a second.  This isn't in evidence

17  yet, so you can't read from it.

18              MS. DENENBERG:  I would like to move this in evidence.

19              THE COURT:  Any objection?

20              MR. BROWN:  No objection.

21              THE COURT:  Defense Exhibit A is received.

22              (Defendants' Exhibit A received in evidence)

23  Q    This is your email.  What does the subject line say?

24  A    Compensation package revised.

25  Q    And you prepared this document --

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                        Cross - Walpert

1    A   I believe I did.

2    Q   -- that is attached to it?

3            Referring --

4    A   Excuse me.  There is a question because of the notation at

5    the bottom of the document with an NY document number, but I

6    think I prepared this.

7    Q   What does that number at the bottom mean, NY787070,

8    version 1?

9    A   I can only guess that it is a document number, but I don't

10   know its source.

11   Q   Did Byrne Poh use little footers like this to identify

12   documents?

13   A   Not like this, no.

14   Q   What did their footers look like?

15   A   To the extent they had any footers, it would have been a

16   matter number; but on almost all the Byrne Poh documents I have

17   seen, there are no footers.

18   Q   Do they put footers on their draft documents?

19   A   No.

20   Q   I attached the wrong document last night.  Let's move to

21   Exhibit B.  Exhibit B, do you recognize that document?

22   A   It is a document from me to Mr. Jaffrey.

23   Q   And what time does that one say?

24   A   2:49 a.m. on the 28th of February.

25            MS. DENENBERG:  I would like to move this document

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                          Cross - Walpert

1   into evidence, as well.

2            MR. BROWN:  No objection, your Honor.

3            THE COURT:  Defense Exhibit B is received.

4            (Defendants' Exhibit B received in evidence)

5   BY MS. DENENBERG:

6   Q   The reference to the 10 a.m. one -- I attached the wrong

7   document last night -- is that referring to the 2:49 a.m.

8   email?

9   A   I'm sorry.  I didn't understand your question.

10  Q   Exhibit B is February 28, 2:49 a.m., and Exhibit A is the

11  same date, 10:07 a.m.

12  A   Yes.

13  Q   Would it be fair to say that the 10:07 one is referencing

14  the 2:49 a.m. one?

15  A   It could be.  Probably is.

16  Q   Why were you sending Mr. Jaffrey a document entitled "Gary

17  Walpert Compensation Package"?

18  A   As best as I can recall is that it was a document that he

19  asked for in connection with a potential investment or investor

20  that he was dealing with.

21  Q   You're saying that, in addition to Exhibit 1, where you're

22  getting compensated $900,000, you're now proposing a separate

23  compensation package of $2 million?

24  A   Well, in fact, I wasn't being compensated, obviously, by

25  Mr. Jaffrey.  But aside from that, this is a document that

EC24WALH                    Cross - Walpert

1    Mr. Jaffrey requested in order to show investors.

2    Q    What investors?

3    A    Excuse me?  I don't know who they were.

4    Q    So this is not a new contract, this is just something in

5    addition?

6    A    This is what it is, and it is something that Jaffrey asked

7    for.  What he was going to use it for, I don't know.  If I had

8    been lucky, perhaps, it would have been the contract that he

9    would have been able to execute.

10   Q    So you would have been the general counsel and the

11   executive vice president, making approximately $3 million for

12   two different companies; is that what you're saying?

13   A    No.  No.  I would have been happy to have received what any

14   one of these contracts had said.

15   Q    Then, why are you making this proposal, then, if you are

16   not being compensated under Exhibit 1?

17   A    The proposal, as I recall, was something Mr. Jaffrey wanted

18   and asked me to include what I needed to make up for what he

19   hadn't paid.

20   Q    So you just prepared this out of the goodness of your

21   heart?

22   A    No.  He had asked for it.  He had asked for it not only

23   from me but from one other person.

24   Q    Let's refer to Exhibit C.

25        Just one more thing about Exhibit B.

EC24WALH                          Cross - Walpert

1  A   Yes, ma'am.

2  Q   Isn't that reflecting you cc'ed this document to your Gmail

3  account?

4  A   That's correct.

5  Q   Did you search that Gmail account for any emails with that

6  attorney, Ms. Laurie -- I forgot her last name.

7  A   Burke-Weiss.

8  Q   Have you checked for any emails between yourself, maybe

9  Mr. Jaffrey, regarding Exhibit 1?

10 A   Yes.

11 Q   Where did you conduct that search?

12         MR. BROWN:  Objection, your Honor.

13 BY MS. DENENBERG:

14 Q   How did you conduct that search?

15 A   I did a search through Gmail using key words.

16 Q   What key words?

17 A   I don't recall at this time.  I'm sure at that time they

18 were words including the attorney's full name and her email

19 account.

20 Q   Did you ask -- what was her last name?

21 A   Burke-Weiss.

22 Q   Burke-Weiss.  Did you ask Ms. Burke-Weiss to provide you

23 with the communications between yourself and her in preparing

24 this 2010 document?

25 A   I don't recall.

EC24WALH                      Cross - Walpert

1  Q   You know that attorneys are required to maintain files for

2  seven years?

3  A   Yes, ma'am.

4  Q   You started this litigation in 2013 and now it is 2014, yet

5  you haven't asked her for any documents to verify the

6  negotiations and the drafting of Exhibit 1?

7          MR. BROWN:  Your Honor, I have to object.  It is a

8  little out of the ordinary, and I recognize that current

9  counsel wasn't involved in the litigation throughout, but her

10  predecessors actually subpoenaed Ms. Burke-Weiss, who opposed

11  the subpoena and didn't produce documents.  I think this entire

12  line of questioning is misleading and unfair.

13          THE COURT:  That is one issue, and that is certainly

14  an important issue.  I guess just to state the obvious, to the

15  extent that Ms. Burke-Weiss was providing legal services to

16  Mr. Walpert, it would seem to me that their communications

17  would be privileged and, therefore, not subject to discovery.

18          Do you have a different view of it, Ms. Denenberg?

19          MS. DENENBERG:  It wouldn't be subject to discovery

20  for me, but it is a privilege that Mr. Walpert can waive,

21  allowing Ms. Burke-Weiss, even under a confidential seal, to

22  provide otherwise critical documents to verify the authenticity

23  of Exhibit 1.

24          THE COURT:  It is true that as to the attorney-client

25  privilege, it is the client's right to waive it; as to work

EC24WALH                        Cross - Walpert

1    product, that's not true.  But regardless, it would be

2    uncommon, in my experience, for someone to waive the

3    attorney-client privilege under these circumstances.  I'm not

4    sure why that would happen exactly.

5         MS. DENENBERG:  Mr. Walpert is availing himself of

6    this Court and seeking a substantial sum of money from my

7    clients.  So I would think a document that has been called into

8    question, he would want to provide authentication than his own

9    word.

10        THE COURT:  Regardless of what you might think, it is

11   pretty uncommon for people to waive the attorney-client

12   privilege regardless of how much money is at stake, I can tell

13   you that.  I don't accept the premise for your argument.  But

14   regardless, he hasn't waived the privilege, and so it seems to

15   me not to be a fruitful area of inquiry.

16        MS. DENENBERG:  Okay.  I just would want to point out

17   that we are in a potential default situation before your Honor,

18   and this is what I have considered critical evidence that can

19   help prove his case, prove the defense case, that is solely

20   within his possession; and it could be ordered again under

21   seal, subject to redaction, so that we can all see what

22   communications there were or were not.

23        THE COURT:  Well, if you're asking me to direct the

24   plaintiff to waive the attorney-client privilege, I don't have

25   the authority to do that.  As I said, in my experience, it

EC24WALH                         Cross - Walpert

1    would be uncommon for a client to waive the attorney-client

2    privilege.  It is not at all uncommon for the attorney-client

3    privilege to be involved with respect to document productions;

4    and as I said, in my experience, it is very uncommon for

5    parties to waive that privilege, as well as the work product

6    privilege.  You've made your request.

7             I take it you don't have any thoughts about waiving

8    the attorney-client privilege, Mr. Walpert?

9             THE WITNESS:  Not at all.

10            THE COURT:  He's not going to waive the privilege.  As

11   I said, I don't know where this goes from there.

12            MS. DENENBERG:  Well, I would just like the Court to

13   take into consideration that these are documents that are

14   solely within his possession that could be quite defining in

15   this case.

16            THE COURT:  Okay.  Please proceed.

17   BY MS. DENENBERG:

18   Q    Returning to Exhibit C --

19   A    Yes, ma'am.

20   Q    -- is that another email from you to Mr. Jaffrey?

21   A    Yes.

22   Q    Is that another email regarding your proposed compensation

23   package?

24   A    This is an email with regard to a proposed compensation

25   package, but this occurred a year later and has to do with a

EC24WALH                    Cross - Walpert

1   somewhat different investment entity.

2   Q    What investment entity does this one have to do with?

3   A    This has to do with Collingwood Investments.

4   Q    If this one is different, a different investment, why is it

5   identical, including the March 1st date --

6            THE COURT:  I will sustain the objection.  There is no

7   foundation.  You got to lay a foundation.

8            MS. DENENBERG:  Also, I would like to move Exhibit C

9   into evidence.  I don't believe I did that yet.

10           MR. BROWN:  No objection, your Honor.

11           THE COURT:  Defense Exhibit C is received.

12           (Defendants' Exhibit C received in evidence)

13  BY MS. DENENBERG:

14  Q    Looking at Exhibit C and the attachment dated March 1st,

15  2012, how is it different from Exhibit B, also dated March 1st,

16  2012?

17  A    You're now talking about the attachment to Exhibit B and

18  the attachment to Exhibit C?

19  Q    The attachment.

20  A    Without reading them word-for-word, I assume they are the

21  same.

22  Q    So if this is a different investment, why is it exactly the

23  same as Exhibit B?

24  A    I believe it is the same because in the body of the email

25  to which it is attached, it says that it should be the basis

EC24WALH                    Cross - Walpert

1   for our discussions now, let's discuss as soon as possible.

2   Q   If it is a different entity, why doesn't it say Collingwood

3   on it?

4   A   I'm sorry.  Say it again, please?

5   Q   If this Exhibit C is for a different entity, different

6   investment entity, why doesn't it reference that different

7   investment entity?

8   A   I presume because Mr. Jaffrey and I knew what we were

9   talking about.

10  Q   How do you know that from this January 15, 2013 email?

11  A   How do I know what?

12  Q   How do you know that you and Mr. Jaffrey are just going to

13  mysteriously know what you're talking about?

14          THE COURT:  Sustained.

15  Q   How are you and Mr. Jaffrey going to know what you're

16  talking about from this email?

17  A   From our prior discussions.

18  Q   Were these discussions in any emails?

19  A   I can't answer that.  I don't know.

20  Q   Did you look for any emails that would have precipitated

21  you sending this January 15th email?

22  A   I provided all emails that were requested by defendants'

23  request for documents to my lawyers.  So I have nothing in

24  addition to any of those emails.  They responded by producing

25  whatever they produced in response to the interrogatories and

SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

EC24WALH                    Cross - Walpert

1   the requests for documents.

2   Q   Well, continuing to refer to Exhibit C, when you look down

3   on the email, it reflects that you are actually forwarding the

4   prior February 28th email that we marked as Exhibit B.

5   A   I see that.

6   Q   So where is the email from Syed Jaffrey seeking that you

7   send this to him, or are you just doing it on your own?

8           MR. BROWN:  Objection, your Honor.

9           THE COURT:  Sustained.

10  BY MS. DENENBERG:

11  Q   Where is the email that caused you to send this --

12          THE COURT:  There is no foundation.  We don't know

13  that there was an email.  There is just no foundation for the

14  question.  The objection is sustained.

15  BY MS. DENENBERG:

16  Q   This references, in your email, you had texted me that you

17  were going to call yesterday.

18  A   I see that.

19  Q   What have you done to produce those texts?

20  A   Those texts are entirely gone because of a phone change.

21  Q   Did you change phone numbers?

22  A   No.

23  Q   Did you contact your phone carrier to provide you with the

24  text messages?

25          MR. BROWN:  Objection, your Honor.

EC24WALH                         Cross - Walpert

```
 1              THE COURT:  Grounds?
 2              MR. BROWN:  In addition to being way beyond the scope
 3    of the direct, this type of questions about discovery requests
 4    and practices is inappropriate in this context or for a client
 5    such as Mr. Walpert, in the first instance.  I don't even know
 6    if text messages were requested in the document demands.
 7              THE COURT:  What about that, Ms. Denenberg?  If the
 8    texts were never requested, this is totally irrelevant.
 9              MS. DENENBERG:  All communications between parties
10    have been requested.
11              THE COURT:  All right.  Do you agree with that,
12    Mr. Brown?
13              MR. BROWN:  I can't disagree with it, your Honor.
14              THE COURT:  All right.  So I am going to overrule the
15    objection.
16              You can answer.
17              Is there a pending question?
18              MS. DENENBERG:  I think I asked if you changed phone
19    numbers.
20              THE COURT:  I think he answered that.
21    BY MS. DENENBERG:
22    Q   Did you request the text messages from your cell phone
23    provider?
24    A   No, I did not.
25    Q   Have you changed cell phone providers in the last year and
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                        Cross - Walpert

1    a half?

2    A    No.

3    Q    Who is your cell phone provider?

4    A    Verizon Wireless.

5    Q    Referring back to Exhibit C, does this document further

6    reflect that you cc'ed your own Gmail account?

7    A    I did.

8    Q    So at least on occasion you cc'ed your own Gmail account?

9    A    That's correct.

10   Q    When would you decide to cc your Gmail account?

11   A    Typically because I had easier access to it than I did my

12   Wingate account.

13   Q    Why was that?

14   A    Just the nature of getting into Wingate versus getting into

15   Gmail.

16   Q    Can you be more specific?  What was so much easier about

17   Gmail?

18   A    It was simply, for me at least, a much easier Gmail

19   environment to work in.

20   Q    Referring back to Exhibit 1, did you ever email this

21   document to your Gmail account?

22   A    I have no recollection one way or the other.

23   Q    Where did you obtain this document in order to provide it

24   to your attorneys?

25   A    I obtained it from my wife.

EC24WALH                          Cross - Walpert

1   Q    How did your wife obtain it?

2   A    How did she what?

3   Q    How did your wife obtain it?

4   A    Obtain it?  She obtained it from me when she asked for it

5   some time earlier.

6   Q    What made you give it to your wife?

7   A    As I said, she asked for it.

8   Q    Does she ask for all your contracts?

9            MR. BROWN:  Objection, your Honor.

10           THE COURT:  Sustained.

11  BY MS. DENENBERG:

12  Q    Do you recall why she asked for a copy of this?

13           MR. BROWN:  Objection, your Honor.

14           THE COURT:  Sustained.

15  BY MS. DENENBERG:

16  Q    When she provided it to you, did she provide it to you in

17  electronic form or paper form?

18  A    Paper form.

19  Q    Have you looked for any electronic forms of this document?

20  A    Not specifically, I don't think, no.

21  Q    Did you ask Ms. Burke-Weiss for an electronic form of this

22  document?

23           MR. BROWN:  Objection, your Honor.  It is protected by

24  the attorney-client privilege.

25           THE COURT:  Yes, we have been over this.  Given that

1  his communications with Ms. Burke-Weiss are privileged, I'm not

2  going to draw any inference of any sort with respect to

3  production or requests for production from Ms. Burke-Weiss.

4  Their communications are privileged, subject to waiver if the

5  client wishes to waive attorney-client privilege.  Absent

6  waiver, there is no grounds to demand production of such

7  documents.

8  BY MS. DENENBERG:

9  Q   Now, back to what we marked as Exhibit 1, your employment

10  agreement that Ms. Burke-Weiss drafted for you.  Who

11  represented Wingate Capital in drafting this agreement?

12  A   Wingate Capital was not involved in drafting this

13  agreement.

14  Q   So just you or Ms. Burke-Weiss drafted the agreement?

15  A   The agreement was drafted by Ms. Burke-Weiss.

16  Q   On your behalf; correct?

17  A   On my behalf, correct.

18  Q   Who represented Wingate Capital, Inc., in negotiating and

19  preparing this employment agreement?

20  A   As I said before, Wingate was not involved in preparing

21  this agreement.

22  Q   Okay.  It says that Wingate is a party to the agreement.

23  Are you saying that they had no legal representation in

24  connection with this document marked as Exhibit 1?

25  A   No, because this is a document I gave to Mr. Jaffrey and

EC24WALH                          Cross - Walpert

1   which he eventually signed.

2   Q    So this is your document creating yourself as the general

3   counsel for a company, and there is no other attorney

4   representing the company; is that what you're saying?

5   A    There were other attorneys representing the company.

6   Q    What other attorneys represented the company in connection

7   with the employment agreement that is marked as Exhibit 1?

8   A    I don't know what Mr. Jaffrey did with the agreement,

9   whether he showed it to one lawyer or ten lawyers.

10   Q    Did you recommend that he show it to an attorney?

11   A    I didn't recommend that he did or he should or should not

12   show it to an attorney.

13   Q    May I turn your attention to page 9 of Exhibit 1, marked

14   Plaintiff's Bates stamp 14.

15   A    Yes, ma'am.

16   Q    Where were you when you signed this document?

17   A    In his office.

18   Q    Whose office?

19   A    I'm sorry.  Mr. Jaffrey's office.

20   Q    Office where?

21   A    At 601 Lexington Avenue, 59th floor.

22   Q    And where was Mr. Jaffrey?

23   A    Across the desk from me.

24   Q    How come the signature block by Mr. Jaffrey's name has the

25   word "by" but the signature block next to your name does not

EC24WALH                    Cross - Walpert

1   have the word "by"?

2   A   I assume that he was signing on behalf of Wingate Capital,

3   Inc., and I was signing on behalf of me.

4   Q   So that's why Ms. Burke-Weiss left out the word "by"?

5            MR. BROWN:  Objection.

6            THE COURT:  Sustained.

7   BY MS. DENENBERG:

8   Q   Also, if you notice, by Mr. Jaffrey's name, there is a

9   signature line.

10  A   I see it.

11  Q   By your name, there is a different signature line.  These

12  lines are not congruous.

13  A   Okay.

14  Q   Do you know why that is?

15  A   No.

16  Q   Could it be that Mr. Jaffrey's signature was added

17  afterwards?

18  A   No.

19  Q   So a $900,000 document has a sloppy signature line like

20  that?

21           THE COURT:  Sustained.

22  BY MS. DENENBERG:

23  Q   Now, I believe you said you never received any compensation

24  pursuant to Exhibit 1.

25  A   I don't think I said that, no.

EC24WALH                          Cross - Walpert

1   Q    I'm sorry.  What compensation did you receive pursuant to

2   Exhibit 1?

3   A    $50,000.  At least I believe it to be pursuant to that

4   contract.

5   Q    $50,000 from Wingate pursuant to Exhibit 1?

6   A    I believe that's true, yes.

7   Q    Do you have a copy of that check?

8   A    I do not.

9   Q    And I believe you said yesterday that there were some

10  further communications regarding the $50,000?

11  A    There were.

12  Q    And I think you said that the $50,000 -- it was something

13  about requesting your tax identification number?

14  A    My Social Security number, yes.

15  Q    Did you ever provide that?

16  A    No.

17  Q    How come you never provided that?

18  A    On the advice of counsel.

19  Q    On the advice of counsel?

20  A    Yes, ma'am.

21  Q    In connection with this litigation or some other counsel?

22  A    No.  In connection with this litigation.

23            THE COURT:  I'm confused.  When was the request made

24  for your Social Security number?

25            THE WITNESS:  Probably in early 2013.


SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1          THE COURT:  Had this litigation already commenced?

2          THE WITNESS:  No.

3          MR. BROWN:  Your Honor, while I wasn't counsel at the

4     time, it was shortly before the litigation was commenced.

5          THE COURT:  All right.

6          MR. BROWN:  I believe it was begun in June of 2013.

7          THE COURT:  Thank you.

8          MS. DENENBERG:  May I mark an exhibit, please?

9          THE COURT:  Yes.

10          MS. DENENBERG:  May I approach?

11          THE COURT:  Yes.

12          What is the exhibit number?

13          MS. DENENBERG:  D.

14          THE COURT:  Defense Exhibit D.  All right.  Go right

15     ahead.

16     BY MS. DENENBERG:

17     Q    Do you recognize that, Exhibit D?

18     A    Excuse me?

19     Q    Do you recognize this email?

20     A    I presume I have seen it, but I don't recognize it in this

21     form.

22     Q    Is gary@byrnepoh.com one of your email addresses?

23     A    It is.

24     Q    Did you search that email address for any communications

25     between Mr. Syed Jaffrey, Mr. Kamal Jaffrey, Mr. Ali Jaffrey?

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                        Cross - Walpert

1    A    I would have, yes.

2    Q    Does this reflect that Mr. Ali Jaffrey is seeking your

3    Social Security number?

4    A    Yes.

5             MS. DENENBERG:  I would like to move this into

6    evidence.

7             MR. BROWN:  No objection.

8             THE COURT:  Defense Exhibit D is received.

9             (Defendants' Exhibit D received in evidence)

10   BY MS. DENENBERG:

11   Q    This is dated April 26, 2013; correct?

12   A    That's correct.

13   Q    It is coming from Mr. Ali Jaffrey at deltasearchlabs.com?

14   A    That's correct.

15   Q    Do you know why it was coming from Mr. Ali Jaffrey at Delta

16   Search Labs?

17            THE COURT:  Sustained.

18            MS. DENENBERG:  I would like to mark another exhibit.

19            THE COURT:  Yes.

20            MS. DENENBERG:  Let us know when you're done reading.

21            THE WITNESS:  Okay.

22   BY MS. DENENBERG:

23   Q    May I turn your attention to the third page of Exhibit E,

24   which has the Bates stamp at the bottom, D-019.

25   A    I see that.

SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

EC24WALH                          Cross - Walpert

```
1    Q    Is that a copy of the $50,000 check that you've been
2    referencing?
3              MR. BROWN:  Objection, your Honor.  Lack of
4    foundation.
5              THE COURT:  May I see the document?
6              Thanks.
7              Can you rephrase the question, Ms. Denenberg.
8    Rephrase the question.
9    BY MS. DENENBERG:
10   Q    Do you recognize this as a $50,000 check made payable to
11   you?
12   A    Yes, I do.
13   Q    This check comes from Delta Search Labs?
14   A    This check has a logo of Delta Search Labs on it, yes.
15   Q    Is this the $50,000 check that Mr. Ali Jaffrey was
16   referencing in his email seeking your Social Security number?
17   A    I'm looking for a reference to $50,000 in Mr. Ali Jaffrey's
18   email, but I don't see it.
19   Q    Did you receive more than one $50,000 check from any of the
20   defendants, or did you only receive one $50,000 check?
21   A    Actually, I never received a $50,000 check, if you're
22   asking if that is something I could hold in my hand.
23   Q    Yesterday you told us you received $50,000 payable under
24   Exhibit 1.
25   A    Yes.
```

EC24WALH                         Cross - Walpert

1    Q   Here's a $50,000 check.  Have you received more than one

2    $50,000 check from any of the defendants?

3              THE COURT:  Sustained.  You have to lay a foundation

4    for these questions.

5    BY MS. DENENBERG:

6    Q   How many $50,000 checks did you receive?

7              THE COURT:  Sustained.

8    BY MS. DENENBERG:

9    Q   The $50,000 check that you referenced yesterday for which

10   you were questioned about your Social Security number, is this

11   the check?

12             THE COURT:  Did you receive a $50,000 check?

13             THE WITNESS:  No, I did not.

14             THE COURT:  All right.

15   BY MS. DENENBERG:

16   Q   So you're saying you never received a $50,000 check?

17   A   I never received a check for $50,000 that one could hold in

18   one's hand.

19   Q   Okay.  Referring to page 3 here, it says at --

20             THE COURT:  Wait a second.  Are you offering Defense

21   Exhibit E?

22             MS. DENENBERG:  I would like to move Exhibit E into

23   evidence.

24             THE COURT:  Any objection?

25             MR. BROWN:  There is no foundation, but there is no

EC24WALH                          Cross - Walpert

1   objection.

2              THE COURT:  All right.  I will receive it because

3   there is no objection.  Defense Exhibit E is received.

4              (Defendants' Exhibit E received in evidence)

5   BY MS. DENENBERG:

6   Q   Continuing to refer to page 3 of Exhibit E, which is Bates

7   stamped D-019, there is handwriting on the back of the check

8   made out to you that says, "For deposit only" with initials.

9   A   Yes.

10  Q   Do you recognize that handwriting?

11  A   No.

12  Q   So back to your testimony from yesterday, did you get a

13  $50,000 check or not?

14             THE COURT:  He testified about two minutes ago that he

15  never received a $50,000 check.

16             MS. DENENBERG:  Oh, okay.

17             THE COURT:  You didn't hear that testimony?  I will

18  ask him again.

19             Did you ever receive a $50,000 check?

20             THE WITNESS:  No.

21  BY MS. DENENBERG:

22  Q   So the testimony yesterday was not correct?

23  A   It was correct, but I don't believe I ever referenced a

24  check yesterday.

25  Q   How did you get the $50,000?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                         Cross - Walpert

1    A    There was a $50,000 deposit to my account.

2    Q    Where did that deposit come from?

3    A    At the time, I presumed it came from Mr. Jaffrey at

4    Wingate.  I still believe that.

5    Q    Okay.  Why wasn't this provided in the course of discovery?

6              THE COURT:  Why wasn't what provided?

7              MS. DENENBERG:  A copy of the bank account.  He is

8    making claims about 50,000.

9              THE COURT:  Did you request bank account information?

10             MS. DENENBERG:  We requested all communications.

11             THE COURT:  This isn't a communication.  Listen to my

12   question and try to answer it.  Did you or predecessor counsel

13   request bank account records from the plaintiff?

14             MS. DENENBERG:  I did not.

15             THE COURT:  How about predecessor counsel?

16             MS. DENENBERG:  I do not know, but I will accept that

17   they probably did not.

18             THE COURT:  All right.  If there was never any request

19   for bank records, why would he have produced them?

20   BY MS. DENENBERG:

21   Q    All right.  So I will ask like this:  How did you provide

22   your bank account information to any of the defendants to get

23   $50,000?

24   A    I provided my bank account information to Mr. Jaffrey,

25   that's Mr. Syed Jaffrey, for purposes of making a deposit.  I

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                          Cross - Walpert

1    don't recall if it was this deposit, but for purposes of making

2    a deposit.

3    Q    How did you provide that information?

4    A    Orally or by text message.

5    Q    The text messages that you did not request?

6              MR. BROWN:  Objection, your Honor.

7              THE COURT:  Sustained.

8    BY MS. DENENBERG:

9    Q    Do you have any proof that this $50,000 was wired to you --

10              THE COURT:  Sustained.  There is no foundation.

11    BY MS. DENENBERG:

12    Q    -- was transferred?

13              THE COURT:  There is no evidence of that, either.  So

14    the objection is sustained.

15    BY MS. DENENBERG:

16    Q    Continuing with Exhibit E, if Mr.-- strike that.

17              Continuing back to Exhibit D, which asks for your

18    Social Security number, was there any other requests that you

19    can recall asking for your Social Security number in connection

20    with a separate $50,000 check or transfer?

21    A    There were other requests for my Social Security number.

22    Q    How come those weren't provided?

23              THE COURT:  No foundation.

24              MS. DENENBERG:  All communications were requested, and

25    there are no other communications.

                SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                         Cross - Walpert

```
 1              THE COURT:  What if it was verbal.  You don't lay a
 2    foundation.  That has been a repeated problem here.  You have
 3    to lay a foundation for your questions.  If there is no
 4    foundation, I have to sustain objections.  You can't assume
 5    that it was in writing.  You have to ask a question, and we get
 6    an answer.  That's called foundation.  That's what you have to
 7    do.  Right?
 8              MS. DENENBERG:  Thank you.
 9              THE COURT:  Will you do that in the future?
10              MS. DENENBERG:  I will do that.
11              THE COURT:  Thank you.
12    BY MS. DENENBERG:
13    Q    How were these other requests for your Social Security
14    number made to you?
15    A    As I recall, either orally or by text message.
16    Q    Is it fair to say that there were no other emails than the
17    one we marked as Exhibit D?
18    A    I don't recall any.
19    Q    Do you know who Ashley Morris is?
20    A    Yes.
21              THE COURT:  I'm sorry?
22              MS. DENENBERG:  Ashley Morris.
23              THE COURT:  M-O-R-R-I-S?
24              MS. DENENBERG:  Yes.
25              THE COURT:  All right.
```

EC24WALH                          Cross - Walpert

1              THE WITNESS:  Yes, I do.

2    BY MS. DENENBERG:

3    Q    Who is Ms. Morris?

4    A    She is a paralegal at Byrne Poh.

5    Q    These emails that have been marked as Exhibit E, do you

6    recall reviewing these?

7              THE COURT:  When?

8              MS. DENENBERG:  I was going to first ask if he

9    recalled reviewing them.

10             Strike that.

11   BY MS. DENENBERG:

12   Q    I note that there is an email gary@byrnepoh.com on this

13   email chain.

14   A    Could you direct my attention to it?

15             Ah.  Are you thinking of the one on page 2?

16   Q    If you will refer to page 22, that is where Ms. Morris'

17   name first comes up on a December 17, 2013 email, with a cc to

18   gary@byrnepoh.

19   A    I see that.

20             THE COURT:  What's the question?

21   BY MS. DENENBERG:

22   Q    This email is referencing an outstanding payment.  Do you

23   recall reviewing these emails?

24   A    Do you now mean all emails in this exhibit or that one

25   particular email?

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                    Cross - Walpert

1   Q   For expediency, let's take all emails.

2   A   I don't recall seeing all these emails, no.

3   Q   Do you recall seeing the December 17th email from Ashley?

4   A   I believe I did.

5   Q   Did you take any action in connection with this email from

6   Ashley?

7   A   Not that I recall.

8   Q   Who is Philip Poh?  Is that the Poh of Byrne Poh?

9   A   It is.

10  Q   Do you know what happened to this $50,000 check that's

11  D-019?

12          MR. BROWN:  Objection, your Honor.  I think we have

13  been over the fact that Mr. Walpert never received the check.

14  I don't know how he could possibly know what happened to it.

15          MS. DENENBERG:  I'm just asking if he knows, because

16  it has a bank statement stamp that it has been cashed.  I'm

17  just asking if he knows what happened to it.

18          THE COURT:  Well, have you ever seen this check

19  before?

20          THE WITNESS:  Not in the original, no.  Only copies

21  such as this one.

22          THE COURT:  Was that through discovery in this case?

23          THE WITNESS:  It was originally through discovery in

24  this case, yes.

25          THE COURT:  So prior to discovery in this case, you

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                        Cross - Walpert

1   never saw this check before?

2            THE WITNESS:  I don't think so, no.

3            THE COURT:  If he never saw the document before, then

4   there is no point in asking him where it was deposited, how it

5   came to be deposited.  His position is that he never saw the

6   check.

7            Let me ask you this, Mr. Walpert:  Understanding you

8   never saw the check, do you know whether this check was

9   deposited in your account?

10            THE WITNESS:  I presume it was.  There was a $50,000

11   deposit in my account.

12            THE COURT:  Okay.  So just to be clear, what you're

13   saying is that the check was endorsed by somebody else because

14   you have testified those aren't your initials on the back of

15   the check?

16            THE WITNESS:  That's correct.

17            THE COURT:  The check was endorsed by somebody else

18   and then somehow deposited in your account?

19            THE WITNESS:  That's correct.

20            THE COURT:  All right.

21            THE WITNESS:  Yes.

22            THE COURT:  I take it at some point you noticed that

23   there was $50,000 more in your bank account; right?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  Did you have any conversations with

EC24WALH                        Cross - Walpert

1   Mr. Jaffrey or anyone associated with these companies about

2   that $50,000 payment?

3           THE WITNESS:  Yes, both before and after.

4           THE COURT:  Right.

5           THE WITNESS:  Before that it was coming; and after,

6   thanks.

7           THE COURT:  And did you speak with Mr. Syed Jaffrey

8   about that or someone else?

9           THE WITNESS:  No, just Syed Jaffrey.

10          THE COURT:  All right.  What did he say to you when

11  you said thanks for the check or thanks for the money?

12          THE WITNESS:  I don't recall now.

13          THE COURT:  Okay.  Go ahead.

14  BY MS. DENENBERG:

15  Q   There has been a lot of discussion about Mr. Syed Jaffrey's

16  immigration status.  Were you aware of Mr. Syed Jaffrey's

17  immigration status prior to 2014?

18  A   I was aware that he was here on a visa, as were a number of

19  his family, and I put him in touch with an immigration lawyer

20  at the firm that I was at.

21  Q   Which firm was that?

22  A   That was Wilmer Hale.

23  Q   Did you have your law firm Byrne Poh involved, your current

24  law firm, Byrne Poh, involved in Mr. Syed Jaffrey's immigration

25  issues?

1  A    Involved, no.  But I think, by mistake, K&L Gates

2  transferred a bunch of immigration files to Byrne Poh at a time

3  when I was leaving K&L.

4  Q    Do you know what Byrne Poh did with those files?

5  A    I believe I returned them either to K&L Gates or to the

6  lawyer who I had introduced Mr. Jaffrey to at Wilmer Hale.

7  Q    Didn't, in fact, Byrne Poh actually open those files and

8  work on them?

9  A    I'm sure they must have opened them to see what they were,

10  but to my knowledge, there is no one at Byrne Poh is competent

11  to work on immigration matters.

12  Q    But nonetheless, you were aware of Mr. Jaffrey's

13  immigration status?

14  A    To the extent that he was on a visa, yes.

15           MS. DENENBERG:  I would like to mark another exhibit,

16  please.

17           THE COURT:  Yes.

18           MS. DENENBERG:  Is this F and G?

19           THE DEPUTY CLERK:  F and G.

20           THE COURT:  All right.  Do we have a question?

21           MS. DENENBERG:  Are you finished reviewing those, sir?

22           MR. BROWN:  Is there a question pending, your Honor?

23           THE COURT:  No.  We're waiting for Mr. Walpert to

24  finish his review of the documents.

25           THE WITNESS:  Thank you.

 1              THE COURT:  Go ahead.

 2    BY MS. DENENBERG:

 3    Q   Referring to Exhibit F, is that what you were just

 4    referencing, the receipt of two immigration files from

 5    K&L Gates?

 6    A   I don't recall how many there were, but these are the

 7    immigration files I think I was referencing, yes.

 8    Q   That email is dated July 24, 2010.

 9    A   That's right.

10    Q   And then referring to Exhibit G, the bottom half, it is

11    again July 24, 2010.  Exhibit F is at 1:53 p.m., and Exhibit G

12    is at 3:10 p.m.

13    A   Excuse me?

14    Q   Towards the bottom of the email.

15    A   Okay.

16    Q   It is from Matt Byrne.  Is that the same Byrne of

17    Byrne Poh?

18    A   Yes, it is.

19    Q   He is emailing you, Gary --

20              THE COURT:  These are not in evidence.

21              MS. DENENBERG:  I'm sorry.  Can I offer these into

22    evidence?

23              MR. BROWN:  No objection.

24              THE COURT:  Defendants' Exhibits F and G are received.

25              (Defendants' Exhibits F and G received in evidence)

EC24WALH                         Cross - Walpert

1   BY MS. DENENBERG:

2   Q    May I draw your attention towards the July 24, 2010,

3   3:10 p.m. ...

4           THE COURT:  All right.  What is the question?

5   BY MS. DENENBERG:

6   Q    Do you see Exhibit G, sir?

7   A    Yes, I do.

8   Q    Matt Byrne notes:  The immigration matters can be set up as

9   general matters.

10  A    I see that sentence.

11  Q    So Byrne Poh retained these files?

12  A    Not to my knowledge, no.

13  Q    Why is Mr. Byrne -- do you know why Mr. Byrne is opening

14  these files as general matters?

15  A    You have to ask Mr. Byrne.  I don't know why he did that.

16  I don't think I had seen these files at this point in time.

17  Q    Do you recall giving Mr. Byrne any other instructions than

18  opening these files as general matters?

19  A    I don't recall giving him any instructions at all.

20  Q    You also did not give him instruction to send the files to

21  K&L Gates?

22  A    I don't recall.

23  Q    Continuing referencing Exhibit G, Mr. Byrne, the first part

24  of his July 24th email says:  Normally we have a rule that no

25  files leave the office so we don't lose them.

1              What is he talking about there?

2              MR. BROWN:  Objection, your Honor.

3              THE COURT:  Sustained.

4    BY MS. DENENBERG:

5    Q   Do you know what he is talking about there?

6              THE COURT:  Sustained.

7    BY MS. DENENBERG:

8    Q   Where did you routinely maintain your files?

9              THE COURT:  Are you talking about him or the firm?

10   BY MS. DENENBERG:

11   Q   Where did you in 2010 routinely maintain your files?

12             THE COURT:  You're talking about the plaintiff?

13             MS. DENENBERG:  Yes.

14   BY MS. DENENBERG:

15   Q   Mr. Walpert, where did you in 2010 maintain your files?

16   A   If they were files that I was working on in connection with

17   work at Byrne Poh, at either Byrne Poh or my home.  If they

18   were files that I was working on in connection with Wingate or

19   any of its activities or Mr. Jaffrey's activities, they would

20   have been in the Wingate offices on Lexington Avenue.

21   Q   Did you check your home office for any files pertaining to

22   any of the defendants?

23   A   Yes.

24   Q   Did you find any?

25   A   I believe I did, yes.

EC24WALH                      Cross - Walpert

1            MS. DENENBERG:  I would like to mark another document

2      as an exhibit.  May I approach?

3            THE COURT:  Yes.

4            All right.  Next question.

5      BY MS. DENENBERG:

6      Q   Are you ready, sir?

7      A   Yes.

8      Q   Document BP35, is this --

9            THE COURT:  This is Defense Exhibit H.

10            MS. DENENBERG:  I'm sorry.

11     BY MS. DENENBERG:

12     Q   Defendants' Exhibit H, do you recognize this as an email

13     from yourself to Matthew Byrne?

14     A   I do, at least the first half of it.

15     Q   Can you read for us what you wrote to Mr. Byrne?

16            THE COURT:  It is not in evidence yet.

17            MS. DENENBERG:  I'm sorry.  Can I move this into

18     evidence.

19            MR. BROWN:  No objection.

20            THE COURT:  Defense Exhibit H is received.

21            (Defendants' Exhibit H received in evidence)

22     BY MS. DENENBERG:

23     Q   Can you read what you wrote to Mr. Byrne on July 2nd, 2012.

24     A   Sure.

25            Hope you are enjoying the vacation.  It is very hot

EC24WALH                         Cross - Walpert

 1  and humid here.  As to Wingate, one small step forward, but I
 2  am planning to do almost nothing for them and concentrate on
 3  the patent practice until a major breakthrough, i.e, money
 4  shows up.  Still not too likely.  I will see you when you get
 5  back.  Best, Gary.
 6  Q    What made you write this to Mr. Byrne?
 7  A    I have no recollection.
 8  Q    Do you know why he was asking you about Wingate, which is
 9  your separate entity?
10  A    I can only guess.
11           THE COURT:  We're not here to guess.
12  BY MS. DENENBERG:
13  Q    Did Mr. Byrne have any involvement with Wingate?
14           THE COURT:  I'm sorry?
15  BY MS. DENENBERG:
16  Q    Did Mr. Byrne or Byrne Poh have any involvement with
17  Wingate?
18  A    Not that I recall.
19           THE COURT:  Next question.
20           MS. DENENBERG:  I'm sorry.  I'm just thinking.
21  BY MS. DENENBERG:
22  Q    Who were the shareholders of Wingate?
23  A    The partners in Wingate are Mr. Byrne and Mr. Poh.
24  Q    No, I asked about Wingate.
25  A    I'm sorry.  I'm sorry.  Excuse me.  The only shareholder I

EC24WALH                        Cross - Walpert

 1   know is Mr. Syed Jaffrey.  There may be others but not that I'm

 2   aware of.

 3   Q   Who were the other shareholders in 2010 when you became

 4   general counsel, when you allegedly became general counsel?

 5   A   Again, Mr. Jaffrey.

 6   Q   One of the defendants we have been calling USDFM.

 7   A   Yes, ma'am.

 8   Q   Who were the shareholders of USDFM?

 9   A   USDFM was an LLC, so the members of the LLC were

10   Mr. Jaffrey, Mr. de Boissezon, Mr. Schneider, Mr. Cross,

11   Mr. Gonzales, and me.

12            THE COURT:  Who was the managing partner?

13            THE WITNESS:  Mr. Jaffrey was the managing partner.

14   BY MS. DENENBERG:

15   Q   So you are suing an entity that you are a member of?

16   A   That's correct.

17   Q   Who is general counsel of USDFM?

18   A   I was or would have been.

19   Q   Or what?

20   A   I was or would have been.  USDFM.

21   Q   You're also suing a party that you're not only a member of

22   but you're also the general counsel of?

23   A   Correct.

24   Q   As the general counsel, weren't you privy to confidential

25   information?


     SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                         Cross - Walpert

1   A   As a member or general counsel, I was privy to confidential

2   information.

3   Q   So you're suing your own client?

4           MR. BROWN:  Objection, your Honor.

5           THE COURT:  Grounds?

6           MR. BROWN:  Argumentative, your Honor.

7           THE COURT:  I'm not sure what the point is,

8   Ms. Denenberg.

9           MS. DENENBERG:  Well, I would request leave to brief

10  the issue, but it seems to me that he's privileged to

11  attorney-client information, he was a member and the general

12  counsel; and now he is violating potentially ethical

13  obligations and canons.

14          THE COURT:  You appear to believe that there is some

15  prohibition against lawyers suing their clients.  I have to

16  tell you it is quite common for lawyers to sue their clients.

17  It happens every day.  You're welcome to brief any and all

18  issues.  But if your point is that there is something unethical

19  about lawyers suing their clients, you're wrong.  To the extent

20  you think it is unusual, you're wrong on that front, too.

21  Lawyers actually commonly sue their clients when they don't

22  pay, which is exactly the situation that is alleged to have

23  occurred here.

24          MS. DENENBERG:  I'm referring, also, to the issue that

25  he was a member of the defendant.  I understand lawyers sue

EC24WALH                    Cross - Walpert

1   their clients all the time and vice versa, clients sue lawyers.

2           THE COURT:  Were you a limited partner?

3           THE WITNESS:  A minority membership.

4           THE COURT:  Minority partner.  It is not at all

5   unusual for minority partners or limited partners to sue the

6   general partner or managing partner.  That is also quite

7   common, also.

8   BY MS. DENENBERG:

9   Q   Was there a written -- for lack of a better term --

10  partnership agreement -- and correct me if I'm using the term

11  wrong -- memorializing the members of USDFM?

12  A   There was an LLC agreement for the members of USDFM, yes.

13  Q   Did you prepare that document?

14  A   No, I did not.

15  Q   Who prepared that document?

16  A   The lawyers at Kaye Scholer.

17  Q   Do you have a signed copy of that agreement?

18  A   I believe I do or did.

19  Q   Did you provide that to your counsel?

20  A   If I had it, it would have been provided to counsel, yes.

21  Q   Do you know if there were multiple drafts of that

22  agreement?

23  A   There were multiple drafts of that agreement, yes.

24  Q   They were all done by Kaye Scholer?

25  A   That's correct.

EC24WALH                         Cross - Walpert

1    Q   Was that done at your direction?

2    A   I supervised it, I guess you might say.  I was the contact

3    person for Kaye Scholer.

4    Q   How was most of the communications with Kaye Scholer

5    conducted?

6    A   That was done by email, typically, or by phone.

7    Q   Did you search for any emails with Kaye Scholer?

8    A   Those emails would have been in my Wingate account or on my

9    Wingate computer, neither of which I have access to.

10   Q   Was there a time that you did have access to the Wingate

11   emails?

12   A   Yes.

13   Q   Let me clarify.  Did you have access to the Wingate email

14   in cooperating with your attorneys to provide discovery?

15   A   No.

16          MS. DENENBERG:  May I mark some exhibits, please?

17          THE COURT:  Yes.

18   BY MS. DENENBERG:

19   Q   Do these emails that have been marked as I, J, and K

20   reflect some of the revisions that were done to form the USDFM,

21   LLC?

22   A   They reflect revisions that were made in the process of

23   forming an understanding of what USDFM, LLC would be like, yes.

24   Q   When was USDFM formed or finalized, created?

25   A   I don't recall the exact date.

EC24WALH                        Cross - Walpert

1   Q    Was it on or around June 2010?

2   A    I just don't recall how close to the date of these

3   documents and these emails the LLC was actually finished and

4   created.

5   Q    At this point in time, were you consulting with Kaye

6   Scholer?

7   A    I'm sure I was, but I have no independent recollection of

8   that at this moment.

9   Q    Can you tell us why Kaye Scholer is not on any of these

10  emails?

11  A    Well, as best I can recollect, it would be because this was

12  something that Syed Jaffrey had to be comfortable with and

13  approve, not to mention the rest of the proposed members.

14  Q    So Kaye Scholer wasn't involved at this time?

15  A    I didn't say that.  No.  No.  I suspect Kaye Scholer was

16  involved at this time.  Looking at the words that are used in

17  these documents, I think Kaye Scholer was involved.

18  Q    And you were the point person for Kaye Scholer; is that

19  fair?

20  A    That's fair.

21  Q    And you don't have any of those email communications at

22  this point?

23  A    Anything I had was given to my attorneys, but most of them

24  would have been in my Wingate account.

25  Q    Does each of the drafts indicate you having a 9.8 percent

EC24WALH                          Cross - Walpert

1    stake in USDFM?

2    A    That's correct.

3    Q    Is that how it played out in the end?

4    A    Yes.  It played out so that Mr. Jaffrey would have a

5    majority share and controlling power, if you will, for the LLC.

6    Q    Does this agreement provide for any salary to any of the

7    principals?

8              THE COURT:  You mean any of the partners?

9              MS. DENENBERG:  I'm using the word "principal" because

10   that's what it says.  We can use "partner."

11             THE COURT:  This is a partnership we're talking about,

12   right, or it is an LLC, I guess.

13             THE WITNESS:  LLC.

14             THE COURT:  All right.  So, "members," I guess, is the

15   right term.  Are we speaking of members?

16             MS. DENENBERG:  Mr. Walpert used the word "members."

17   The agreement itself uses the word "principals."

18   BY MS. DENENBERG:

19   Q    The people listed there that you previously mentioned, does

20   this agreement provide for any salary?

21   A    I don't believe it does.

22   Q    And it does provide compensation to be, I guess, any -- I

23   guess it says here in a bonus pool for later distribution.

24             MR. BROWN:  Objection, your Honor.  If Ms. Devenberg

25   would direct the witness to what she is looking at, I think it

EC24WALH                          Cross - Walpert

1   might be easier.

2          THE COURT:  Yes, can you direct Mr. Walpert's

3   attention to what you're talking about.

4          MS. DENENBERG:  Also, can I move these three exhibits

5   into evidence.

6          MR. BROWN:  No objection, your Honor.

7          THE COURT:  Defense Exhibits I, J, and K are received.

8          (Defendants' Exhibits I, J, and K received in

9   evidence)

10          THE COURT:  Can you direct Mr. Walpert's attention to

11   any portions of the documents you're interested in.

12          MS. DENENBERG:  You know what, withdrawn.

13   BY MS. DENENBERG:

14   Q    There is no salary to any of the principals?

15   A    There is no annual salary listed here.

16          THE COURT:  What's next?

17          MS. DENENBERG:  Sorry?

18          THE COURT:  What's next?

19   BY MS. DENENBERG:

20   Q    I want to refer your attention to what was marked as

21   Exhibits 2 and 3 yesterday.

22   A    I have those.

23   Q    Were these documents generated in connection with the USDFM

24   that we were just talking about, the LLC?

25   A    They were.

EC24WALH                          Cross - Walpert

1    Q    Referring to Exhibit 3, I see initials on the bottom of

2    page 1 of Exhibit 3.

3    A    I see that.

4    Q    Whose initials are those?

5    A    I believe them to be Mr. Jaffrey and Mr. de Boissezon.

6    Q    Turning your attention to Exhibit 2, the one directed to

7    you, how come there are no initials on that one?

8    A    Because this is an outside draft.

9    Q    How come you had a signed draft of Mr --

10   A    De Boissezon?

11   Q    -- de Boissezon but you don't have a signed draft of your

12   own?

13   A    As I testified yesterday, I kept my copy in the office, and

14   the papers that I had in the office were removed and have now

15   disappeared.

16              MS. DENENBERG:  I would like to mark another exhibit.

17              THE COURT:  All right.

18              Next question.

19   BY MS. DENENBERG:

20   Q    Do you recognize that document, sir?

21   A    Yes, I do.

22              THE COURT:  What is the exhibit?

23              MS. DENENBERG:  Exhibit L.

24              THE COURT:  What is Exhibit L?

25              THE WITNESS:  Exhibit L is an unsigned draft of a

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

EC24WALH                    Cross - Walpert

1   employment offer to Mr. Jaffrey to work at USDFM.

2   BY MS. DENENBERG:

3   Q   Do you know who prepared that document?

4   A   Yes, I do.  I did.

5   Q   You prepared that document?

6   A   I did.

7   Q   Do you know if this document was ever signed?

8   A   I believe it was, yes.

9   Q   And you signed that document on behalf of USDFM?

10  A   I'm not certain that I signed it or that Charles

11  de Boissezon signed it or both of us.  I can't recall for sure.

12  Q   Do you know why this one is dated October 21st; whereas,

13  Exhibit 2 and 3 are dated October 26th?

14  A   They are dated, I think, because that is when they were

15  prepared.

16          MS. DENENBERG:  I would like to move Exhibit L into

17  evidence.

18          MR. BROWN:  No objection, your Honor.

19          THE COURT:  Defense L is received.

20          (Defendants' Exhibit L received in evidence)

21  BY MS. DENENBERG:

22  Q   I would like to refer back to that $50,000 check.  I forget

23  which exhibit it was.

24          THE COURT:  I think it is E, Defense Exhibit E.

25          MS. DENENBERG:  Yes, you're right, sir.

EC24WALH                      Cross - Walpert

1   BY MS. DENENBERG:

2   Q    I don't have an exhibit for this, but your attorneys

3   produced Plaintiff's Exhibit 16, the exact same check that I

4   also got pursuant to subpoena from Byrne Poh, which we marked

5   as Exhibit E.

6            MR. BROWN:  Your Honor, I will just note for the

7   record that Exhibit E is Bates-stamped D, which reflects

8   defendants' production, not a Byrne Poh production.  Other than

9   that, I'm not quite sure what Ms. Denenberg is referring to.

10  BY MS. DENENBERG:

11  Q    Do you know where you got this to give it to your

12  attorney?

13           THE COURT:  Where he got what?

14           MS. DENENBERG:  What your attorneys provided as

15  Bates-stamped P16, which is the exact same check that was

16  provided by Byrne Poh.

17           MR. BROWN:  Objection, your Honor.

18           THE COURT:  Sustained.  No foundation.

19  BY MS. DENENBERG:

20  Q    Your attorneys have provided Plaintiff's Exhibit 16 in a

21  discovery response.  Did you give this to your attorney?

22           MR. BROWN:  Your Honor, I don't know how the witness

23  can possibly answer questions about a document that he can't

24  see.

25           THE COURT:  Can you show him the document?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                         Cross - Walpert

 1            MS. DENENBERG:  It was provided by Plaintiff's
 2    counsel.
 3            THE COURT:  I understand it was provided by
 4    plaintiff's counsel.  I'm asking if you can show the witness
 5    the document.  Can you do that?
 6            MS. DENENBERG:  I can show the witness the document,
 7    but it has my handwriting on it.
 8            THE COURT:  All right.  Do you have another version
 9    that you haven't marked up?
10            MS. DENENBERG:  I do not.  I can put a Post-it over
11    what I wrote.
12            THE COURT:  You said it was Defense Exhibit 16 to
13    what?
14            MS. DENENBERG:  That was Defendants' production, so
15    that was Bates-stamped D16 -- no, D something else, but it was
16    provided by plaintiff's counsel as P16.
17            THE COURT:  I'm totally confused.  I don't know what
18    you're talking about.
19            MS. DENENBERG:  All right.
20            THE COURT:  I'm just trying to understand.  I thought
21    that you referred to this -- I thought I heard you say Exhibit
22    16.  Did I mishear you?
23            MS. DENENBERG:  It was Bates-stamped P16.
24            THE COURT:  All right.
25            MS. DENENBERG:  The one that I marked as Exhibit E was

EC24WALH                           Cross - Walpert

 1    from a defendants' disclosure.

 2              THE COURT:  Okay.

 3              MS. DENENBERG:  But I have come to realize, looking

 4    through my notes, that I had missed that this had already been

 5    provided by plaintiff's counsel.  So I just want to ask the

 6    witness where he got it to provide it to his counsel because he

 7    has already testified that he doesn't recall ever seeing this

 8    check.

 9              THE COURT:  Well, was the document that Ms. Denenberg

10    is referring to, was that produced by plaintiff in discovery?

11              MR. BROWN:  Ms. Denenberg has a copy of that document

12    with a plaintiff's Bates stamp.  Obviously, we weren't involved

13    in the production; prior counsel was.  I don't know if they

14    received this from Mr. Walpert or Byrne Poh or someone else.  I

15    can't make any representations about its source.  It is the

16    document with P16 on it.

17              THE COURT:  All right.  So what question is it that

18    you want to ask?

19              MS. DENENBERG:  Well, the production that was provided

20    by plaintiff's counsel indicated that they were documents that

21    they obtained from their client.  They did not indicate that it

22    was pursuant to a subpoena.  And upon information and belief,

23    it was not.  So I want to ask the witness where he got the

24    check in order to give it to his attorneys, considering that he

25    has already testified he never saw it before.

EC24WALH                        Cross - Walpert

1              THE COURT:  That's right, he already has said he has

2     never seen the check before.

3              Having heard what Ms. Denenberg has said about the

4     production, do you want to change your testimony in any way

5     with respect to the $50,000 check that a copy of which is part

6     of Defense Exhibit E?

7              THE WITNESS:  I think what I said is I never received

8     the check.  I never had it.

9              THE COURT:  Right.

10             THE WITNESS:  After the email that is the first

11    page of Exhibit E, I did go -- maybe I saw the check then, as

12    well -- I'm not sure -- but I did go back to my bank and ask

13    for them to track down this deposit.  At some time afterwards,

14    which was during the course of litigation, they did provide me

15    with a copy of what appears to be Defendants' Exhibit 19.

16             MR. BROWN:  Just to clarify, I believe Mr. Walpert is

17    referring to Bates-stamped D19, which is part of Defendants'

18    Exhibit E.

19             Am I correct, Mr. Walpert?

20             THE WITNESS:  Sorry about that.  Yes.

21             THE COURT:  All right.

22    BY MS. DENENBERG:

23    Q   Do you recognize the signature on that check?

24             THE COURT:  Asked and answered.

25             MS. DENENBERG:  I don't think I asked that.

 1            THE COURT:  Are you talking about the signature

 2   endorsement?  Because you most certainly asked about that.

 3            MS. DENENBERG:  No, I guess the payor signature.

 4            THE WITNESS:  I can't say I recognize it, but I

 5   believe it to be Mr. Ali Jaffrey's signature.

 6   BY MS. DENENBERG:

 7   Q   When you went back to your bank to get a copy of this, did

 8   you inquire about any other transactions by any of the

 9   defendants?

10   A   No.

11            THE COURT:  At what point did you go back to the bank?

12            THE WITNESS:  Sometime after this surfaced, this

13   exhibit surfaced.  It was during the course of litigation.

14            THE COURT:  It was during the litigation that you went

15   to your bank?

16            THE WITNESS:  That's right.  Not at the time this

17   occurred.

18            MS. DENENBERG:  I have another exhibit.

19            THE COURT:  Yes.

20            MS. DENENBERG:  I am almost done, I promise.  Famous

21   last words.

22            THE COURT:  This is Defense Exhibit M?  Is that what

23   we're looking at?

24            MS. DENENBERG:  Yes.  I'm sorry.  There are extra

25   pages stapled to it.  It's just the first three pages.

EC24WALH                        Cross – Walpert

1              THE COURT:  All right.

2              MS. DENENBERG:  I'm. sorry.

3    BY MS. DENENBERG:

4    Q    Is this email from your K&L Gates to your Gmail?

5    A    Yes, it is.

6    Q    Did you prepare this Email?

7    A    I did.

8              MS. DENENBERG:  I would like to move Exhibit M into

9    evidence.

10             MR. BROWN:  No objection.

11             THE COURT:  Defense Exhibit M is received.

12             (Defendants' Exhibit M received in evidence)

13   BY MS. DENENBERG:

14   Q    This is dated March 30, 2010.

15   A    That's the date of the email, yes.

16   Q    Why did you prepare this?

17   A    It was the first outline of duties and responsibilities

18   that Mr. Syed Jaffrey and I had talked about.

19   Q    Did you ever show this to anybody?

20   A    I don't recall.

21   Q    Did you copy this for anyone?

22   A    I don't think I did, but I really don't recall.

23   Q    Back to Exhibit Number 1.  That document provides for

24   certain benefits.

25             THE COURT:  Next question.

EC24WALH                         Cross - Walpert

1   BY MS. DENENBERG:

2   Q   Did you ever receive those benefits?

3   A   I'm sorry.  Where are you looking at?

4   Q   I'm referring to Exhibit 1.

5   A   Yes.

6   Q   Health and accident plan, supplemental retirement plan,

7   pension plan.  All under paragraph 4(c).

8   A   I received reimbursements randomly from Mr. Jaffrey, and I

9   had set up a 401K plan for the receptionist we had and,

10  actually, put myself into it, as well, although there were

11  never contributions ever made to it, except $10, which I made

12  to set it up.

13  Q   Who is the receptionist?

14  A   Last name is Liang, I believe; first name, Cindy.

15  Q   Cindy?

16  A   I believe so, yeah.

17  Q   Was Cindy on the payroll?

18  A   She was.

19  Q   Wasn't Cindy the only person who was on the payroll for

20  Wingate?

21  A   She was the only one that was on payroll at Wingate, yes.

22  Q   Now, this agreement also provides that you are to get

23  $2,000 a month no later than the 10th of the month, and I'm

24  referring to paragraph 3(b).

25  A   I see the reference.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                        Cross - Walpert

1   Q   Did you ever get your $2,000 a month?

2   A   I don't believe that that is what this says.

3           THE COURT:  You worked for three years without getting

4   paid?

5           THE WITNESS:  I received $50,000 during this period.

6   BY MS. DENENBERG:

7   Q   From Delta Search Labs?

8   A   No, from Wingate through Delta Search Labs.

9   Q   Did you ever get the health insurance benefits?

10  A   I believe I said I didn't get any of the benefits.

11  Q   What did you do for health insurance benefits during this

12  time that you were working under this agreement?

13  A   During part of the time, I believe, as I recall, it was

14  under COBRA from K&L Gates, and then I joined a health policy

15  plan at Byrne Poh.

16  Q   Did you ever communicate your concern -- were you concerned

17  that you weren't getting any health insurance benefits?

18  A   Not as long as I had health insurance, no.

19  Q   It was okay you paid for it through COBRA?

20  A   It wasn't okay, but it was the way it was.

21  Q   Referring to the first page of this document, Exhibit 1, at

22  the lower left-hand corner, there is a small doc ID number.

23  A   I see that.

24  Q   It is like New York 778639.

25  A   I see that.

EC24WALH                          Cross - Walpert

1    Q    That appears to be similar to the New York footer that we

2    notated in an earlier exhibit.

3    A    Could you identify which exhibit that was?

4         Actually, that was Exhibit B and also Exhibit C.  I'm

5    sorry.  Exhibit A and Exhibit B.

6    Q    Looking at these, does that refresh your recollection as to

7    what that footer means?

8    A    Well, it is a document number, that is what it means, but

9    it doesn't recollect where it came from.

10   Q    Do you know why it is only on page 1 of Exhibit 1 and not

11   on the other pages?

12   A    I do not, no.

13   Q    One more, probably the last exhibit.

14        Have you ever seen this before?

15   A    No, I have not.

16   Q    You're aware that Wingate is a Delaware corporation,

17   though?

18   A    I believe I remember that, yes.

19   Q    Were you aware that Mr. Ali Jaffrey is the sole shareholder

20   and officer of the company?

21   A    I am not aware of that.

22   Q    You're aware that the company was formed in January 2000?

23   A    I don't recall the exact date of the creation.  I was not

24   with the company at that point in time.

25   Q    As the general counsel of Wingate Capital, Inc., did you

1    think it was important to know when the corporation was formed?

2    A    No.

3    Q    Did you think it was important to know who the shareholder

4    and corporate officer was?

5    A    I believe I did know who the shareholder was.

6    Q    And the corporate officer?

7    A    And the corporate officer.

8    Q    Did you check the records with the state of Delaware?

9    A    I did not check the records.

10   Q    As general counsel, you didn't think that was important to

11   check the records of the state of Delaware?

12   A    Not for that purpose.

13            MS. DENENBERG:  No further questions.

14            THE COURT:  Any redirect?

15            MR. BROWN:  Very briefly, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. BROWN:

18   Q    Mr. Walpert, was the $50,000 payment that we have spoken so

19   much about for you personally or for Byrne Poh?

20   A    It was for me personally.

21   Q    Were you entitled to both a salary and a share of

22   management fees as compensation for the work that you did for

23   Mr. Syed Jaffrey?

24   A    I was.

25   Q    Why wasn't your compensation limited solely to a share of

EC24WALH                         Redirect - Walpert

1   the management fees?

2   A    Because that, for me at least, would have been too

3   speculative.  I needed compensation on an ongoing basis; and

4   compensation on an ongoing basis, in my view, at least,

5   ordinarily is not risky.

6            MR. BROWN:  I have nothing further.

7            THE COURT:  Anything else, Ms. Denenberg?

8            MS. DENENBERG:  No, your Honor.

9            THE COURT:  You may step down, Mr. Walpert.

10           I think the only remaining issue is briefing at this

11  point.

12           Ms. Denenberg, you wish to put in additional papers?

13           MS. DENENBERG:  No additional papers, but I do have

14  Mr. Kamal Jaffrey here prepared to testify.

15           THE COURT:  How long do you expect his testimony to

16  take?

17           MS. DENENBERG:  It is difficult to say, your Honor,

18  and I don't know what kind of examination plaintiff's counsel

19  will have.

20           THE COURT:  How long is your direct examination?

21           MS. DENENBERG:  Half an hour.  I don't want to make

22  too many commitments to the Court, though, either.

23           THE COURT:  Let me ask the court reporter how late

24  she's willing to stay.

25           (Discussion off the record)

EC24WALH                    Redirect - Walpert

 1          (Recess)

 2          THE COURT:  All right.  Please call your witness,

 3  Ms. Denenberg.

 4          MS. DENENBERG:  I would like to call Syed Kamal

 5  Jaffrey.

 6   SYED KAMAL HAIDER JAFFREY,

 7      called as a witness by the Defendants,

 8      having been duly sworn, testified as follows:

 9          THE DEPUTY CLERK:  Please state your full name and

10  spell it for the record.

11          THE WITNESS:  My name is Syed Kamal Haider Jaffrey.

12  Syed is S-Y-E-D, Kamal is K-A-M-A-L, and H-A-I-D-E-R.  Last

13  name is Jaffrey, J-A-F-F-R-E-Y.

14          THE COURT:  Please proceed.

15  DIRECT EXAMINATION

16  BY MS. DENENBERG:

17  Q   Where do you currently reside?

18  A   I live in Winchester, on 19 Gerard Road in Winchester.

19  Q   How long have you lived there?

20  A   Almost ten-plus years.

21          THE COURT:  Where is Winchester?

22          THE WITNESS:  In Massachusetts.

23          THE COURT:  Winchester, Massachusetts.

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Go ahead.

EC24WALH                          Direct - Jaffrey

1    BY MS. DENENBERG:

2    Q    Are you a U.S. citizen?

3    A    Yes, I am.

4    Q    Can you briefly tell us about your education, where you

5    went to college and post college.

6    A    I went to school -- I did all my schooling here in the U.S.

7    I went to Arizona State University.  I did my undergraduate in

8    engineering.  Then, I went to Western International University.

9    I did my master's in business administration.  Then I went to

10   ASU.  From there, I went to MIT, where I did my education in

11   biotechnology.  I also attended Harvard and I am a

12   professional, I'm a PE.

13   Q    Are you currently employed?

14   A    Yes, I am.

15   Q    Where are you employed?

16   A    I am employed at Delta Search Labs.

17   Q    What do you do for Delta Search Labs?

18   A    I'm the CEO, chief executive officer.

19   Q    Are there any other officers?

20   A    Yes.  We have a CFO, and his name Syed Ali Jaffrey; and a

21   COO, chief operating officer, Syed Hasan Jaffrey.  For some

22   time, from 2010 to 2011, Syed Razi Haider Jaffrey, SJ, and he

23   was our chief strategic commercialization officer.

24   Q    You mentioned the CFO is Ali Jaffrey?

25   A    Yes, he is.

EC24WALH                          Direct - Jaffrey

1    Q    Is that your brother Ali?

2    A    Yes, he is.

3    Q    Is he a U.S. citizen?

4    A    Yes, he is a U.S. citizen.

5    Q    Does he reside in Winchester, Massachusetts, as well?

6    A    Yes.

7    Q    You mentioned a COO, Hasan Jaffrey.

8    A    Yes.

9    Q    Is he a U.S. citizen?

10   A    Yes, he is.

11   Q    Does he reside in Winchester, Massachusetts?

12   A    Yes.

13   Q    And Syed Razi Jaffrey -- strike that.

14        What is the business of Delta Search Labs?

15   A    Delta Search Labs' model is to do inventions, and it

16   performs research for the government, and it performs research

17   for private entities and also develops its own technologies.

18   And the business model is basically to develop these new

19   technologies, create IP, and then launch new companies and

20   entities and make revenue from that.

21   Q    Your brother Syed Razi Jaffrey, does he work for the

22   company?

23   A    He worked for a short while when we invited him on L1 visa,

24   from 2010, I think it was, 2011 or '12.

25   Q    Did there come a time that his visa expired?

EC24WALH                    Direct - Jaffrey

1   A    Yes.

2   Q    Is he still involved with the company?

3   A    Not directly.

4   Q    Where does he currently reside?

5   A    In Europe.

6   Q    Is he in London?

7   A    London, yes.

8   Q    When was the last time you spoke with him?

9   A    Couple of days ago.

10  Q    Was there a time that you spoke to him about this case?

11  A    Yes.

12  Q    Did you talk about his potential deposition in this case?

13  A    Yes.

14           THE COURT:  Sustained.  It is hearsay.

15  BY MS. DENENBERG:

16  Q    What did you talk about with your brother?

17           THE COURT:  That is sustained.  It is hearsay.

18  BY MS. DENENBERG:

19  Q    Are you familiar with USDFM, one of the defendants here?

20  A    I've heard about it.

21  Q    What is your understanding of the business of USDFM?

22           THE COURT:  Sustained.

23           MR. BROWN:  Objection.

24           THE COURT:  Sustained.

25

EC24WALH                          Direct - Jaffrey

1   BY MS. DENENBERG:

2   Q   Do you know what the business of USDFM is.

3   A   To --

4           MR. BROWN:  Objection.  The answer is going to contain

5   hearsay, I believe.

6           THE COURT:  You need to lay a foundation.

7   BY MS. DENENBERG:

8   Q   Have you ever worked with USDFM?

9   A   No.

10  Q   Are you familiar with a company Wingate Capital, Inc.?

11  A   Yes, I am.

12  Q   What is your understanding of the business -- do you know

13  what the business of Wingate Capital, Inc. is?

14  A   Yes.

15  Q   And what is the business of Wingate Capital, Inc.?

16          MR. BROWN:  Objection, your Honor.  Lack of

17  foundation.

18          THE COURT:  Sustained.

19  BY MS. DENENBERG:

20  Q   In what context have you worked with Wingate Capital --

21          THE COURT:  Sustained.  There is no foundation.  He

22  hasn't testified that he worked with Wingate Capital.

23  BY MS. DENENBERG:

24  Q   Have you ever worked with Wingate Capital, Inc.?

25  A   Yeah, we collaborated with Wingate Capital, yes.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

EC24WALH                          Direct - Jaffrey

1   Q    When you say you "collaborated," what do you mean?

2   A    Basically, Wingate provided the initial funding and the

3   funding for our lab projects.  And also, there responsible for

4   commercialization of our product.

5   Q    Do you know whether there are any shareholders of Wingate

6   Capital, Inc.?

7               MR. BROWN:  Objection, your Honor.

8               THE COURT:  Sustained.

9   BY MS. DENENBERG:

10  Q    Are you a shareholder of Wingate Capital, Inc.?

11  A    No, I am not.

12  Q    Are you an officer of Wingate Capital, Inc.?

13  A    No, I am not.

14  Q    Are you familiar with the plaintiff, Gary Walpert?

15  A    Yes.

16  Q    How are you familiar with him?

17  A    I have interacted with him as an IP attorney from Wilmer

18  Hale and K&L Gates, and Byrne Poh.  That was our relationship.

19  Q    How did you first come to meet him?

20  A    For intellectual property transactions and filing new

21  patents.

22  Q    How did you first come to meet him?  Who introduced you?

23  A    It was the law firm when I was interacting with Wilmer Hale

24  at that time, and he was the contact, Syed Jaffrey.

25              THE COURT:  Now, when you say "Syed Jaffrey," which

1 | brother do you mean?

2 |       THE WITNESS:  Syed Razi Jaffrey.

3 |       THE COURT:  Okay.  Go ahead.

4 |       MS. DENENBERG:  Your Honor, my client frequently

5 | refers to him as SJ.  For clarification, is it okay if we use

6 | SJ?

7 |       THE COURT:  As long as it is understood that SJ refers

8 | to Syed Razi Haider Jaffrey.

9 |       THE WITNESS:  Yes.

10 |       THE COURT:  Okay.  Then we can refer to him as SJ.

11 |       Go ahead, Ms. Denenberg.

12 | BY MS. DENENBERG:

13 | Q   Did you ever socialize with Mr. Walpert?

14 | A   Not -- no, not -- define "socialization" here.  I have

15 | never been to parties with him or anything.  Just mostly it was

16 | like professional relationship.

17 | Q   When you first met him, he was working at Wilmer Hale, you

18 | said?

19 | A   Yes.

20 | Q   Did you work with him when he went to K&L Gates?

21 | A   Yes.  Because he moved all of our files from Wilmer Hale to

22 | K&L Gates.

23 | Q   Did you work with him at Byrne Poh?

24 | A   Yes.

25 | Q   In what context did you work with him at Byrne Poh?

EC24WALH                        Direct - Jaffrey

1    A    Intellectual property, IP, patents, that's it.  That's his

2    expertise.

3    Q    Do you know why he left Wilmer Hale for K&L Gates?

4              MR. BROWN:  Objection.

5              THE COURT:  Sustained.

6    BY MS. DENENBERG:

7    Q    When he left Wilmer Hale, how did you come to learn he was

8    leaving Wilmer Hale?

9    A    He told me that he's going to leave Wilmer Hale and he is

10   going to a new law firm, K&L Gates, and informed us as a

11   company.  And he asked us, can he move the stuff from Wilmer

12   Hale to K&L Gates, our intellectual property materials, and we

13   agreed, yes.

14   Q    Did there come a time that you learned that he left

15   K&L Gates?

16   A    He informed us.  It was more like a surprise.

17   Q    Why do you say it was a surprise?

18   A    He said that he is moving to a small law firm.

19   Q    What law firm was that?

20   A    Byrne Poh.

21   Q    Did you work with him at Byrne Poh?

22   A    Excuse me?

23   Q    Did you work with him at Byrne Poh?

24   A    Yes.

25   Q    What type of work did you do with him there?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                          Direct - Jaffrey

1    A    Intellectual property, patent applications, copyrights.

2    Q    Did he ever do any employment work for Delta Search Labs?

3    A    No.  I don't recall.

4    Q    Did he do any contractual work for Delta Search Labs?

5    A    No.

6    Q    Do you know if he did any legal work for USDFM?

7              MR. BROWN:  Objection, your Honor.

8              THE COURT:  You got to lay a foundation.  The

9    testimony was he has never worked with USDFM.  So there is

10   utterly no foundation for the question, do you know whether he

11   did legal work for USDFM.

12   BY MS. DENENBERG:

13   Q    Do you know if he did any legal work for Wingate Capital,

14   Inc.?

15             MR. BROWN:  Objection, your Honor.  There is no

16   foundation.

17             THE COURT:  You got to lay a foundation.

18   BY MS. DENENBERG:

19   Q    Do you know who the employees of Wingate Capital were?

20   A    Yes.

21   Q    And who were the employees of Wingate --

22             MR. BROWN:  Objection, your Honor.  I think we need to

23   know the basis of his knowledge before he can testify.

24             MS. DENENBERG:  I will adopt that.

25

EC24WALH                        Direct - Jaffrey

1    BY MS. DENENBERG:

2    Q    What is the basis of your knowledge of the employees of

3    Wingate?

4    A    Interaction with Wingate because we worked with Wingate,

5    and Ali Jaffrey was with Wingate, and there was only one

6    secretary at that time, Lilia, that I remember.

7    Q    Where was the offices -- where are the offices of Delta

8    Search Labs today?

9    A    In Cambridge, Massachusetts.

10   Q    How long have they been in Cambridge?

11   A    Almost 14 years, right from inception.

12   Q    When Mr. Walpert left Wilmer Hale, do you know what

13   happened with the Delta Search Labs files that he was working

14   on?

15   A    I was told that they were all moved from Wilmer Hale.

16   Intellectual property files and some of their files were moved

17   from Wilmer Hale to K&L Gates.

18   Q    When he left K&L Gates, do you know what happened to the

19   physical files of Delta Search Labs?

20   A    I remember that Gary told me that some of the files were

21   moved to Byrne Poh, and some of the files were sent to his home

22   address and were left in the snow, and I was very surprised why

23   the stuff was sent to his home.

24   Q    Have you had any discussions with SJ regarding being

25   deposed in this case?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

EC24WALH                     Direct - Jaffrey

1          MR. BROWN:  Objection, your Honor.  Asked and answered

2     and hearsay.

3          THE COURT:  It is hearsay.  Sustained.

4     BY MS. DENENBERG:

5     Q    Did you say anything to SJ about being deposed in this

6     case?

7     A    I phoned them, about two weeks ago we were called to show

8     up in --

9          MR. BROWN:  Objection, your Honor.  There is hearsay

10    within his answer.

11         THE COURT:  I don't know where it is going.  I mean

12    the question was what he said to SJ, the defendant in the case.

13         MR. BROWN:  If I might, your Honor, I agree, but I

14    believe he began his answer by, I was called a few weeks ago

15    and told, which to me is classic hearsay.

16         THE COURT:  It certainly sounds like it.  I don't

17    think it was responsive to the question.  I will sustain that,

18    and I'm going to sustain the objection to that answer.

19         Maybe you can ask the question again and try to

20    emphasize that what you're seeking is what this witness said

21    and not what was said to him.

22         MS. DENENBERG:  I think the witness may have been

23    referring to our own conversation.

24         The Court is not interested in what you and I have

25    discussed about appearing here.

EC24WALH                        Direct - Jaffrey

1    BY MS. DENENBERG:

2    Q    What I am asking is, did you say anything to SJ about

3    appearing -- strike it.

4            Have you ever been to the headquarters of Wingate

5    Capital, Inc.?

6    A    What time frame?

7    Q    Where are the headquarters of Wingate Capital, Inc. today?

8    A    Technically, in Massachusetts.  Technically.  But in the

9    past was in New York.

10   Q    Do you know the address?

11   A    The current address or the old address?

12   Q    Do you recall the address?

13           THE COURT:  No, he said:  The current address or the

14   old address?

15   BY MS. DENENBERG:

16   Q    I'm sorry.  The address in New York.

17   A    I don't remember the exact address.  It used to be like a

18   Regis facility, like back in 2001 to 2007 or something.

19   Q    Do you know where it was located in 2010?

20   A    I have heard about it.

21           THE COURT:  We don't want to hear what you've heard

22   about.  So the answer is "no."

23           THE WITNESS:  New York City.

24   BY MS. DENENBERG:

25   Q    Were you here in New York City for the court appearance

EC24WALH                    Direct - Jaffrey

 1   that was originally scheduled for November 13th?

 2   A   Yes.

 3   Q   And who were you with?

 4   A   Ali Jaffrey.

 5           MS. DENENBERG:  No further questions.

 6           THE COURT:  All right.  Anything, Mr. Brown?

 7           MR. BROWN:  If I might, may I have a brief two minutes

 8   to consult with my client?

 9           THE COURT:  Sure.

10           (Pause)

11           MR. BROWN:  Your Honor, if I may.

12           THE COURT:  Yes, please.

13   CROSS-EXAMINATION

14   BY MR. BROWN:

15   Q   Mr. Jaffrey, have you ever been to a Wingate office at

16   610 Lexington Avenue here in New York City?

17   A   Never.

18   Q   You mentioned in your direct examination that Mr. Walpert

19   did some work for Delta Search Labs.  Do you recall that

20   testimony?

21   A   Yes.

22   Q   And you indicated that that work was in the area of

23   intellectual property; correct?

24   A   Yes.

25   Q   Were you aware that Mr. Walpert did work in other areas for

EC24WALH                          Cross – Jaffrey

1    Delta Search Labs?

2    A    From Byrne Poh?  No.  But he helped us as a friend in

3    different matters, but only intellectual property.

4    Q    Mr. Jaffrey, while you were at Delta Search Labs, was there

5    an insurance claim by Delta Search Labs for damage to property?

6              MS. DENENBERG:  Objection, your Honor.

7              THE COURT:  Grounds?

8              MS. DENENBERG:  First of all, it is beyond the direct;

9    and second of all, it is not even part of the complaint.

10             THE COURT:  Overruled.

11             THE WITNESS:  Yes.

12   BY MR. BROWN:

13   Q    And was there a dispute with the insurance company over how

14   much it would pay in connection with that claim?

15   A    There was no dispute.  We filed the claim.

16   Q    Did you ultimately have to retain attorneys to help you

17   resolve that claim?

18   A    Yes.

19   Q    Did Mr. Walpert assist you in working with those attorneys

20   in resolving that claim?

21             MS. DENENBERG:  Continuing objection.  It is also

22   presuming that the claim is resolved.

23             THE COURT:  Can you rephrase?

24   BY MR. BROWN:

25   Q    Was that claim ultimately resolved?

1   A    Not yet.

2   Q    During the efforts to resolve it, was Mr. Walpert involved

3   in assisting Delta in resolving it?

4           MS. DENENBERG:  Continuing objection.  It is way

5   beyond the direct, way beyond the complaint.  It is an ongoing

6   claim that is totally irrelevant.

7           MR. BROWN:  With all due respect, your Honor, she

8   specifically asked the witness about the nature of the legal

9   work Mr. Walpert did for Delta, and I am exploring that very

10  area.

11          THE COURT:  It is clearly not beyond the scope of

12  direct.  It is clearly relevant.  The objection is overruled.

13          Answer the question.

14          THE WITNESS:  He provided some assistance.

15  BY MR. BROWN:

16  Q    Do you know who asked him to provide that assistance?

17  A    I don't, but he was aware of the situation.

18  Q    And wasn't he available, sir, because your brother SJ made

19  him available to you for assistance in situations like this?

20          MS. DENENBERG:  Objection.  This is getting to the

21  same hearsay.

22          THE COURT:  Overruled.  Anything that Mr. Syed Jaffrey

23  said is an admission.  It is not hearsay by definition.

24          THE WITNESS:  He never directly said, but I start

25  seeing Gary's involvement in the case because he is known as a

EC24WALH                        Cross - Jaffrey

1    friend for long time.

2    BY MR. BROWN:

3    Q   At some point -- strike that.

4           Were you familiar with a man named Mr. Hussain

5    al-Shibib?

6    A   Excuse me?

7    Q   Do you know a man named Mr. Hussain al-Shibib?

8           MS. DENENBERG:  Objection.  Again, beyond the scope of

9    the direct.

10          THE COURT:  Overruled.

11          THE WITNESS:  I know his name.  I maybe met him once

12   or twice.  That's it.

13   BY MR. BROWN:

14   Q   Isn't it true, sir, that Mr. al-Shibib sued you, among

15   others, for failure to be paid by Ovalia Resorts?

16          MS. DENENBERG:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  I don't recall that.

19          THE COURT:  You don't know whether he sued you or not?

20          THE WITNESS:  Not personally.

21   BY MR. BROWN:

22   Q   Let me see if I can refresh your recollection, sir.  Let me

23   show you what we'll mark as Plaintiff's Exhibit 5 for

24   identification.

25          May I approach, your Honor?

EC24WALH                        Cross – Jaffrey

1           THE COURT:  Yes.

2   Q   Mr. Jaffrey, are you the Syed Ali M. Jaffrey who is listed

3   as the second-to-the-last defendant in this complaint?

4   A   No, I'm not.

5   Q   You're not.  Who is that?

6   A   My brother, Ali.

7   Q   My apologies.

8           The Delta Search Labs that's listed as the fourth

9   defendant was the company that you testified you are the CEO

10  of; correct?

11  A   That's correct.

12  Q   And were you aware that Mr. al-Shibib sued Delta Search

13  Labs, among other entities, for nonpayment of his wages?

14  A   He did, but I don't remember this thing.

15  Q   Are you aware, sir, that Mr. Walpert assisted the

16  defendants in responding to this claim by Mr. al-Shibib?

17  A   I don't know.

18          MS. DENENBERG:  Objection.  I don't think there's

19  foundation for that, either.

20          THE COURT:  I'm sorry.  Could you repeat the question?

21          MR. BROWN:  Sure.  My question, your Honor, was:  Is

22  he aware that Mr. Walpert assisted the defendants in defending

23  this claim?

24          THE COURT:  Could you rephrase the question?

25

EC24WALH                       Cross - Jaffrey

1    BY MR. BROWN:

2    Q   Who handled the defense of this claim for Delta Search

3    Labs?

4    A   I don't remember that.

5    Q   I'm sorry?

6    A   I don't remember.

7            THE COURT:  You're the CEO of the company, and you

8    don't remember who handled this piece of litigation against

9    your company?

10   A   Yes, because I have nothing to do with Hussain al-Shibib,

11   and I was not aware of this.  This was handled by Wingate and

12   the other companies.  So we were not involved in this directly.

13   Q   Mr. Jaffrey, is it true as alleged in paragraph 13 of this

14   complaint by Mr. al-Shibib that he was paid by Delta Search

15   Labs for work he did for Ovalia Resorts?

16   A   We need to look at the accounting books.  I don't remember

17   this.

18           THE COURT:  Do you have any reason to doubt the

19   statement in this paragraph 13 of the complaint that he was

20   paid by Delta Search Labs?

21           THE WITNESS:  I don't remember because I never

22   interacted with Hussain al-Shibib.

23           THE COURT:  You never interacted with who?

24           THE WITNESS:  This gentleman.

25           THE COURT:  Mr. Hussain al-Shibib?

EC24WALH                    Cross - Jaffrey

1              THE WITNESS:  Mr. Hussain al-Shibib, yes.

2    BY MR. BROWN:

3    Q    Was it standard practice, Mr. Jaffrey, for payments to be

4    made by Delta Search Labs to employees of other companies

5    associated with the Jaffrey family?

6              MS. DENENBERG:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  Delta Search Labs maintains its own

9    payroll accounts.  So we don't do this.  I don't know what

10   you're asking for, sir.  I don't understand.

11   BY MR. BROWN:

12   Q    You've told me, sir, that you don't recall whether

13   Mr. al-Shibib was paid by Delta.  I'm asking you whether, as a

14   general matter, other employees of different companies

15   associated with your brother were paid through Delta Search

16   Labs?

17   A    I don't remember, and I only know -- we only pay people who

18   work for Delta Search Labs or interacted with Delta Search

19   Labs.

20   Q    You've told us, am I correct, sir, that Mr. al-Shibib, to

21   your knowledge, did not interact with Delta Search Labs?

22   A    Yes, directly.

23   Q    Did he interact indirectly with Delta Search Labs?

24             MS. DENENBERG:  Note my objection.

25             THE COURT:  Overruled.

1          THE WITNESS:  Define "indirectly."

2   BY MS. DENENBERG:

3   Q    Sir, I'm following up on your answer.  Your answer was he

4   didn't interact directly, and I'm trying to find out if he

5   interacted in some other way than directly.

6   A    No.

7          THE COURT:  You said you met this fellow al-Shibib a

8   couple of times.  Under what circumstances did you meet him?

9          THE WITNESS:  Just for dinner or something.  He came

10  to town, and I just met him once or twice.  That's it.

11  BY MR. BROWN:

12  Q    Did you know him as an employee of Ovalia Resorts,

13  Incorporated?

14  A    Excuse me?

15  Q    Did you know that he worked for Ovalia Resorts,

16  Incorporated?

17  A    He worked for -- I don't know the exact thing where he

18  worked.  I know he worked for one of the companies.

19  Q    Is Ovalia Resorts a company that you've heard of before?

20  A    Yes.

21  Q    How do you know of that company?

22  A    Basically, from my brother, and I was not involved in any

23  of the Ovalia affairs.

24  Q    When you say from your brother, can you specify which

25  brother.

1   A   SJ.

2   Q   SJ.   Thank you.

3           Am I correct that you don't know whether Mr. al-Shibib

4   was an employee of Ovalia Resorts or not?

5   A   I don't know the details.

6   Q   You know he worked with one of your brother's companies?

7   A   That's correct.

8   Q   But not which one?

9   A   That's correct.

10          MR. BROWN:  Your Honor, I would move Defendants'

11  Exhibit 5 into evidence.

12          THE COURT:  Is there an objection?

13          MS. DENENBERG:  The objection would be that this is a

14  complaint from Mississippi, and it is just the allegations of

15  the plaintiff.  Clearly, it is not necessarily factual.  It is

16  allegations contained in the complaint.

17          THE COURT:  It is a public record.  Even if it wasn't

18  received in evidence, I could take judicial notice of it

19  because it is a public record.  I don't think it is being

20  offered for the truth of all of the statements in it.

21          Is it, Mr. Brown?

22          MR. BROWN:  No, your Honor, it is not.

23          THE COURT:  Then I will receive it.  Is it Defense

24  Exhibit 5?

25          MR. BROWN:  It is, your Honor.  I'm sorry.

EC24WALH                          Cross - Jaffrey

1    Plaintiff's Exhibit 5.

2              THE COURT:  Plaintiff's Exhibit 5, I will receive it,

3    not for the truth of the matters asserted in it, but as a

4    public record.

5              (Plaintiff's Exhibit 5 received in evidence)

6    BY MR. BROWN:

7    Q   Mr. Jaffrey, are you aware of a man with the last name

8    Alkazi.

9    A   Yes.

10             THE COURT:  Can you spell that for the court reporter.

11             MR. BROWN:  A-L-K-A-Z-I.

12             THE COURT:  Is that hyphenated?

13             MR. BROWN:  It is not.

14             THE COURT:  Okay.

15   BY MR. BROWN:

16   Q   Is Mr. Alkazi a long-time family friend of the Jaffrey

17   family?

18   A   Yes.

19   Q   At some point in time did Mr. Alkazi make some allegations

20   against Delta Search Labs?

21   A   No.  Not directly.  Not directly.

22   Q   Isn't it true that, in fact, that Mr. Alkazi wrote an email

23   to you saying that Delta Search Labs was guilty of what

24   amounted to misappropriation of some intellectual property

25   he --

EC24WALH                        Cross - Jaffrey

1            MS. DENENBERG:  Counsel is reading from the email that

2     hasn't been offered into evidence.

3            THE COURT:  Counsel can read from anything he wants to

4     and ask him a question.  He can read from the phone book, if he

5     wants to.

6            Repeat the question.

7     BY MR. BROWN:

8     Q   Isn't it true, sir, that Mr. Alkazi wrote an email to you

9     that accused Delta Search Labs of misappropriating some

10    inventions that he had developed?

11    A   You'll have to show me that email, please.

12    Q   I would be happy to.

13           THE COURT:  You don't remember as you sit there today

14    whether you ever got an email from Mr. Alkazi making claims of

15    misappropriation?  You don't remember that?

16           THE WITNESS:  I got a lot of emails from him, and he

17    sent me angry emails, as well.

18    BY MR. BROWN:

19    Q   Mr. Jaffrey, I'm giving you what we have marked as

20    Plaintiff's Exhibit 6 for identification.  Is that, in fact, an

21    email that you received on or about April 19th of 2012?

22    A   Yes.

23           MR. BROWN:  Your Honor, I would move this into

24    evidence.

25           MS. DENENBERG:  I'm just trying to read it.  I didn't

EC24WALH                          Cross - Jaffrey

 1   bring my reading glasses.

 2              I'll just note my objection.  There is a lot of detail

 3   and a lot of irrelevant material.  It is also written super

 4   tiny, so I'm having trouble reading it.

 5              THE COURT:  What is the relevance, Mr. Brown, of

 6   Plaintiff's Exhibit 6?

 7              MR. BROWN:  As I will develop, Mr. Walpert assisted

 8   Delta Search Labs responding to these allegations.

 9              THE COURT:  I'm not receiving Plaintiff's Exhibit 6

10   for its truth but, rather, in connection with the claim that

11   Mr. Walpert has made that he provided legal services to the

12   Jaffreys in a variety of ways.  On that basis, Plaintiff's

13   Exhibit 6 is received.

14              MR. BROWN:  Thank you.

15              (Plaintiff's Exhibit 6 received in evidence)

16   BY MR. BROWN:

17   Q   Mr. Jaffrey, isn't it, in fact, true that Mr. Walpert

18   assisted Delta in responding to the allegations from

19   Mr. Alkazi?

20   A   Yes, because he is an intellectual property attorney, and

21   he is aware of the technologies developed in the lab, and there

22   was allegations that we took his technology, which is not

23   correct.  The stuff was developed inside our labs.  This

24   project was developed.

25   Q   In answer to my question, this was, in fact, a legal matter

EC24WALH                          Cross - Jaffrey

 1   that Mr. Walpert assisted you with; correct?

 2             MS. DENENBERG:  Note my objection to a legal matter.

 3             THE COURT:  Overruled.

 4             THE WITNESS:  It was a typical matter that

 5   intellectual property lawyers work from Byrne Poh.

 6   BY MR. BROWN:

 7   Q   When you told us before, sir, that Mr. Walpert had assisted

 8   you with intellectual property type matters, this was one of

 9   the matters you were referring to?

10   A   Yes.

11   Q   Did the law firm of Ropes & Gray also provide services to

12   Delta Search Labs?

13   A   Yes.

14   Q   Did the law firm of Ropes & Gray allege that it wasn't paid

15   in full for the services it provided?

16   A   Actually, they were paid before, and they were paid

17   intermittently, but at the last, they were not paid for certain

18   services they provide for Chubb, claims and some other matters.

19   Q   And did they threaten to sue Delta Search Labs if they

20   weren't paid what they claimed they were owed?

21   A   Yes.

22   Q   Wasn't Mr. Walpert asked to negotiate with them to try to

23   resolve this dispute?

24   A   Mr. Walpert was always involved as an IP guy from my side

25   during our project developments.  So he was aware of the

EC24WALH                          Cross - Jaffrey

1    situation.

2              THE COURT:  You got to listen to the question and try

3    to answer the question.  Listen to the question.  Try to answer

4    the question.  The question was:  Did Mr. Walpert assist Delta

5    Search Labs in connection with Ropes & Gray's threat to sue for

6    legal fees?  That's the question.  What's the answer?

7              THE WITNESS:  The answer is partially, yes.

8              THE COURT:  And could you explain want you mean by

9    "partially, yes"?

10             THE WITNESS:  Because I was also talking to the law

11   firm directly.

12             THE COURT:  All right.  So both you and Mr. Walpert

13   were talking to Ropes & Gray about this dispute over legal

14   fees?

15             THE WITNESS:  That's correct.

16             THE COURT:  Okay.

17             THE WITNESS:  Yes, sir.

18   BY MR. BROWN:

19   Q   In around November of 2012, did the Commonwealth of

20   Massachusetts, Office of the Attorney General, raise some

21   issues with Delta Search Labs about payment to its employees?

22   A   I don't remember --

23             MS. DENENBERG:  Objection.  Delta Search Labs isn't

24   even a defendant.  So what would a Massachusetts issue with

25   Delta Search Labs have anything to do with this case?

EC24WALH                          Cross - Jaffrey

1           THE COURT:  Well, the allegation is that Delta Search

2    Labs was funneling money through Wingate and that was a pattern

3    and practice.  That's the allegation.  Right?

4           MR. BROWN:  The additional allegation, your Honor, is

5    that at Mr. Syed Jaffrey's request, Mr. Walpert performed

6    services for all the various Jaffrey companies for which he is

7    entitled to compensation.

8           MS. DENENBERG:  And Delta Search Labs paid him

9    $50,000.

10          THE COURT:  You just told me Delta Search Labs doesn't

11   have anything to do with this case.

12          MS. DENENBERG:  No, no, no.

13          THE COURT:  Your adversary has explained why it is

14   central to the case, and now I want to hear your response.

15          MS. DENENBERG:  Because now he is talking about some

16   issue with Massachusetts, the state.  I don't see what that has

17   to do -- and that's completely --

18          THE COURT:  Well, I assume based on the prior record

19   that it is going to turn out to be the case that Mr. Walpert

20   provided some assistance in that regard.  Is that where this is

21   headed?

22          MR. BROWN:  That is, your Honor.

23          THE COURT:  Go ahead.

24   BY MR. BROWN:

25   Q   Mr. Jaffrey, isn't it correct that the Massachusetts

EC24WALH                          Cross - Jaffrey

1    Attorney General undertook an investigation of Delta for

2    nonpayment of payroll taxes?

3    A   For payroll taxes?  You got to ask that question again.

4    Q   Sure.  Rather than characterizing it, let me show you what

5    we'll mark as Plaintiff's exhibit 7 for identification.

6              Mr. Jaffrey, is Plaintiff's Exhibit 7 a letter that

7    was sent to you by the Office of the Attorney General of the

8    Commonwealth of Massachusetts on or about November 5, 2012?

9    A   Yes, I can see that, yeah.

10   Q   Is that letter seeking documents and other information from

11   Delta Search Labs?

12   A   Yes.

13   Q   And isn't it true, sir, that Mr. Walpert was asked to speak

14   to the Office of the Attorney General about this request?

15   A   There was another attorney, but yes, he also spoke to the

16   people.

17   Q   Do you know who asked Mr. Walpert to speak with the Office

18   of the Attorney General about this matter?

19   A   I don't remember exactly the request.

20   Q   Was it your brother SJ who asked him to do that?

21   A   I don't remember that, sir.

22             THE COURT:  Did you ask him to help you with it?

23             THE WITNESS:  I informed him because Gary -- I'm

24   sorry -- Mr. Walpert is our intellectual property attorney --

25             THE COURT:  I know, you have said that a number of

EC24WALH                    Cross - Jaffrey

1    times, but this isn't an intellectual property matter.  They're

2    making an allegation that you're not paying payroll taxes.

3    This isn't IP.  There is no intellectual property inquiry going

4    on here.  It is an inquiry about whether you're violating

5    Massachusetts law with respect to the wage and hour.  That's

6    what the letter is about.  My question to you is whether you

7    asked Mr. Walpert to help you deal with this issue that was

8    raised by the Massachusetts Attorney General's Office.

9              THE WITNESS:  I informed him.  I informed him because

10   he was aware of the situation in the lab after the flooding in

11   2010.

12   BY MR. BROWN:

13   Q    How did you know he was aware of that situation?

14   A    Because he was working as an intellectual property lawyer.

15   He used to visit our lab, and he was aware of all the

16   situation, and we were interacting with these other law firms

17   in the past, K&L Gates, so he introduced me to other lawyers

18   there, as well.  When he moved from K&L Gates to the other

19   company, he moved our account with him.  Basically, as a

20   lawyer, my intellectual property lawyer, because there was a

21   lot of intellectual property damaged during the flooding in the

22   lab --

23             THE COURT:  I'm completely confused.  This doesn't

24   have anything to do with an insurance claim.

25             Have you read this letter?  Have you seen this letter

EC24WALH                          Cross – Jaffrey

1    before?  It is addressed to you.

2              THE WITNESS:  Yes, sir.  I don't remember the whole --

3              THE COURT:  Take a moment.  It is not about an

4    insurance claim.  It is about whether your company, the company

5    that you said that you were the CEO of, whether it was paying

6    its employees properly.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  That's what it is about.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  It is not about an insurance claim.  I

11   want to make sure that you're not confused about what the

12   substance of the letter is.

13             THE WITNESS:  I do understand.  This is due to the

14   insurance claim after the flooding.  We were unable to pay

15   people.  Because employment was at-will and somebody

16   complained.  This matter was resolved because I had a proper

17   labor lawyer for this.

18             THE COURT:  What you're saying is you stopped paying

19   your employees because of the outstanding insurance claim?

20             THE WITNESS:  No, because after the flood, there was

21   no work.  The lab was destroyed, basically.

22   BY MR. BROWN:

23   Q   Mr. Jaffrey, isn't it true that whenever you had any legal

24   issue at Delta Search Labs, you involved Gary Walpert in that

25   issue?

             SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1   A   I usually informed him.  But I used to ask him:  Gary, what

2   is our contact with us?  Because I know that our relationship

3   is only with Byrne Poh.  But since he is a senior person and he

4   is involved in our work, day-and-night-type work, intellectual

5   property, so he was aware of that.  So he used to discuss these

6   matters.  But I did ask him many times, how you're compensated,

7   and he said, don't worry about it, it's just like I'm doing it.

8   I know official relationship with Delta Search and Byrne Poh

9   was through Mr. Walpert.

10             THE COURT:  Are you offering Plaintiff's Exhibit 7.

11             MR. BROWN:  Yes, your Honor.

12             THE COURT:  Any objection?

13             MS. DENENBERG:  No objection.

14             THE COURT:  Plaintiff's Exhibit 7 is received.

15             (Plaintiff's Exhibit 7 received in evidence)

16

17  BY MR. BROWN:

18  Q   Mr. Jaffrey, at some point, your company paid $50,000 to

19  Gary Walpert; correct?

20  A   That's correct.

21  Q   And you asked Mr. Walpert to provide his Social Security

22  number after that payment was made.  Correct?

23             MS. DENENBERG:  Objection.  We know it was Ali that

24  asked him that.

25             THE COURT:  Overruled.

SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300

EC24WALH                          Cross - Jaffrey

1             THE WITNESS:  It was not me directly, but it was a

2    request of our CPA.

3    BY MR. BROWN:

4    Q   Were you aware that your brother Ali made that request to

5    Mr. Walpert?

6    A   Yes.

7    Q   Did you know why your CPA wanted Mr. Walpert's personal

8    Social Security number after that payment was made?

9    A   Yes, for filing 1099.

10   Q   A 1099 to Mr. Walpert personally; correct?

11   A   Yes.

12           MR. BROWN:  I have nothing further, your Honor.

13           THE COURT:  Anything else, Ms. Denenberg?

14           MS. DENENBERG:  No.  No further questions.

15           THE COURT:  You can step down.

16           All right.  Does either side wish to offer any other

17   evidence?

18           MR. BROWN:  Not from plaintiffs.  Thank you, your

19   Honor.

20           THE COURT:  Ms. Denenberg?

21           MS. DENENBERG:  Well, to be honest with you, I thought

22   of a few questions I forgot to ask Mr. Walpert.  If the Court

23   will allow me, I would like to call him back.

24           THE COURT:  No.

25           MS. DENENBERG:  Okay.  I just thought I'd ask.

EC24WALH                         Cross - Jaffrey

1          THE COURT:  Any other proof that you wish to offer?

2          MS. DENENBERG:  Well, if the Court will give me time

3   to subpoena some records.

4          THE COURT:  No.  I already gave you an extra day.  I

5   broke yesterday even though it required plaintiff's counsel and

6   plaintiff to return to court today.  You offered me no

7   explanation why you weren't prepared to conduct the

8   cross-examination of Mr. Walpert yesterday.  I'm not going to

9   give you additional time to offer additional evidence.  This

10  hearing was scheduled long ago.  You've had plenty of advanced

11  notice, and there is utterly no reason to delay the proceedings

12  further.

13         Do you have any evidence you wish to offer today?

14         MS. DENENBERG:  Well, as we've already discussed,

15  obviously, I'm opposing the default.  I would like discovery to

16  proceed.  I would like to get to the merits of the case.  The

17  Court has, within its discretion, to order a deposition in

18  Canada, Bermuda, London.  Mr. SJ, Syed Jaffrey, is prepared to

19  pay for this.  These are all things we discussed.  So I just

20  want to get to the merits of the case.

21         THE COURT:  All right.  So I think we should proceed

22  to briefing on the outstanding motion for default judgment.  So

23  the schedule is going to be, first, an opposition from

24  defendants and then a reply.  My inclination, Ms. Denenberg, is

25  to give you a week to put in your opposition and then to give

1    Mr. Brown a week to put in his reply.  Given the extensive

2    delays that, unfortunately, have occurred in the case, I'm

3    reluctant to give a longer schedule than that.  But I will hear

4    anyone who wants to address the matter.

5              MS. DENENBERG:  Just that I'm a little confused

6    because we have fully briefed this, I thought.

7              THE COURT:  I'm just giving you an opportunity,

8    Ms. Denenberg.  If you don't want to put anything else in, I'm

9    happy to rule on what has been submitted already.  It is up to

10   you.  Just an opportunity.  If you don't want to take the

11   opportunity, I will decide the matter based on what has been

12   submitted.

13             MS. DENENBERG:  Can I have a day to think about it?

14   I'm wondering, if I waive that, is plaintiff's counsel

15   similarly going to waive that?

16             THE COURT:  Mr. Brown, do you want to put in anything

17   else?

18             MR. BROWN:  If Ms. Denenberg opts not to, I can opt

19   not to, as well.

20             MS. DENENBERG:  Can I speak to plaintiff's counsel

21   tomorrow about it?

22             THE COURT:  I will tell counsel that I am concerned

23   about an issue that came up today.  I believe I heard

24   Mr. Walpert testify that he was a member of U.S. Defense Fund

25   Management, LLC.  We've referred to that as USDFM today.  U.S.

EC24WALH                         Cross - Jaffrey

1    Defense Fund Management, LLC, is a defendant in the case.  If,

2    in fact, Mr. Walpert is a member of U.S. Defense Fund

3    Management, LLC, it raises an issue as to whether the Court has

4    subject matter jurisdiction.  The Court's subject matter

5    jurisdiction here is based on diversity of citizenship.  That

6    requires that there be complete diversity between the plaintiff

7    and all the defendants, and I'm concerned, based on the

8    testimony I heard today, as to whether that is true.  So I'm

9    highlighting that issue for you now, and I was going to give

10   the parties an opportunity to address the matter.  If they

11   don't want to address the matter, I'm not going to make them do

12   that.

13              So tell me what your wishes are.

14              Mr. Brown.

15              MR. BROWN:  I think in light of the question raised by

16   the Court and given the fact that clearly was not an issue

17   briefed before that supplemental briefing is probably

18   warranted, and we're prepared to live with the schedule which

19   the Court proposed, which as I took it was December 9th for

20   defendant's opposition and December 16th for plaintiff's reply.

21              THE COURT:  Again, Ms. Denenberg, it is up to you

22   whether you wish to put in anything else or not.  It is

23   entirely up to you.  If you do wish to submit anything else to

24   the Court in connection with the motion for default judgment,

25   you will do so by December 9th; and then plaintiff can put his

EC24WALH                          Cross - Jaffrey

1    reply in by December 16th.

2              Is there anything else anyone wants to raise tonight?

3              MR. BROWN:  Not from plaintiff, your Honor.

4              MS. DENENBERG:  No, sir.

5              THE COURT:  I would like to thank the court reporter

6    for her indulgence.  I very much appreciate it.  Thank you.

7              All right.  We're adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                             Page

 3    GARY WALPERT

 4    Cross By Ms. Denenberg . . . . . . . . . . . . 3

 5    Redirect By Mr. Brown  . . . . . . . . . . . .64

 6    SYED KAMAL HAIDER JAFFREY

 7    Direct By Ms. Denenberg  . . . . . . . . . . .66

 8    Cross By Mr. Brown . . . . . . . . . . . . . .78

 9                        PLAINTIFF EXHIBITS

10    Exhibit No.                              Received

11     5   . . . . . . . . . . . . . . . . . . . .87

12     6   . . . . . . . . . . . . . . . . . . . .89

13     7   . . . . . . . . . . . . . . . . . . . .96

14                        DEFENDANT EXHIBITS

15    Exhibit No.                              Received

16     A   . . . . . . . . . . . . . . . . . . . .10

17     B   . . . . . . . . . . . . . . . . . . . .12

18     C   . . . . . . . . . . . . . . . . . . . .18

19     D   . . . . . . . . . . . . . . . . . . . .29

20     E   . . . . . . . . . . . . . . . . . . . .32

21    s F and G   . . . . . . . . . . . . . . . .41

22     H   . . . . . . . . . . . . . . . . . . . .44

23    s I, J, and K   . . . . . . . . . . . . . .52

24     L   . . . . . . . . . . . . . . . . . . . .54

25     M   . . . . . . . . . . . . . . . . . . . .60
```