USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/28/15__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GARY WALPERT,

                Plaintiff,

     - against -

SYED JAFFREY, WINGATE CAPITAL,
INC. a/k/a WINGATE CAPITAL NEW
YORK, and US DEFENSE FUND
MANAGEMENT LLC,

                Defendants.

**MEMORADUM
OPINION & ORDER**

13 Civ. 5006 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

           Plaintiff Gary Walpert brings this action against Defendants Syed Jaffrey,

Wingate Capital, Inc., a/k/a Wingate Capital New York ("Wingate"), and United States Defense

Fund Management LLC ("USDFM"), alleging claims of (1) breach of contract against

Defendants Jaffrey and Wingate; (2) quantum meruit against all Defendants; (3) unjust

enrichment against all Defendants; (4) violation of New York Labor Law § 193 against all

Defendants; and (5) conversion against Defendants Jaffrey and Wingate. (Am. Cmplt. (Dkt. No.

19)) Plaintiff has moved for a default judgment and a turnover order – or in the alternative, a

pre-judgment attachment – against Defendants. (Dkt. No. 53) Defendants have moved to

dismiss the Amended Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule

of Civil Procedure 12(b)(1). (Dkt. No. 72) Plaintiff has cross-moved to drop USDFM as a

defendant pursuant to Federal Rule of Civil Procedure 21. (Dkt. No. 69)

           For the reasons stated below, (1) Defendants' motion to dismiss the Amended

Complaint will be denied; (2) Plaintiff's Rule 21 motion to dismiss all claims against Defendant

USDFM will be granted; and (3) Plaintiff's motion for a default judgment against Defendants

Jaffrey and Wingate will be granted.

## BACKGROUND[1]

### I.   FACTS

Plaintiff Gary Walpert is a practicing lawyer who received a J.D. from Harvard Law School and a Ph.D. from the Massachusetts Institute of Technology. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 17)  He is currently a partner at the law firm Byrne Poh LLP, and before that he was a partner at K&L Gates, Wilmer Hale, and Fish & Richardson. (Id. at 17-18)  Walpert specializes in intellectual property law, as well as transactional law relating to technology. (Id. at 18)

Plaintiff met Defendant Jaffrey in 2006 or 2007, while Plaintiff was working at Wilmer Hale. (Id. at 18-19)  Jaffrey was a client of the firm and retained Walpert to work on issues relating to the intellectual property of Delta Search Labs, a company Jaffrey controls. (Id. at 18)  Walpert performed legal work for Jaffrey on Delta Search Labs until about 2010. (Id. at 19)  At the beginning of 2010, Jaffrey "asked [Plaintiff] whether [he] would be interested in working for him on a new [private equity] startup that [Jaffrey] was going to create." (Id.)  Jaffrey wanted Plaintiff to become the general counsel of Wingate Capital, Inc. – one of Jaffrey's companies – and a second entity that Jaffrey was planning to form, which became United States Defense Fund Management. (Id.)  Plaintiff and Jaffrey agreed that Plaintiff would be paid $900,000 a year to serve in these positions. (Id. at 20)

In 2010, Plaintiff arranged for an employment agreement to be prepared that memorialized his agreement to work at Wingate (the "Employment Agreement"). (Id. at 20-21; PX 1)  Plaintiff and Jaffrey signed the Employment Agreement in July of 2010.[2]  (Dec. 1, 2014

---

[1]  The facts are drawn largely from testimony and documents received in evidence at a default judgment hearing conducted by this Court in December 2014.

[2]  Plaintiff testified that the version of the Employment Agreement received in evidence (PX 1) is "an exact copy of the original." (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 23)  Plaintiff

2

Hearing Tr. (Dkt. No. 65) at 24) The Employment Agreement states that it is "made effective as of the 11th day of June, 2010 . . . , by and between Wingate Capital, Inc. . . . ('Employer'), and Gary A. Walpert ('Executive')." (PX 1 at 1) The Agreement states that "Employer wishes to hire Executive in connection with the creation, management and operation of certain private equity funds and such other legal or related tasks as may occur[.]" (Id.) It also states that Plaintiff "agrees to serve as Executive Vice President and General Counsel of Employer," and that he "shall report to the Chief Executive Officer (CEO) of the Employer" – i.e., Jaffrey. (Id.; Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 32) The Employment Agreement states that the "term of this Agreement and the Period of Executive's employment under this Agreement shall begin as of [June 11, 2010] and shall continue for a period of thirty-six (36) full calendar months, and shall continue thereafter until terminated. . . ." (PX 1 at 1)

With respect to Plaintiff's duties, the Employment Agreement states that Plaintiff "will devote all of his business time, attention, skill and efforts to the faithful performance of his duties under this Agreement, including activities and duties directed by the CEO." (Id.) As to compensation, the Employment Agreement provides that "Employer will pay Executive a salary of not less than $900,000 per year," which "will be payable in accordance with the customary payroll practices of Employer but not less often than on a pro rata basis, monthly." (Id. at 2)

While employed at Wingate, Plaintiff had an office at Wingate's offices, which were located at 601 Lexington Avenue in Manhattan. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 23) Plaintiff had "some personal furniture at the office in Wingate," which is worth "somewhere around $20,000," including a desk, a credenza, and a high-backed office chair. (Id. at 23, 47-49)

---

explained that "Mr. Jaffrey did not pay the landlord for [Wingate's] offices for a certain period of time and was evicted. Upon eviction, Mr. Jaffrey removed all the goods and property in [Plaintiff's] office," including the original version of the Employment Agreement. (Id. at 23)

3

He also had some paintings on the walls, and about "25 boxes of documents that [he] had brought with [him] from K&L Gates," most of which were "business" documents, and most of which were "irreplaceable." (Id. at 47)

Plaintiff testified that his "primary work" for Wingate "was the formation of [two] [limited liability companies], USDFM and Collingwood." (Id. at 26) "Collingwood was created by Mr. Jaffrey" and lawyers at Kaye Scholer. (Id. at 43) Plaintiff testified that Collingwood "was another investment company that was supposed to make a huge amount of money." "It didn't have a parent . . . [b]ut it was controlled by Mr. Jaffrey." (Id. at 43-44) "[I]n addition to [doing work for USDFM and Collingwood], [Plaintiff did] work relating to other investment targets that Mr. Jaffrey came up with[,] [a]nd there were dealings with the lawyers who helped Wingate get its space[, who] were not paid. . . ." (Id. at 26)

Plaintiff also worked on personal matters for Jaffrey and his wife, including a lawsuit "by [the law firm] Quinn Emanuel against Mr. Jaffrey personally in connection with [$6 million in lost fees] that were [allegedly] owed by him to the law firm," as well as a "dispute [Jaffrey] had with an interior decorator relating to work done by the decorator that he did not pay for, or refused to pay for." (Id. at 25-26, 29) Plaintiff also performed services for Jaffrey's other companies, including Delta Search Labs and Ovalia Resorts. (Id. at 25) Plaintiff's work for Delta Search Labs "related to a claim that Delta had for losses as a result of flooding in [its] space." (Id. at 27) Plaintiff's work for Ovalia Resorts related to "a suit that Jaffrey [had] brought against HSBC for HSBC's failure to perform in a contractual arrangement," under which HSBC was "going to help raise . . . money" to "create a casino and resort in Gulfport, Mississippi." (Id. at 30) Plaintiff also performed work in connection with a lawsuit that Hussain al-Shibib – Ovalia Resort's sole employee – brought against Jaffrey "for non-payment under his employment with Ovalia Resorts." (Id. at 30-31)

4

During the time period that Plaintiff worked for Wingate, he also worked "part time" for the law firm Byrne Poh. Plaintiff spent "under an hour a day[,] maybe [two] . . . to three . . . hours a week" on Byrne Poh-related work. (Id. at 46) Plaintiff was "able to work for Byrne Poh while [he] was under [the] contract with Wingate" because he and Jaffrey "agreed that [Plaintiff] could keep some of [his old practice] . . . as long as there wasn't a conflict of interest." (Id. at 46-47) The Employment Agreement memorializes this understanding: "Employer agrees that Executive may continue to practice law for outside clients as Of Counsel to a private law firm of his choosing, as long as such representation does not unreasonably interfere with, or create a conflict of interest with respect to, the performance of his duties for Employer." (PX 1 at 2)

Plaintiff testified that Jaffrey was "the CEO of Wingate Capital"; "the CEO and president of Ovalia"; "the managing partner" of USDFM; the "managing partner" of Collingwood; and he "may have been CEO" and "a board director" at Delta Search Labs. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 32) Plaintiff's "understanding is that all the funds [to operate these companies] came from Mr. Jaffrey, whether it was Wingate or any of the other companies," because "when anyone needed money, they asked . . . Mr. Jaffrey for it, whether it was for petty cash or rent." (Id. at 40-41) Jaffrey was the source for all money needed by Ovalia, USDFM, or Collingwood: "He was simply the place money came or didn't come from. There was no other source." (Id.) Plaintiff also testified that "Mr. Jaffrey didn't really recognize corporate bounds and he was the sole controlling entity, from [Plaintiff's] perspective, of all of the companies that he was involved in, and he didn't really separate who worked on what." (Id. at 47-48)

In October 2010, Plaintiff and Jaffrey executed another employment agreement in connection with Plaintiff's work for USDFM.[3] (Id. at 33; PX 2) This agreement states that "[USDFM] is pleased to extend [Plaintiff] an offer of employment as General Counsel and Compliance Officer effective September 1, 2010." (PX 2 at 1) It also states that, "[i]n addition to [Plaintiff's] annual salary of $600,000, which shall be paid on a monthly basis, at the end of the month, [Plaintiff] shall receive a payment of $175,000 in recognition of [his] efforts from May 17 to August 31, 2010. A special [payment] of $500,000 will also be paid annually." (Id.) Plaintiff testified that USDFM is a limited liability company, and that "the members of the LLC were Mr. Jaffrey, Mr. [Charles] de Boissezon, Mr. Schneider, Mr. Cross, Mr. Gonzales, and [himself]." (Dec. 2, 2014 Tr. (Dkt. No. 67) at 45)

For approximately the first two years that Plaintiff worked at Wingate, Plaintiff received no "compensation at all." (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 46) Over the entire three years that he worked for Jaffrey, Plaintiff received a total of only $65,500.00. On or about August 31, 2012, a $50,000 deposit was made in Plaintiff's bank account. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 22, 41; Dec. 2, 2014 Hearing Tr. (Dkt. No. 67) at 32; DX E at 3) Plaintiff testified that this money "came from Jaffrey, but it came through Delta Search [Lab] funds."[4] (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 41) Plaintiff testified that he "kn[e]w that this money was intended for [him]" because "Mr. Jaffrey said so." (Id.)

---

[3] Plaintiff testified that the copy of this agreement received as PX 2 contains the same provisions as the original, signed version. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 36) As with the Wingate Employment Agreement, the signed, original version of this second employment agreement was maintained "in [Plaintiff's] files at Wingate Capital . . . when the property was removed from the premises as a result of the eviction." (Id. at 33)

[4] During the default judgment hearing, Defendants offered into evidence a copy of a $50,000 check made payable to Plaintiff and dated August 31, 2012. (DX E at 3; Dec. 2, 2014 Hearing Tr. (Dkt. No. 67) at 29-31) The check bears the logo of Delta Search Labs and is signed by Syed Ali Mohammed Jaffrey, Defendant Jaffrey's brother and the CFO of Delta Search Labs. (DX E at 3; Dec. 2, 2014 Hearing Tr. (Dkt. No. 67) at 58, 66-67) Plaintiff testified, however,

6

Plaintiff received two other payments from Mr. Jaffrey during his employment at
Wingate. First, Plaintiff received "a check for $500 that Mr. Jaffrey gave [him] to reimburse
[him] for the cost of a so-called virtual office [in New York] for Collingwood." (Id. at 43; PX 4)
This check is signed by Jaffrey, and Plaintiff testified that Jaffrey gave it to him. (Dec. 1, 2014
Hearing Tr. (Dkt. No. 65) at 43; see PX 4)  Second, Plaintiff received "a gift of $15,000 from
Mr. Jaffrey" as "a present for helping him out in connection with [an] insurance claim that
[Jaffrey] had against Chubb [Corporation]" relating to "damages resulting from moving
[Jaffrey's] personal propert[y] from Switzerland to the U.S."  Jaffrey received a settlement of
$300,000 from Chubb. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 42, 44)  Plaintiff testified that
he "know[s] that this was a gift" because "Mr. Jaffrey said so."  (Id. at 44)

Plaintiff testified that, to "secure payment of any funds under the contract
between [him] and Wingate," he would "[b]asically ask[] Mr. Jaffrey for the money, for
payments," and Jaffrey "would always say it was coming."  (Id.)  Plaintiff testified that Jaffrey
"would have [a] story as to why it hadn't come," and "it was . . . usually [done] orally, when
[Plaintiff] was seeing him, either socially or for lunch or in the office."  (Id. at 44-45)  Plaintiff
testified that he believed Jaffrey because he "trusted him.  [Plaintiff] had seen him make
payments of very large amounts of money.  He bought his home in New Jersey for cash, for $9
million.  He had a number of cars, including Bentleys."  (Id. at 45)  Plaintiff had also "seen him
pay money when he had to make payments, whether it was to lawyers or to others.  And
[Plaintiff] believed that [Jaffrey] was going to make . . . those payments to [him]."  (Id.)

---

that he "never received a $50,000 check . . . that . . . [he] could hold in [his] hand."  (Id. at 29)
Instead, a "$50,000 deposit [was made] to [his] [bank] account."  (Id. at 32)  Plaintiff testified
that the check -- which was produced in discovery -- was "endorsed by somebody else and then
somehow deposited in [his] account," and that the "initials on the back of the check" are not his.
(Id. at 36-37)

Plaintiff's tenure with Wingate ended after "Mr. Jaffrey did not pay the landlord for [the] offices [of Wingate Capital at 601 Lexington Avenue] and was evicted. Upon eviction, Mr. Jaffrey removed all the goods and property in [Plaintiff's] office. And that was the point in time whe[n] [Plaintiff] lost contact with [Jaffrey]." (Id. at 23) Plaintiff testified that, "[a]s far as [he] know[s], [the contents of his office] were put into a storage locker at the time" by "the chauffeur . . . [f]or Mr. Jaffrey." (Id. at 36-37) The chauffeur told Plaintiff that he "gave the key and the so-called code [for the storage locker] to Mr. Jaffrey."[5] (Id. at 37)

## II. PROCEDURAL HISTORY

### A. Plaintiff's Claims and Defendants' Counterclaim

The Complaint was filed on July 18, 2014, and asserted claims against Defendants Jaffrey and Wingate. (Dkt. No. 1) An Amended Complaint filed on January 8, 2014, added claims against Defendant USDFM. (Dkt. No. 19) In the Amended Complaint, Plaintiff asserts claims for (1) breach of contract against Defendants Jaffrey and Wingate based on the Employment Agreement with Wingate; (2) quantum meruit against all Defendants based on services Plaintiff performed for Defendants; (3) unjust enrichment against all Defendants based on their failure to pay Plaintiff for services he rendered to them; (4) violation of New York Labor Law § 193 against all Defendants based on their failure to pay Plaintiff wages to which he is entitled; and (5) conversion against Defendants Jaffrey and Wingate based on their removal of, and exercise of control over, Plaintiff's office furnishings and papers that were maintained in his Wingate office. (Id.) Plaintiff seeks damages of at least $2,612,500 on each of the first three

---

[5] At the default judgment hearing, defense counsel stated that Defendants "dispute the eviction altogether." (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 36). Defense counsel did not cross-examine Plaintiff regarding the eviction, however, nor did she present any evidence that casts doubt on Plaintiff's account of the eviction.

causes of action; $2,275,000 plus liquidated damages equal to 100% of wages unlawfully

withheld on the fourth cause of action; and $20,000 on the fifth cause of action. (Id. at 10-11)

Defendants filed an Answer to the Amended Complaint on January 21, 2014,

including a counterclaim by Defendant Wingate against Plaintiff for unjust enrichment. (Dkt.

No. 21) Defendant Wingate alleges that, while working in Wingate's offices, Plaintiff

"performed services for persons and/or companies unrelated to Jaffrey, Wingate or USDFM,

including work for clients of the law firm Byrne Poh LLP," and that Plaintiff "reaped the full

benefit of occupying an office in the Office Suite, but failed to pay rent or other expenses

associated with his occupancy and use of an office in the Office Suite." (Id. ¶¶ 82-83)

## B. Defendant Jaffrey's Repeated Efforts to Derail this Litigation

Between September 2013 and August 2014, Defendant Jaffrey effectively

derailed these proceedings by (1) repeatedly refusing to pay his lawyers agreed upon fees,

causing the lawyers to file motions to withdraw; (2) on four occasions, disobeying court orders to

retain new counsel by a specific date; and (3) preventing Plaintiff from taking his deposition, by

leaving the United States twelve days before the deposition was scheduled to take place. Jaffrey

has also attempted to ensure that Plaintiff cannot enforce any judgment against him, selling his

$7.5 million New Jersey home and its contents weeks before his scheduled deposition. See

Phillips Affirmation (Dkt. No. 55), Ex. 4.

On August 23, 2013, Defendants' first lawyer -- Dominic Picca -- requested

permission to withdraw "because the defendants have not paid half of the retainer they agreed to

pay, despite many requests by [counsel] and promises from defendants to do so, and because the

defendants have ceased communicating with counsel." (Dkt. No. 11) On September 12, 2013,

this Court ordered Defendants Jaffrey and Wingate to appear at an October 11, 2013 conference,

and to ensure the presence of new counsel at the conference if Defendants no longer wished to be

9

represented by Picca. (Dkt. No. 12) Defendants appeared at the October 11 conference without

new counsel, however (see Phillips Affirmation (Dkt. No. 55) ¶ 2), and this Court granted

Picca's motion to withdraw. (Dkt. No. 13) This Court also directed Defendants Jaffrey and

Wingate to retain counsel and appear at a conference on November 14, 2013. (Id.) Defendants'

second lawyer – Michael Freeman – appeared at the November 14, 2013 conference. See Dkt.

No. 14.

On November 15, 2013, this Court entered a Rule 16 scheduling order. (Dkt. No.

15) The scheduling order required the parties to complete all discovery by March 14, 2014. (Id.

at 2) On February 18, 2014, the parties jointly requested an extension of the discovery deadline.

(Dkt. No. 24) On March 7, 2014, this Court issued an order extending the discovery deadline to

May 2, 2014. (Dkt. No. 25)

On April 3, 2014, Defendants' second lawyer – Michael Freeman – moved to

withdraw, citing "defendants' failure, despite repeated requests, to pay our invoices for legal

services. . . ." (Dkt. No. 30) This Court then ordered the parties to appear at a conference on

April 23, 2014, and directed Defendants to "ensure that new counsel is present at the conference"

if Defendants no longer wished to be represented by Freeman. (Dkt. No. 33) Defendants

appeared at the April 23, 2014 conference without new counsel. This Court granted Freeman's

motion to withdraw and ordered Defendants to retain counsel by a May 22, 2014 conference.

(Dkt. No. 34) This Court stated that "[i]f Defendants do not retain counsel by that time, [the

Court] is likely to enter an order of default as to [Wingate] and [USDFM], and Jaffrey will

proceed pro se." (Id.) Defendants appeared at the May 22, 2014 conference without new

counsel. See Phillips Affirmation (Dkt. No. 55) ¶ 4. Accordingly, on May 28, 2014, this Court

issued an order warning that it would enter an order of default if Defendants did not retain

counsel by a June 2, 2014 conference. (Dkt. No. 35) Defendants appeared at the June 2, 2014

10

conference without new counsel.[6]  (Phillips Affirmation (Dkt. No. 55) ¶ 5)  On June 9, 2014, this

Court issued an order stating that if Defendants failed to retain counsel by June 9, 2014,

"Plaintiff will file a motion for default judgment as to [Wingate] and [USDFM] by June 13,

2014, and Jaffrey will proceed pro se."[7]  (Dkt. No. 36)  On June 9, 2014, Defendants current

counsel – Deborah Denenberg and Jean Claude Mazzola – entered notices of appearance.  (Dkt.

Nos. 37-38)

        On June 17, 2014, this Court directed the parties to submit a joint letter by June

20, 2014, proposing a revised discovery schedule and addressing any remaining discovery

disputes.  (Dkt. No. 40)  On June 20, 2014, the parties submitted a joint letter proposing that all

discovery be completed by September 26, 2014.  (Dkt. No. 41)  The parties informed the Court

that Defendant Jaffrey's deposition would take place on August 8, 2014, and that a schedule had

also been set for the depositions of five other witnesses.  (Id. at 1)

        In a June 20, 2014 letter, Plaintiff informed the Court that "there are serious issues

with the responsiveness, scope, and volume of the production by Defendants," and asked that an

order be entered "compelling Defendants to produce the missing documents as soon as

practicable."  (Dkt. No. 42)  Plaintiff noted that Defendants had produced only 203 pages of

discovery as of that date, and that their "production is so paltry that there are deficiencies in their

responses to almost all of Walpert's requests."  (Id. at 1)  Defendants responded that they were

---

[6] A new lawyer – Frederick H. Fern – appeared at the conference "for the limited purpose of
stating that he was considering being retained in the action."  (Phillips Affirmation (Dkt. No. 55)
¶ 5)  Fern did not ultimately file a notice of appearance.

[7] Jaffrey presented a litany of excuses as to why he had not retained counsel, as the Court
repeatedly ordered, and pleaded for the Court to give him additional time to retain counsel.  See
Phillips Aff. (Dkt. No. 55) ¶¶ 3-4)  On October 11, 2013, Jaffrey asserted that he was not a
principal of Wingate, and that his brother – Syed Mohammed Raza Jaffrey – was responsible for
Wingate's affairs.  On April 23, 2014, Jaffrey told the Court that his father had recently died,
causing his brother to be out of the country for five weeks.  Later, Jaffrey represented that he was
expecting a cash infusion that would permit him to retain counsel.

"unable to respond to the issues raised by plaintiff's counsel" because new counsel had "only recently filed a notice of appearance and [did] not yet have the file from the outgoing counsel." (Id. at 4)

On July 7, 2014, this Court modified the original case management plan, directing the parties to complete all discovery, including depositions of fact witnesses, by September 26, 2014.  (Dkt. No. 44)

Between July 16, 2014 and late July 2014, Plaintiff's counsel wrote to defense counsel a number of times to confirm Jaffrey's August 8, 2014 deposition, but Defendants never responded. (Phillips Affirmation (Dkt. No. 55) ¶ 8, Ex. 1-2) On July 24, 2014, Plaintiff learned that Jaffrey had auctioned off the contents of his New Jersey estate on June 6 and 7, 2014, and that he had sold his $7.5 million home on June 28, 2014.[8]  (Id. ¶¶ 9-11, Ex. 3-4 (listing a number of luxury items that Jaffrey sold at auction and showing a Streeteasy.com webpage referencing the sale of Jaffrey's estate)) On July 24, 2014, defense counsel told Plaintiff's counsel that she had spoken with Jaffrey that day, that Jaffrey was in the United States, and that Jaffrey's August 8, 2014 deposition would proceed as scheduled. (Id. ¶ 12) On August 4, 2014, however, defense counsel informed Plaintiff's counsel that Jaffrey's August 8, 2014 deposition would have to be postponed because defense counsel needed to care for her ailing mother.  Counsel agreed to adjourn Jaffrey's deposition to August 21, 2014.  (Id. ¶¶ 13-14, Ex. 5)  Defense counsel emailed Plaintiff's counsel on August 6, 2014, stating that she had "confirmed the [deposition] schedule with [her] clients."[9]  (Id., Ex. 5 at 2)  On August 15, 2014, however, defense counsel informed

---

[8]  Jaffrey maintains that he sold his home on July 23, 2014.  See Jaffrey Aff. (Dkt. No. 57), Ex. B ¶ 5.

[9]  Jaffrey has since admitted that he left the United States on July 27, 2014.  See Jaffrey Aff. (Dkt. No. 57), Ex. B ¶ 3.  Accordingly, when his lawyer was telling Plaintiff's counsel on August 6, 2014, that Jaffrey's deposition would proceed on August 21, 2014, Jaffrey was already outside the United States and – as explained below – unable to re-enter because of an expired visa.

Plaintiff's counsel that Jaffrey had left the United States, had let his visa expire, and that defense counsel did not know when or if Jaffrey could return to the United States. (Id. ¶ 16; see also Dkt. No. 45 at 1)

On August 18, 2014, Plaintiff's counsel submitted a letter to this Court requesting that it "award a default judgment and all other appropriate sanctions against Jaffrey, his companies, and his counsel for his intentional and repeated refusal to participate in discovery and for this pretense of doing so while liquidating assets and moving the assets and himself offshore." (Dkt. No. 45 at 2)  Defense counsel submitted a letter in response, stating that Jaffrey "has not 'fled' the country," but rather "had to leave the country in order to remain in compliance with immigration laws." (Dkt. No. 46 at 1)  Defense counsel stated that Jaffrey "is staying in London while his immigration attorney, Matthew Maiona, . . . completes the application process for a new Visa," and that counsel "spoke with Mr. Maiona [that day] and he has confirmed that his firm has been retained to renew the Visa." (Id.)  Defense counsel also stated that "the reason for the adjournment of the August 8th deposition date[] was . . . a request by [defense counsel]," and that it "had nothing to do with S. Jaffrey." (Id. at 2)  Finally, defense counsel stated that, "[o]n August 15th, when this office learned that S. Jaffrey's Visa may not come through by [the] August 21 deposition date, we immediately notified plaintiff's counsel," and that counsel has "confirmed through discussions with S. Jaffrey and communications with his immigration counsel that he is in the process of applying and fully expects to obtain a new Visa." (Id.)

This Court held a conference on September 4, 2014. This Court stated that it was "concerned that [Jaffrey's departure] is part of a deliberate strategy to derail this case," and asked defense counsel to address "why, if there was a possibility that Mr. Jaffrey was going to have to leave the country because of a visa problem[,] that wasn't disclosed long before that issue came to a head." (Sept. 4, 2014 Conf. Tr. (Dkt. No. 49) at 3)  Defense counsel did not answer the

13

question, but instead stated that "Mr. Jaffrey left the country because he had to and presumed he was going to get a new visa in two weeks." (Id. at 4-6) With respect to Jaffrey's sale of assets, defense counsel stated that, although Jaffrey "sold his house" in New Jersey, "[a]ll his assets remain in the United States," "[h]is business remains in the United States, his brothers are residents of Massachusetts and are U.S. citizens, so all of his assets remain in the United States." (Id. at 10) She also stated that it is "just a coincidence" that Jaffrey sold his New Jersey house at the end of June and then left because of an immigration problem in early August. (Id. at 13)

On September 12, 2014, Plaintiff filed a motion for default judgment and turnover order – or in the alternative, pre-judgment attachment – against Defendants. (Dkt. Nos. 53-54) Defendants filed an opposition, including a request that Jaffrey's deposition be taken in London or by remote means, on October 2, 2014. (Dkt. No. 57) Plaintiff filed a reply brief on October 7, 2014. (Dkt. No. 56)

This Court held a hearing on Plaintiff's motion for a default judgment on December 1 and 2, 2014. At the conclusion of the hearing, the Court notified the parties that it was "concerned, based on the testimony [at the hearing], as to whether" "there [is] complete diversity [of citizenship] between the plaintiff and all the defendants." (Dec. 2, 2014 Hearing Tr. (Dkt. No. 67) at 99) This Court noted that Plaintiff testified that he is a member of the limited liability company USDFM, and that USDFM is a defendant in the case. (Id. at 98-99) This Court gave the parties an opportunity to brief this issue. (Id. at 99)

On December 9, 2014, Defendants filed a brief in which they "request that the Court dismiss the matter pursuant to [Federal Rule of Civil Procedure] 12(b)(1)" because there is not complete diversity of citizenship between Plaintiff and Defendants. (Def. Post-Hearing Br. (Dkt. No. 72) at 1) Plaintiff filed a brief on December 16, 2014, in which he opposes Defendants' Rule 12(b)(1) motion to dismiss, moves to drop USDFM as a defendant pursuant to

14

Fed. R. Civ. P. 21, and provides further support for his default judgment motion. (Pltf. Post-Hearing Br. (Dkt. No. 69))

## LEGAL STANDARD

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)[.]" Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S. 422, 430-31 (2007) (citation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under [Federal] Rule [of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'" APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citing Makarova, 201 F.3d at 113).

## DISCUSSION

## I.   SUBJECT MATTER JURISDICTION

### A.   Diversity of Citizenship

Defendants assert that this Court lacks subject matter jurisdiction because there is not complete diversity between the parties. (Def. Post-Hearing Br. (Dkt. No. 72) at 1)

#### 1.   Applicable Law

Pursuant to 28 U.S.C. § 1332(a)(1), "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]" 28

15

U.S.C. § 1332(a)(1). "'[A] case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State.'" Hai Yang Liu v. 88 Harborview Realty, LLC, 5 F. Supp. 3d 443, 446 (S.D.N.Y. 2014) (quoting Wisconsin Dept. of Corr. v. Schacht, 524 U.S. 381, 388 (1998)). For jurisdictional purposes, "[a] limited liability company ["LLC"] is a citizen of every state of which any of its members is a citizen[.]" Krause v. Forex Exchange Market, Inc., 356 F. Supp. 2d 332, 336 (S.D.N.Y. 2005) (citations omitted). "Thus, in general, a plaintiff who is a member of an LLC cannot bring a diversity action against the LLC." Hai Yang Liu, 5 F. Supp. 3d at 450-51 (citing Keith v. Black Diamond Advisors, Inc., 48 F. Supp. 2d 326, 330 (S.D.N.Y. 1999)).

## 2.  Analysis

Plaintiff alleges in the Amended Complaint that this Court has subject matter jurisdiction based on diversity of citizenship. (Am. Cmplt. (Dkt. No. 19) ¶ 3) Plaintiff further alleges that (1) the amount in controversy exceeds $2 million; (2) Plaintiff resides in Massachusetts; (3) Defendant Jaffrey resides in New Jersey; and (4) Defendants Wingate and USDFM are Delaware corporations doing business in New York. (Id. ¶¶ 6-9, p.10-11) At the default judgment hearing, however, Plaintiff testified that he is a member of USDFM, a limited liability company. (Dec. 2, 2014 Hearing Tr. (Dkt. No. 67) at 45) Because Plaintiff is a citizen of Massachusetts,[10] USDFM is also a citizen of Massachusetts. See Krause, 356 F. Supp. 2d at

---

[10] Defendants argue that Plaintiff is actually a citizen of New York, not Massachusetts. (Def. Post-Hearing Br. (Dkt. No 72) at 4-5) They cite to Plaintiff's tax returns from the years 2008 through 2013, which list a New York address. (Id., Ex. 1) They also state that Plaintiff works and is licensed to practice law in New York, and that Plaintiff lists New York as his primary address for his legal jobs and for the Massachusetts Board of Bar Overseers of the Supreme Judicial Court. (Id. at 5, Ex. 2)

In response, Plaintiff submitted an affidavit stating that he is a Massachusetts resident, and that he sold his Manhattan apartment in February 2013, five months before initiating this lawsuit.

336. Accordingly, there is not complete diversity of citizenship between the parties, and this Court lacks subject matter jurisdiction as long as USDFM is a party.

Plaintiff argues, however, that "[t]his Court should preserve jurisdiction by dismissing USDFM from the case" pursuant to Federal Rule of Civil Procedure 21. (Pltf. Post-Hearing Br. (Dkt. No. 69) at 4)

## B.    Indispensability of USDFM

### 1.    Applicable Law

"[Federal Rule of Civil Procedure] 21 'allows a court to drop a nondiverse party at any time to preserve diversity jurisdiction, provided the nondiverse party is not 'indispensable' under Rule 19(b).'" Quantlab Financial, LLC, Quantlab Techs. Ltd. (BVI) v. Tower Research Capital, LLC, 715 F. Supp. 2d 542, 549-50 (S.D.N.Y. 2010) (quoting CP Solutions PTE, Ltd. v. Gen. Elec. Co., 553 F.3d 156, 159 (2d Cir. 2009) (citations omitted)); see also Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); Caspary v. Louisiana Land & Exploration Co., 725 F.2d 189, 191 (2d Cir. 1984) ("District courts considering cases in which they lack jurisdiction because of the presence of a non-diverse party can grant an amendment to drop the party and create complete diversity.") (citations omitted); Fehder v. Nemerovsky, No. 92 Civ. 7801 (JFK), 1993 WL 361638, at *2 (S.D.N.Y. Sept. 14, 1993) ("It is settled law that a plaintiff may drop a non-diverse defendant if that party is not

---

(Walpert Aff. (Dkt. No. 70) ¶¶ 2-4)  Plaintiff also provided property records for the Manhattan apartment, which indicate that the apartment was sold in February 2013.  (Id., Exs. 1-2) Accordingly, this Court concludes that Plaintiff is a Massachusetts resident.

The issue that remains is whether USDFM's citizenship defeats diversity. As noted above, "[a] limited liability company is a citizen of every state of which any of its members is a citizen." Krause, 356 F. Supp.2d at 336. Accordingly, even accepting that Plaintiff is a citizen of Massachusetts, complete diversity does not exist, because USDFM is a Massachusetts citizen by virtue of Plaintiff's citizenship. See id.

indispensable.") (citing Horn v. Lockart, 84 U.S. 570, 579 (1873); Kerr v. Compagnie de

Ultramer, 250 F.2d 860, 863 (2d Cir. 1958)).

      To determine whether a party is "indispensable" under Rule 19(b), a court must

consider the following factors:

> (1) whether a judgment rendered in a person's [or entity's] absence might
> prejudice that person [or entity] or parties to the action, (2) the extent to which
> any prejudice could be alleviated, (3) whether a judgment in the person's [or
> entity's] absence would be adequate, and (4) whether the plaintiff would have an
> adequate remedy if the court dismissed the suit.

CP Solutions, 553 F.3d at 159 (citing Fed. R. Civ. P. 19(b)). "'Whether a person is

"indispensable," that is, whether a particular lawsuit must be dismissed in the absence of that

person, can only be determined in the context of a particular litigation.'" Quantlab Financial,

LLC, 715 F. Supp. 2d at 550 (quoting Curley v. Brignoli, Curley & Roberts Assocs., 915 F.2d

81, 90 (2d Cir. 1990) (citation omitted)).

## 2.    Analysis

      Here, Defendants argue that USDFM is an indispensable party because

(1) "Plaintiff himself . . . testified that USDFM, LLC was the company for which he was

supposed to be performing services"; (2) "Plaintiff also testified that he primarily worked on the

formation of the 'LLCs, [including] USDFM' . . . and 'had a contract with USDFM'";

(3) "Plaintiff is suing for payment of alleged services that he provided, in major part, for alleged

work that he performed for USDFM, LLC"; and (4) "Plaintiff clearly wanted USDFM, LLC to

be a part of his lawsuit, an integral party, [because he] . . . specifically sought the leave of the

Court to add USDFM, LLC as a party." (Def. Post-Hearing Br. (Dkt. No. 72) at 7 (citing Dec. 1,

2014 Hearing Tr. (Dkt. No. 65) at 25-26, 32))

#### (a)     First and Second Factors:  Prejudice

The first two factors under Rule 19(b) require this Court to consider whether any

prejudice would result to USDFM or any other defendant as a result of USDFM's dismissal, and

if so, the extent to which such prejudice can be alleviated. Fed. R. Civ. P. 19(b).  Defendants

have not argued that they would be prejudiced by USDFM's dismissal.  Moreover, "[g]iven the

absence from the [Amended Complaint] of any action attributable only to [USDFM], the chance

that [USDFM]'s actions were the sole or primary cause of [Plaintiff's] damages appears remote."

CP Solutions, 553 F.3d at 159; see also Am. Cmplt. (Dkt. No. 19).  Indeed, Plaintiff asserts that

he added USDFM as a defendant because it is "just another Jaffrey-controlled shell," and it had

"[become] increasingly clear that Jaffrey and Wingate intended to evade this litigation."  (Pltf.

Post-Hearing Br. (Dkt. No. 69) at 9)  And even if Defendants Jaffrey and Wingate believe that

USDFM contributed to any liability they might incur in this case, they "could seek to bring a

claim against [USDFM]."  CP Solutions, 553 F.3d at 159.

#### (b)     Third Factor:  Adequacy of Judgment in USDFM's Absence

"As to the third Rule 19(b) factor, 'adequacy refers to the "public stake in settling

disputes by wholes, whenever possible."'"  Quantlab Financial, LLC, 715 F. Supp. 2d at 551

(quoting CP Solutions, 553 F.3d at 160 (quoting Republic of Philippines v. Pimentel, 553 U.S.

851, 870 (2008))).  "'Thus, this factor concerns the social interest in the efficient administration

of justice and the avoidance of multiple litigation.'"  Id. (quoting CP Solutions, 553 F.3d at 160

(citation omitted)).  Here, "[t]he absence of [USDFM] will not prevent [Plaintiff] from being

granted the full . . . legal relief sought in the [Amended Complaint]."  Id.  Although Plaintiff

asserts three claims against USDFM – (1) quantum meruit; (2) unjust enrichment; and

(3) violation of New York Labor Law § 193 (see Am. Cmplt. (Dkt. No. 19) ¶¶ 38-59) – all three

of these claims are also asserted against Defendants Jaffrey and Wingate.  See id.  And although

19

Plaintiff "had a contract with USDFM" (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 32), he has
not sued to enforce that contract. Instead, Plaintiff has asserted a breach of contract claim only
against Defendants Jaffrey and Wingate, based on an employment agreement he entered into
with those Defendants. See Am. Cmplt. (Dkt. No. 19) ¶¶ 14, 32-37. Moreover, Plaintiff asserts
that "[t]he Court can provide complete relief to [him] in each cause of action without USDFM in
the case," because "Jaffrey [– the controlling person of both Wingate and USDFM –] remains a
Defendant." (Def. Post-Hearing Br. (Dkt. No. 69) at 9)   Accordingly, because none of the
allegations in the Amended Complaint are attributable only to USDFM, and because Plaintiff
acknowledges that he can obtain complete relief without USDFM in the case, "piecemeal
litigation is improbable." CP Solutions, 553 F.3d at 160.

    Moreover, "[i]n evaluating [the third] factor, '[courts] are influenced by the
procedural posture [of the case].'" Id. (quoting Merrill Lynch & Co. v. Allegheny Energy, Inc.,
500 F.3d 171, 180 (2d Cir. 2007)). "Although the case has not yet been tried, the parties have
litigated for over two years, including conducting discovery. It would make little sense to
require them to start over in state court simply because [USDFM] . . . cannot be joined in federal
court." Id. (citing Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 836 (1989)).

### (c)   Fourth Factor: Adequate Remedy for Plaintiff

    Finally, "[a]s to the fourth Rule 19(b) factor, it does not appear that [Plaintiff]
would be deprived of an adequate remedy were this action dismissed. [Plaintiff] [is] able to
bring an action against [Defendants] in state court." Quantlab Financial, LLC, 715 F. Supp. 2d
at 551. "But, '"when federal diversity jurisdiction will exist if nondiverse parties are dropped,
the bare fact that a state court forum is available does not, by itself, make it appropriate to
dismiss the federal action."'" Id. (quoting CP Solutions, 553 F.3d at 161 (quoting Samaha v.
Presbyterian Hosp. in City of N.Y., 757 F.2d 529, 531 (2d Cir. 1985) (per curiam))).

\*            \*            \*            \*

Analysis of the four Rule 19(b) factors demonstrates that USDFM is not an indispensable party. Accordingly, Plaintiff's motion to drop USDFM as a defendant pursuant to Fed. R. Civ. P. 21 will be granted, and Defendants' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction will be denied.

## III.   PLAINTIFF'S MOTION FOR A DEFAULT JUDGMENT

### A.   Sanctions Under Fed. R. Civ. P. 16(f) and 37(b)

Fed. R. Civ. P. 37(b)(2)(A)(ii)-(vii) authorizes courts to impose a variety of sanctions – including "striking pleadings in whole or in part" and "rendering a default judgment against [a] disobedient party" – where a party has "fail[ed] to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A)(ii)-(vii). Fed. R. Civ. P. 16(f) authorizes courts to "issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii)," where a party or his attorney has "fail[ed] to appear at a scheduling or other pretrial conference" or has "fail[ed] to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f).

While these rules provide for a range of sanctions, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." Sieck v. Russo, 869 F.2d 131, 134 (2d Cir. 1989) (internal quotation marks and citation omitted). The imposition of a severe sanction is necessary to avoid a situation where courts "encourage dilatory tactics, and compliance with discovery orders . . . come[s] only when the backs of counsel and the litigants [are] against the wall." Id. (internal quotation marks and citation omitted).

21

The Second Circuit has identified a number of factors that courts should consider in imposing sanctions under the Federal Rules. "These include: '(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance.'" Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302-03 (2d Cir. 2009) (quoting Nieves v. City of New York, 208 F.R.D. 531, 535 (S.D.N.Y. 2002) (citing Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 852-54 (2d Cir. 1995))).

### B.   The Court's Inherent Power to Impose Sanctions

In addition to the sanctions authorized under the Federal Rules, federal courts have the inherent power to sanction a party for conduct that constitutes an abuse of the judicial process. See Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991) ("[A court has] the inherent power to impose sanctions for . . . bad-faith conduct."). The Second Circuit has recognized that "[a] court has the inherent power to supervise and control its own proceedings and to sanction . . . a litigant for bad-faith conduct." Sussman v. Bank of Israel, 56 F.3d 450, 459 (2d Cir. 1995) (citing Chambers, 501 U.S. at 43-50). However, the court must use "restraint and discretion" when ordering sanctions against a party pursuant to its inherent powers, because the court exercises its inherent powers free from legislative oversight. See Chambers, 501 U.S. at 43-44.

Courts' inherent powers include the power to dismiss a party's claims and to strike a party's pleadings for failure to obey court orders. See, e.g., Fonar Corp. v. Magnetic Resonance Plus, Inc., 935 F. Supp. 443, 448 (S.D.N.Y. 1996) ("under this court's inherent authority . . . the court [may in its discretion] . . . impose the particularly severe sanction of dismissal of a suit for improper litigation conduct") (internal quotation marks and citation

omitted). A court's decision to strike a defendant's pleadings is tantamount to entering judgment against that party. Accordingly, a court must proceed with great restraint and caution in determining whether there are sufficient grounds to justify such an extreme sanction. Moreover, the Second Circuit has articulated a strong preference for resolving disputes on the merits. See Marfia v. T.C. Ziraat Bankasi, New York Branch, 100 F.3d 243, 248-49 (2d Cir. 1996).

Cases in which courts have struck pleadings, or entered judgment against a party, have generally involved intentional misconduct that has materially and negatively affected the resolution of an action. See Sieck, 869 F.2d at 134-35 (upholding default judgment where defendants failed to appear for deposition); Cerruti 1881 S.A. v. Cerruti, Inc., 169 F.R.D. 573, 583-84 (S.D.N.Y. 1996) (striking defendants' answer and counterclaims, and entering judgment for plaintiffs on the merits, where defendants produced fraudulent records in response to discovery demands); Lediju v. New York City Department of Sanitation, 173 F.R.D. 105, 106 (S.D.N.Y. 1997) (dismissing complaint for willful failure to obey pretrial scheduling orders); Hall v. Flynn, 829 F. Supp. 1401, 1403 (N.D.N.Y. 1993) (dismissing complaint for plaintiff's failure to appear at discovery conference); Galt G/S v. Sealand Services, Inc., No. 87–CV–1038, 1989 WL 69907, at *1 (N.D.N.Y. June 13, 1989) (entering default judgment against defendant for its failure to comply with court order to obtain new counsel within certain time period).

The Second Circuit has cautioned that """dismissal is 'a harsh remedy to be utilized only in extreme situations.'""" Marfia, 100 F.3d at 249 (quoting Colon v. Mack, 56 F.3d 5, 7 (2d Cir. 1995) (quoting Jackson v. City of New York, 22 F.3d 71, 75 (2d Cir. 1994) (quoting Harding v. Federal Reserve Bank of New York, 707 F.2d 46, 50 (2d Cir. 1983) (quoting Theilmann v. Rutland Hosp., Inc., 455 F.2d 853, 855 (2d Cir. 1972))))). The Circuit has also observed that "default judgments a[re] '"the most severe sanction which the court may apply."'"

23

Id. (quoting Sec. & Exchange Comm'n v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975) (quoting Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 614 (2d Cir.1964))).

      The Second Circuit has acknowledged, however, that dismissal or default may be an appropriate remedy where "there is a showing of willfulness, bad faith, or fault." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); see also Jones v. NFTA, 836 F.2d 731, 734-35 (2d Cir. 1987) (applying "willfulness, bad faith, or fault" test; upholding district court order dismissing action based on failure to comply with pre-trial production order). Because a default judgment "is a 'drastic remedy,' it 'should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'" West, 167 F.3d at 779-80 (quoting John B. Hull, Inc. v. Waterbury Petroleum Prods., Ins., 845 F.2d 1172, 1176 (2d Cir. 1988)); Dodson v. Runyon, 86 F.3d 37, 39 (2d Cir. 1996) ("we have repeatedly noted that one of the factors that should inform a trial court's decision is the suitability of lesser sanctions"); Chira v. Lockheed Aircraft Corp., 634 F.2d 664, 665 (2d Cir. 1980) (a judge should impose extreme sanctions "only when he is sure of the impotence of lesser sanctions").

## C.    Analysis

      In determining an appropriate sanction for Jaffrey and Wingate's misconduct, the Court has considered, inter alia, whether the misconduct was willful, the reasons for non-compliance, the duration of the misconduct, whether the Defendants were warned about the consequences of their misconduct, and the likely efficacy of sanctions less severe than a default judgment. Agiwal, 555 F.3d at 302-03. The Court has also considered whether the Plaintiff has made out a prima facie case of liability as to any cause of action, and whether Defendants have demonstrated that they have a meritorious defense. See New York v. Green, 420 F.3d 99, 109 (2d Cir. 2005); Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983).

### 1.    Nature and Duration of Misconduct, Warnings to Defendants, and Likely Efficacy of Sanctions Less Severe than a Default Judgment

As discussed above, Defendants Jaffrey and Wingate – over a period of nearly a

year – have engaged in a variety of misconduct which appears to have been calculated to derail

this litigation and frustrate any judgment that Plaintiff might obtain.  Defendants first engaged in

a pattern of retaining counsel but then not paying their fees.  This misconduct led Defendants'

first two attorneys – Picca and Freeman – to move to withdraw.  (Dkt. Nos. 11, 30)  The repeated

changes in counsel made it impossible for discovery to proceed.  Indeed, no depositions were

taken between this Court's initial case management plan – issued on November 15, 2013 (Dkt.

No. 15) – and August 2014.[11]  See Dkt. Nos. 41-42.  Defendants further delayed this litigation by

_____

[11]  Defendants have also obstructed paper and electronic discovery throughout this litigation.  To date, Defendants have only produced 203 pages of document discovery.  See Dkt. No. 45 at 1-2; Dkt. No. 46 at 2.  Critical documents that Defendants had custody of – including the original of the Employment Agreement – have not been produced by Defendants.  At the default judgment hearing, Plaintiff testified that he maintained the original of the Employment Agreement at his Wingate office, but that Jaffrey "removed all the goods and property in [Plaintiff's] office" upon eviction, including the original version of the Employment Agreement.  See Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 23.  Plaintiff further testified that he was informed that the materials removed from his office were moved to a storage locker in New Jersey, to which Jaffrey has the key.  (Id. at 36-37)  This evidence is unrebutted, and Defendants have provided no explanation for their failure to produce the original Employment Agreement.

Nor have Defendants provided a credible explanation for their failure to produce emails from Wingate email accounts and Jaffrey's other email accounts.  In an April 9, 2014 letter, Plaintiff's counsel asserted that "Defendants have produced only fourteen emails from Wingate email accounts," and that Plaintiff himself "has produced more than 100 email chains from these [same] accounts."  (Dkt. No. 31 at 2)  Plaintiff's counsel stated that "[w]hen [he] met and conferred with Defendants' Counsel, [defense counsel] suggested that Defendants destroyed any missing emails."  (Id.)  Defense counsel maintains, however, that "Defendants have advised us that they have not destroyed or discarded any documents since being put on notice of plaintiff's claim. . . ."  (Id. at 4)  Accepting that representation, Defendants have not offered any explanation for their failure to produce emails beyond the fourteen included in Defendants' production.

Defendants also assert that they have produced all documents "related to the labor and services [Plaintiff] provided to Jaffrey, Wingate, USDFM, Delta Search Labs, Ovalia Resorts, Collingwood, and Defendants' other business concerns at J[a]ffrey's request."  (Dkt. No. 31 at 3, 5)  In an April 9, 2014 letter, Plaintiff's counsel states that Defendants "produced at least one document related to each of [these individuals and entities]," but that they "have refused to

25

refusing to obey four separate orders issued by this Court to retain counsel by a specific date. See Dkt. Nos. 12, 33, 34, 35. Defendants refused to obtain substitute counsel even after this Court repeatedly threatened to enter a default judgment against the corporate defendants if counsel was not retained by a specific date. See Dkt. Nos. 34, 35.

After Defendants finally retained their present counsel, their efforts to delay and obstruct this litigation continued. As discussed above, after Defendants had agreed on or about June 20, 2014 that Defendant Jaffrey's deposition would take place on August 8, 2014 (see Dkt. No. 41), Jaffrey left the United States on July 27, 2014, knowing that he could not return to this country due to an expired visa. While defense counsel has argued that Jaffrey left this country believing that he could quickly obtain another visa (Sept. 4, 2014 Conf. Tr. (Dkt. No. 49) at 4-6), an affidavit submitted by Matthew Maiona – Jaffrey's immigration attorney – makes clear that Jaffrey could not quickly obtain another visa.

Maiona's affidavit states that on June 17, 2013, Jaffrey's immigration visa petition was denied, and thus Jaffrey began to accrue unlawful presence in the United States as of that date. (Def. Opp. Br. (Dkt. No. 57), Ex. D ("Maiona Aff.") ¶¶ 5-8) Although Jaffrey filed

---

produce further documents, typically objecting that they 'do not understand' the request." (Id. at 3) Defense counsel responded that Defendants "have no other documents" related to Plaintiff's work for Jaffrey or any of his companies. (Id. at 5) This unsupported assertion is not plausible in light of Plaintiff's uncontradicted testimony that he did extensive work for Jaffrey, Wingate, USDFM, Delta Search Labs, Ovalia Resorts, and Collingwood between 2010 and 2013. Accordingly, Defendants have also provided no legitimate excuse for their failure to produce documents relating to Plaintiff's work for Jaffrey and his companies.

On June 20, 2014 – after Defendants finally retained new counsel – Plaintiff's counsel reiterated to the Court that Defendants "have produced only 203 pages of discovery" and raised the same discovery issues discussed above. (Dkt. No. 42 at 1-3) Defense counsel responded that she was "unable to respond to the issues raised by plaintiff's counsel" because she did not yet have Defendants' client file. (Id. at 4) Two months later, Defendants still had not produced any more paper or electronic discovery, and Jaffrey left the country. (Dkt. No. 45 at 1-2) Defense counsel reiterated Defendants' position that "all documents that still exist have been produced." (Dkt. No. 46 at 2)

a motion for reconsideration on July 22, 2013, his motion was denied on October 30, 2013. (Id. ¶ 6) Jaffrey "had no status or right to remain in the United States [after October 30, 2013] and was obligated to depart the country or face detention and removal." (Id. ¶ 8) Under Section 212(a)(9)(B)(i)(I) of the Immigration and Nationality Act, once Jaffrey accrued one year of unlawful presence in the United States, "he would be barred from returning to the United States for a period of 10 years once he departed the country." (Id. ¶ 9) Maiona further states that "it is [his] opinion that the Defendant is barred from returning to the United States for a period . . . of 10 years . . . without the issuance of a waiver from the US Department of State [or] US Consulate." (Id. ¶ 11) "The issuance of the waiver would be subject to the discretion of the Consular Office and is not easily obtained," however. (Id. ¶ 12) Unless Jaffrey is able to secure a waiver, he will "not be able to return to the United States until August 2024." (Id. ¶ 13)

Given that Jaffrey has known since at least June 17, 2013, that he has a significant visa problem, it is not plausible that Jaffrey believed that his visa issue could be resolved between July 27, 2014 – the date he left the United States (see Def. Opp. Br. (Dkt. No. 57), Ex. B ¶ 3) – and his scheduled deposition on August 8, 2014, or the adjourned date of August 21, 2014. It is likewise implausible that Jaffrey had not made his travel plans by July 24, 2014, when his lawyer told Plaintiff's counsel that she had spoken to Jaffrey, that he was in the United States, and that his deposition would go forward on August 8, 2014. See Phillips Decl. (Dkt. No. 55) ¶ 12. Moreover, assuming arguendo that the rescheduling of the August 8, 2014 deposition was due to defense counsel's ailing mother – and was unrelated to Jaffrey's inability to attend – Defendants provide no explanation for defense counsel's statement to Plaintiff's counsel on August 6, 2014, that she had "confirmed the [August 21, 2014 re-scheduled date]" of Jaffrey's deposition "with [her] clients." See id., Ex. 5 at 1. Given that Jaffrey had left the United States on July 27, 2014, and had known since June 17, 2013 that he had a significant visa problem, it is

27

not plausible that Jaffrey believed that he would be able to return to the United States by August 21, 2014. Nor have Defendants explained why they did not alert Plaintiff's counsel that Jaffrey had left the United States due to a serious visa issue.

Defense counsel did not tell Plaintiff's counsel that Jaffrey had left the country until August 15, 2014 – six days before Jaffrey's re-scheduled deposition date. (Id. ¶ 16; Dkt. No. 45 at 1) Even assuming that defense counsel "immediately informed Plaintiff's counsel of Jaffrey's immigration status and inability to attend his deposition" as soon as she learned of these developments (Def. Opp. Br. (Dkt. No. 57) at 10-11), Jaffrey knew at least by October 30, 2013 – when his reconsideration motion was denied – that he had no lawful basis to remain in the United States. See Maiona Aff. (Dkt. No. 57) ¶¶ 5-7. Nothing in Jaffrey's affidavit is to the contrary. See Def. Opp. Br. (Dkt. No. 57), Ex. B. In sum, it is abundantly clear that Jaffrey intentionally withheld information concerning his immigration status and thereby caused his lawyer to mislead Plaintiff's counsel concerning Jaffrey's availability for an August deposition.

Defense counsel's statements at the September 4, 2014 conference that Jaffrey had "applied for [a visa]" and that Maiona "is working on it on an expedited basis" were likewise misleading. See Sept. 4, 2014 Conf. Tr. (Dkt. No. 49) at 7. Nothing in Maiona's affidavit suggests that Jaffrey has "applied" for a visa. Indeed, as of October 2, 2014, Jaffrey had not even requested a waiver of inadmissibility from the U.S. Consulate. And even if he had requested such a waiver, he was not likely to obtain one. (Maiona Aff. (Dkt. No. 57) ¶¶ 11-12) In sum, Jaffrey had no prospect of being able to re-enter the United States, and counsel's representations to the contrary misled the Court.

Jaffrey's bad faith is also apparent from his sale of his New Jersey estate and its contents. In his affidavit, Jaffrey states that he sold his New Jersey home on July 23, 2014 – four days before he left the United States – and about two weeks before his scheduled deposition.

(Def. Opp. Br. (Dkt. No. 57), Ex. B ("Jaffrey Aff.") ¶ 5)  While Jaffrey asserts that it is merely a coincidence that he sold these assets a few weeks before his scheduled deposition and his departure from this country (see id. ¶ 5; Sept. 4, 2014 Conf. Tr. (Dkt. No. 49) at 13), that assertion is not plausible given the surrounding circumstances.  Similarly, while defense counsel has repeatedly represented to this Court that "all of [Jaffrey's] assets remain in the United States" (Dkt. No. 46 at n.1; Sept. 4, 2014 Conf. Tr. (Dkt. No. 49) at 10), no evidence supporting this assertion has been submitted to this Court.

Defendants argue that Jaffrey's conduct does not warrant sanctions because Jaffrey's immigration status provided a legitimate reason for his non-attendance at his deposition.  (Def. Opp. Br. (Dkt. No. 57) at 10-11)  Defendants cite Rosario v. Anson, No. 9:12-cv-1506 (GLS/CFH), 2014 WL 4418052 (N.D.N.Y. Sept. 8, 2014), where plaintiff – who did not appear for his deposition – "presented reasons for his noncompliance, namely that he lacks the economic means to travel to [the location of the deposition] as well as a leg injury that he sustained." Rosario, 2014 WL 4418052, at *4.  The court declined to sanction the plaintiff, noting that "defendants never directly responded to [plaintiff's] letter motion [seeking to be deposed remotely]," and citing plaintiff's pro se status. Id.

The willfulness of Jaffrey's misconduct here stands in sharp contrast to Rosario. Jaffrey knew for nine months that he had no lawful status in the United States and was subject to deportation.  Under these circumstances, Defendants' argument that Jaffrey believed that he could easily obtain another visa and freely re-enter the United States after departing this country (Maiona Aff. (Dkt. No. 57) ¶ 10) defies belief.  The Court concludes that Jaffrey intentionally hid his immigration issues and – once it became clear that he could no longer evade his deposition – decide to dispose of his U.S. assets and leave this country, knowing that he could not return.  This conclusion is fully consistent with Jaffrey's earlier effort to delay and obstruct

this litigation through the device of retaining and not paying his lawyers, and then refusing to

hire substitute counsel in defiance of court orders.[12]

   In sum, this Court concludes that Jaffrey and Wingate's misconduct has been

willful, that it has continued since at least September 2013, that no valid reason for the conduct

has been offered, and that Jaffrey and Wingate were repeatedly warned about the consequences

of further delaying this litigation. Given the duration of Jaffrey and Wingate's misconduct, the

---

[12] Defendants argue that Plaintiff should be required to depose Jaffrey "telephonically or in a
geographic location outside of the United States." (Def. Post-Hearing Br. (Dkt. No. 72) at 8; see
also Def. Opp. Br. (Dkt. No. 57) at 3-7) Defendants cite a number of cases in which courts have
allowed plaintiffs to have their depositions taken in foreign countries by remote means because
their immigration status did not allow them to enter the United States. (Def. Opp. Br. (Dkt. No.
57) at 3-7 (citing Abdullah v. Sheridan Square Press, Inc., 154 F.R.D. 591, 592-93 (S.D.N.Y.
1994) (plaintiff sued defendant for libel, "claiming that defendants destroyed his business and
made him a fugitive from his country"; court granted plaintiff's request that his deposition take
place in London because "plaintiff had no genuine choice of forum, because defendants are
located in the United States"); Stephens v. 1199 SEIU, No. 07 Civ. 0596 (JFB)(AKT), 2011 WL
2940490, at *3 (E.D.N.Y. July 19, 2011) (allowing plaintiff to have her deposition conducted
telephonically because she had been deported); Angamarca v. Da Ciro, Inc., 303 F.R.D. 445,
446-47 (S.D.N.Y. 2012) (allowing plaintiff to have his deposition conducted via remote means
where plaintiff "had returned to his native Ecuador and would be unable to appear in person for
his deposition," and where "Defendants . . . appear to have been aware of [plaintiff's]
undocumented status, and his departure to Ecuador should not come as a surprise").

These cases are inapposite. None involve the type of willful conduct at issue here. As discussed
above, the circumstances surrounding Jaffrey's departure from the United States indicate that he
intentionally misled Plaintiff about his immigration status, and about the implications of the
expiration of his visa. Defendants argue that Plaintiff should have been aware of "the possibility
that [Jaffrey's] L-1 Visa would expire" "due to the friendship Jaffrey and Plaintiff shared prior to
this litigation." (Def. Opp. Br. (Dkt. No. 57) at 7) Defendants present no evidence, however,
that Plaintiff knew that Jaffrey's departure from the United States was imminent, or that he
would not be able to return. And even if Plaintiff was aware of Jaffrey's visa problems to some
extent, Defendants provide no explanation for Jaffrey's sudden departure from the United States
just days before his scheduled deposition. Nor do they explain why Jaffrey misled the Court and
Plaintiff about whether his deposition could take place on the scheduled date. Accordingly, the
instant case is distinguishable from those cited by Defendants.

Even if this Court were to permit Jaffrey's deposition to take place overseas, or by Skype, there
is every reason to believe – given his record of delay, obstruction, and bad faith over a period of
more than a year – that his misconduct will continue. It is for this reason that a default judgment
is an appropriate sanction.

fact that it continued even after the Court warned these defendants that no further delay of the

proceedings would be tolerated, and that prior orders threatening a default judgment were not

sufficient to coerce Jaffrey and Wingate into obeying court orders to retain counsel by specific

dates (see Dkt. Nos. 34, 35), this Court finds that no sanction short of a default judgment is likely

to be efficacious.[13]  See Bambu Sales, 58 F.3d at 853 ("Although entry of a default judgment is

an extreme measure, discovery orders are meant to be followed. . . . Defendants rolled the dice

on the district court's tolerance for deliberate obstruction, and they lost.  We have no intention of

letting them return to the table."); Rammal v. Timberland Co., No. 93 Civ. 8936 (LAP), 1995

WL 559394, at *4 (S.D.N.Y. Sept. 20, 1995) ("The repeated disregard for valid Orders . . . and

---

[13]  Defendants argue that "Plaintiff [– not Defendants – ]impeded the discovery process" because
"Plaintiff refused to sit for his own deposition on August 20, 2014" and "Plaintiff gave no
explanation as to why he could not sit for his deposition." (Def. Opp. Br. (Dkt. No. 57) at 11-12)
As an initial manner, Defendants' August 18, 2014 letter to the Court indicates that Plaintiff did
provide such an explanation: "Plaintiff's counsel . . . stat[ed] that they would not be producing
plaintiff [for his deposition] unless [Defendant] S. Jaffrey is produced live immediately (or close
proximately) thereafter. . . ." (Dkt. No. 46 at 2)  At the default judgment hearing, Plaintiff's
counsel stated:

> When we learned on August 15th that Mr. Jaffrey had left the country and that the
> deposition schedule yet again had been blown up, we decided it was time to move
> for a default judgment, that enough was enough.  And based on that decision and
> the letter we submitted [to] the Court on August 18, we didn't think it made sense
> for Mr. Walpert to sit for a deposition later that week.  And we wanted to come to
> the Court and we wanted to move for this default.  And therefore no discovery
> took place, after we found out that Mr. Jaffrey was out of the country and would
> not be able to engage in discovery.

(Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 13)  Although Plaintiff did not sit for his August 20,
2014 deposition, his failure to appear did not "impede[] the discovery process" as argued by
Defendants.  By August 18, 2015, defense counsel had informed Plaintiff's counsel that Jaffrey
had left the United States and that it was not clear when Jaffrey would be able to return. (Dkt.
No. 46 at 2)  Plaintiff requested that this Court enter default judgment against Defendants that
same day. (Dkt. No. 45)  Given the length of this litigation up to that point and the delays and
costs incurred as a result of Defendants' failure to obey this Court's orders, it was reasonable for
Plaintiff to conserve resources when it became clear that Jaffrey had left the country for an
indeterminate period of time.  In short, Plaintiff's failure to sit for his deposition – after learning
that Jaffrey had left this country and would not appear for his long-scheduled deposition – does
not excuse Jaffrey and Wingate's repeated violations of court orders and other misconduct.

the intentional attempt to mislead me regarding the reason for non-compliance show a

willfulness and bad faith far in excess of that which is required before a case can be dismissed

with prejudice under Rule 37.").[14]

## 2.  **Liability**

"Having determined that [Defendants'] noncompliance warrants an entry of

default judgment pursuant to Rule 37, the Court must 'follow the procedure for entry of a default

judgment as set forth in [Rule 55].'" Coach, Inc. v. O'Brien, No. 10 Civ. 6071 (JPO)(JLC), 2011

WL 6122265, at *5 (S.D.N.Y. Nov. 28, 2011) (quoting Kuruwa v. Meyers, 823 F. Supp. 2d 253,

256 (S.D.N.Y. 2011)), report and recommendation adopted as modified, No. 10 Civ. 6071 (JPO)

(JLC), 2012 WL 1255276 (S.D.N.Y. Apr. 13, 2012). "Where, as here, the defendant has

defaulted, 'the factual allegations of the complaint, except those relating to the amount of

damages, will be taken as true.'" Montblanc-Simplo GmbH v. Colibri Corp., 692 F. Supp. 2d

245, 253 (E.D.N.Y. 2010) (quoting Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir.

1977) (citing Pope v. United States, 323 U.S. 1, 12 (1944)); see also D.H. Blair & Co., Inc. v.

---

[14]  Defendants argue that, "[e]ven if this Court enters default judgment against Syed Jaffrey, [Defendant Wingate] [is] entitled to a full trial on the merits. Entering a default judgment against [Wingate], [which is] able and willing to defend the merits of this case, will result in an unconstitutional deprivation of due process." (Def. Post-Hearing Br. (Dkt. No. 72) at 9-10) As discussed below, however, Plaintiff has demonstrated that Jaffrey is the alter ego of Wingate. Defendants have offered no evidence or argument that refutes Plaintiff's testimony that "all the funds [to operate Wingate] came from Mr. Jaffrey" and that "Jaffrey didn't really recognize corporate bounds and he was the sole controlling entity . . . of all the companies that he was involved in." (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 40-41, 47-48) Moreover, Jaffrey was the CEO of Wingate (id. at 32), and his misconduct – which was committed on behalf of both himself and Wingate – is fully chargeable to Wingate.

Finally, even if Jaffrey's conduct in leaving the country before his scheduled deposition is not attributable to Wingate, Wingate's violation of multiple court orders directing it to obtain counsel supports entry of default judgment against Wingate. See Dkt. Nos. 12, 33, 34, 35. "The Second Circuit has repeatedly affirmed district court cases that granted default judgments against corporate defendants that were specifically instructed to retain counsel by a certain date, yet failed to do so." Grant v. West, No. 97 Civ. 6560 (ILG), 2001 WL 1597804, at *4 (E.D.N.Y. Nov. 6, 2001) (collecting cases).

<u>Gottdiener</u>, 462 F.3d 95, 107 (2d Cir. 2006) ("'[A] default is an admission of all well-pleaded allegations against the defaulting party.'") (quoting <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 246 (2d Cir. 2004)). "This principle applies regardless of whether default is entered as a discovery sanction or for failure to defend." <u>Montblanc-Simplo GmbH</u>, 692 F. Supp. 2d at 253 (citing <u>Bambu</u>, 58 F.3d at 854)). "Accordingly, the factual allegations contained in [Plaintiff's] [Amended] Complaint, except as to the amount of damages claimed, must be taken as true." <u>Coach, Inc.</u>, 2011 WL 6122265, at *5.

In evaluating liability, this Court must also consider "whether [Defendants] can assert a meritorious defense" to each cause of action. <u>Loop Prod. v. Capital Connections LLC</u>, 797 F. Supp. 2d 338, 346 (S.D.N.Y. 2011) (citing <u>Green</u>, 420 F.3d at 109). "To satisfy the criterion of a 'meritorious defense,' the defense need not be ultimately persuasive at this stage. 'A defense is meritorious if it is good at law so as to give the factfinder some determination to make.'" <u>Am. Alliance Ins. Co. v. Eagle Ins. Co.</u>, 92 F.3d 57, 61 (2d Cir. 1996) (quoting <u>Anilina Fabrique de Colorants v. Aakash Chemicals and Dyestuffs, Inc.</u>, 856 F.2d 873, 879 (7th Cir. 1988)). "'[A] defendant must present more than conclusory denials when attempting to show the existence of a meritorious defense,'" however. <u>Green</u>, 420 F.3d at 110 (quoting <u>Pecarsky v. Galaxiworld.com, Ltd.</u>, 249 F.3d 167, 173 (2d Cir. 2001)).

### (a)   Breach of Contract Claim

Plaintiff's first cause of action alleges that Defendants breached the Employment Agreement by failing to pay Plaintiff wages for his labor and services over a 35-month period. (Am. Cmplt. (Dkt. No. 19) ¶¶ 32-37) "'Under New York law, 'the essential elements of a cause of action to recover damages for breach of contract[ are]:  the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages.'" <u>Serdarevic v. Centex Homes, LLC</u>, 760 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2010)

33

(quoting JP Morgan Chase v. J.H. Electric of N.Y., Inc., 69 A.D.3d 802, 803 (2010)).  Here,

Plaintiff alleges that (1) the "Employment Agreement is a valid and binding contract" under

which Defendants were "obligated to pay [Plaintiff] an annual salary of not less than $900,000

and [Plaintiff] was supposed to be paid his wages monthly"; (2) "[Plaintiff] has duly performed

all of his obligations under the Employment Agreement" by "work[ing] as directed by Jaffrey on

various investment vehicle concepts and on Jaffrey's personal legal matters," and by

"provid[ing] services for companies unrelated to Wingate"; (3) "Defendants Jaffrey and Wingate

breached the Employment Agreement by failing to pay [Plaintiff] wages for over thirty-five . . .

months of [Plaintiff's] labor and services, since 2010"; and (4) Plaintiff "has suffered substantial

damages" of at least $2,612,500 due to the breach.  (Am. Cmplt. (Dkt. No. 19) ¶¶ 19-20, 32-37)

        Plaintiff asserts this breach of contract claim against both Defendants Jaffrey and

Wingate, even though Defendant Jaffrey is not a party to the Employment Agreement.  See PX 1

at 1 (stating that the Employment Agreement is "by and between Wingate Capital, Inc. . . . and

Gary A. Walpert").  Although "[o]rdinarily, a non-party to a contract cannot be bound by the

contract . . . a plaintiff may state a claim for breach of contract against a non-signatory where the

plaintiff adequately alleges that the non-signatory was the 'alter ego' of one or more of the

signatories to the contract."  Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc., No. 07

Civ. 10490 (NRB), 2009 WL 855648, at *3 (citations omitted).  "New York law . . . allows

piercing the corporate veil [and holding an individual liable] 'when the corporation [h]as been so

dominated by an individual . . . and its separate identity so disregarded, that it primarily

transacted the dominator's business rather than its own and can be called the other's alter ego.'"

Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 411 (S.D.N.Y. 2012) (quoting Network

Enters, Inc. v. APBA Offshore Prods., Inc., No. 01 Civ. 11765, 2002 WL 31050846, at *3

(S.D.N.Y. Sept. 12, 2002)).

Here, Plaintiff alleges, inter alia, that "Wingate is completely influenced and governed by Jaffrey"; that the "assets of Wingate were intermingled with the assets of Jaffrey, or transferred without consideration, to Jaffrey in disregard of the purported separate corporate form . . . of Wingate"; and "Wingate never was intended to have and never had any true existence as a limited corporation." (Am. Cmplt. (Dkt. No. 19) ¶ 31) Moreover, Plaintiff testified that Jaffrey was the CEO or managing member of each of his corporate entities; that Jaffrey was the sole source of funding for all of these corporate entities; that "Jaffrey didn't really recognize corporate bounds and . . . was the sole controlling entity . . . of all of the companies that he was involved in"; and that those who worked for Jaffrey serviced all of his corporate entities: "[Jaffrey] didn't really separate who worked on what." (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 32, 40-41, 47-48) Defendants have not offered evidence demonstrating that Wingate has a separate identity from Jaffrey, or any assets apart from Jaffrey's assets. Accordingly, Plaintiff has offered a sufficient evidentiary basis for piercing the corporate veil, and has stated a breach of contract claim against both Wingate and Jaffrey.

Defendants argue, however, that Plaintiff's breach of contract claim fails, because "Plaintiff has not produced – and even admits [he] cannot produce – the original contract." (Def. Opp. Br. (Dkt. No. 57) at 13) Although the "best evidence rule requires generally that '[t]o prove the content of a writing, . . . the original . . . is required," Carroll v. LeBoeuf, Lamb, Greene & MacRae, L.L.P., 614 F. Supp. 2d 481, 484 (S.D.N.Y. 2009) (quoting Fed. R. Evid. 1002) (alterations in original), Plaintiff testified at the default judgment hearing that he "[does not] know where [the original Employment Agreement] is right now," but that it "was [last] in [his] office" at "the Wingate offices," and that "Jaffrey removed all the goods and property in [Plaintiff's] office" when Jaffrey and Wingate were evicted. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 22-23) Plaintiff further testified that "all the provisions of [the copy of the Employment

Agreement] [are] the same" as those in the original agreement, and Jaffrey and Wingate have offered no evidence rebutting that assertion. (Id. at 36)

"A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. Here, Jaffrey and Wingate have provided no basis for this Court to doubt the authenticity of the original or find that the copy does not contain the same provisions as the original. Moreover, Plaintiff's unrebutted testimony establishes that the original of the Employment Agreement is unavailable due to Defendants' misconduct. Accordingly, Jaffrey and Wingate's argument that Plaintiff's breach of contract claim fails because he has not produced the original Employment Agreement is not persuasive.

Defendants also argue that the Employment Agreement is unenforceable because (1) Jaffrey's signature on the document is forged, and (2) Jaffrey did not authorize its creation. (Def. Opp. Br. (Dkt. No. 57) at 15-17) As to the signature, Defendants' brief asserts that "Jaffrey denies placing his signature on the Employment Agreement." (Id. at 16). Arguments in a brief do not constitute evidence, however, see Giannullo v. City of New York, 322 F.3d 139, 142 (2d Cir. 2003) ("defendants' memorandum of law . . . is not evidence at all"); MM Ariz Holdings LLC v. Bonanno, 658 F. Supp. 2d 589, 594 (S.D.N.Y. 2009) ("A brief is not evidence"), and Defendants have offered no evidence that Jaffrey's signature on the Employment Agreement is forged. Jaffrey did not testify concerning this issue at the default judgment hearing, and in his affidavit Jaffrey does not deny that he signed the Employment Agreement. See Def. Opp. Br. (Dkt. No. 57), Ex. B.

Defendants' argument that Jaffrey did not authorize the creation of the Employment Agreement is likewise baseless. Although Jaffrey and Wingate assert in their brief that the "Employment Agreement was wholly drafted and executed – in its entirety – by Plaintiff,

36

Gary Walpert" (id. at 16), there is no evidence supporting this assertion. Although Jaffrey and Wingate need not prove at this time that Plaintiff forged Jaffrey's signature, or that Jaffrey did not agree to the creation of the Employment Agreement, Defendants "must present some evidence beyond conclusory denials to support [their] defense." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 98 (2d Cir. 1993). They have not done so. Accordingly, there is no reason for this Court to doubt the validity of the Employment Agreement.

Defendants further argue that the Employment Agreement is "unenforceable due to unconscionability." (Def. Opp. Br. (Dkt. No. 57) at 17) "'Under New York law, a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable . . . according to its literal terms.'" Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Nayal v. HIP Network Servs. IPA, Inc., 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (internal quotation marks and citation omitted)). "Generally, there must be a showing that such a contract is both procedurally and substantially unconscionable. . . . The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract[, per se]." Id. at 121-22 (internal quotation marks and citations omitted) (alteration in original).

Defendants argue that the Employment Agreement is unconscionable because (1) "Plaintiff did not actually provide any legal services to Defendants"; (2) "Plaintiff did not provide Defendants with the opportunity to assent to the Employment Agreement"; and (3) "Plaintiff failed to obtain an authentic signature from Jaffrey or an individual authorized to act on behalf of Wingate Capital, Inc." (Def. Opp. Br. (Dkt. No. 57) at 18-19) As discussed above, however, Defendants have offered no evidence suggesting either that Jaffrey's signature on the Employment Agreement is forged or that he did not agree to the terms of the Employment

37

Agreement. Defendants have likewise offered no evidence that they had no "meaningful choice" as to whether to enter into the Employment Agreement. Ragone, 595 F.3d at 122 (internal quotation marks and citations omitted). Accordingly, there is no indication that the Employment Agreement is procedurally unconscionable.

There is likewise no evidence of substantive unconscionability. "A contract is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed." Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citing Desiderio v. Nat'l Ass'n of Securities Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999)). Defendants do not argue that the terms of the Employment Agreement are unconscionable or unfair, however. Rather, they argue that Plaintiff did not perform as required under the contract. See Def. Opp. Br. (Dkt. No. 57) at 17-19. Because Defendants have not demonstrated that any provision of the Employment Agreement is unreasonably favorable to Walpert, there is no basis to find that the Employment Agreement is substantively unconscionable.

Defendants' argument that they "are unaware of any legal services provided to any of the Defendants by Plaintiff for the benefit of Wingate Capital, Inc." (see Def. Opp. Br. (Dkt. No. 57) at 18) also is meritless. At the default judgment hearing, Plaintiff testified at length about the work he performed for Wingate, Jaffrey, and Jaffrey's other companies between 2010 and 2013. Plaintiff testified that his "primary work" for Wingate was the formation of USDFM and Collingwood, and that he also performed work "relating to other investment targets that Mr. Jaffrey came up with" and "deal[t] with the lawyers who helped Wingate get its [office] space." (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 26, 44) Plaintiff also testified that he performed legal work on individual matters for Jaffrey and his wife (id. at 25-26, 29), and that – at Jaffrey's direction – he performed legal work for Jaffrey's other companies, including Delta

38

Search Labs and Ovalia Resorts. (Id. at 25-31) Defendants have not offered any evidence rebutting Plaintiff's testimony.

Defendants also argue that "damages should be limited to the very minimal value of services Plaintiff was prepared to provide to Defendant Wingate Capital, Inc." See Def. Post-Hearing Br. (Dkt. No. 72) at 9. Defendants point to an email that Plaintiff sent to Matthew Byrne at Byrne Poh LLP on July 2, 2012, in which Plaintiff stated: "As to Wingate, one small step forward, but I am planning to do almost nothing for them and concentrate on the [Byrne Poh] patent practice until a major breakthrough, i.e., money shows up. Still not too likely." (Dec. 2, 2012 Hearing Tr. (Dkt. No. 67) at 43-44 and DX H) Defendants argue that this email proves that "Plaintiff could not logically expect Defendant Wingate Capital, Inc. to perform under the alleged contract and [thus] his damages should be limited to the extraordinarily minimal amount of work he intended to perform." (Def. Post-Hearing Br. (Dkt. No. 72) at 9)

Defendants' argument ignores Plaintiff's unrebutted testimony about the substantial amount of work he in fact performed for Wingate and other Jaffrey companies at Jaffrey's direction. Defendants also ignore the fact that by July 2, 2012, Plaintiff had been performing work for Jaffrey and Wingate for more than two years, and had received none of the compensation promised in the Employment Agreement. (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 46) In any event, Defendants have not, until now, contended that Plaintiff breached his obligations under the Employment Agreement by failing to perform under that agreement. Nor have Defendants offered any evidence that Plaintiff breached the Employment Agreement. Defendants have instead brought an unjust enrichment counterclaim against Plaintiff (Answer to Amended Complaint with Counterclaim (Dkt. No. 21) at ¶¶ 74-86) contending that he owes rent for his Wingate office because he worked on Byrne Poh matters while occupying that office. (Id.) Although Plaintiff acknowledged that he also worked "part time" with Byrne Poh during

the time period he was employed at Wingate (Dec. 1, 2014 Hearing. Tr. (Dkt. No. 65) at 46-47),

Plaintiff testified that the Employment Agreement allowed him to do so "as long as there wasn't

a conflict of interest." (Id.) The Employment Agreement is consistent with Plaintiff's

testimony, because it expressly permits Plaintiff to "continue to practice law for outside clients

as Of Counsel to a private law firm of his choosing, as long as such representation does not

unreasonably interfere with, or create a conflict of interest with respect to, the performance of his

duties for [Wingate]." (PX 1 at 2) There is no evidence that Plaintiff's work for Byrne Poh

created a conflict of interest, or that Plaintiff was not able to complete work assigned to him by

Jaffrey due to his work for Byrne Poh.[15]

Because "'the evidence submitted [by Jaffrey and Wingate], if proven at trial,

would [not] constitute a complete defense'" to Plaintiff's breach of contract claim, they have not

established a meritorious defense to that claim.[16] Brown v. Gabbidon, No. 06 Civ. 8148 (HB),

2007 WL 1423788, at *4 (S.D.N.Y. May 14, 2007) (quoting Enron Oil Corp., 10 F.3d at 98).

---

[15] To the extent that Defendants argue that Plaintiff's recovery should be limited because of his work for Byrne Poh or intention to perform work for Byrne Poh (see Def. Post-Hearing Br. (Dkt. No. 72) at 9), that argument goes to the proper amount of Plaintiff's damages, and not to whether Jaffrey and Wingate Defendants breached the Employment Agreement.

[16] Defendants also argue that, if the Court finds the Employment Agreement valid and binding, "these proceedings must be immediately suspended while the parties submit to arbitration as required by the contract." (Def. Opp. Br. (Dkt. No. 57) at 13; Def. Post-Hearing Br. (Dkt. No. 72) at 8) Although the Employment Agreement contains a mandatory arbitration clause (see PX 1, ¶ 15), in the two years that this litigation has been pending, Defendants have never moved to compel arbitration of this dispute, and neither their original Answer nor their Answer to the Amended Complaint asserts the defense of arbitration. "[Defendants'] conduct strongly implies [that they] forfeited [their] contractual right to compel arbitration." Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 26 (2d Cir. 1995) (defendant waived right to arbitration where, inter alia, it (1) "could have invoked the arbitration clause at the outset of the litigation, . . . but it chose not to"; and (2) "submitted an answer, amended answer, and answer to the amended complaint, each of which raised numerous defenses and counterclaims, but none of these papers asserted the defense of arbitration"). Given Defendants' failure to assert a right to arbitration over the two years that this litigation has been pending, this Court finds that Defendants have "forfeited [their] contractual right to compel arbitration." Id.

#### (b)   Quantum Meruit and Unjust Enrichment Claims

The Amended Complaint also includes claims for quantum meruit and unjust enrichment. "[Claims for] quantum meruit and unjust enrichment [are analyzed] together as a single quasi contract claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citing Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 663 (2d Cir. 1996) (citation omitted)). "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" Id. (quoting Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000)). "New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." Id. (citations omitted).

Here, Plaintiff alleges that (1) he "rendered performance of certain services" at Defendants' request, including working "as directed by Jaffrey on various investment vehicle concepts and on Jaffrey's personal legal matters," and by "provid[ing] services for companies unrelated to Wingate, including but not limited to, Delta Search Labs and Ovalia Resorts"; (2) "Defendants knew that [Plaintiff] was performing the requested services and accepted such services"; (3) Defendants "knew that [Plaintiff] expected to be paid for such work"; and (4) Plaintiff has "suffered substantial damages" in an amount of at least $2,612,500. (Am. Cmplt. (Dkt. No. 19) ¶¶ 19-20, 38-42)

Defendants argue that Plaintiff has not demonstrated that he has a valid quantum meruit claim because he "failed to produce any evidence of actually performing services to Defendants." (Def. Opp. Br. (Dkt. No. 57) at 14)  As noted above, however, Plaintiff testified extensively at the default judgment hearing about a number of legal services he provided to

41

Defendants between 2010 and 2013. Defendants offered no evidence contradicting Plaintiff's testimony. Because some of the work Plaintiff testified to clearly falls outside the scope of the Employment Agreement, including – for example – legal work that Plaintiff performed relating to the personal affairs of Jaffrey and his wife (see Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 25-26, 29) – this Court finds that Jaffrey is liable for quantum meruit and unjust enrichment.

Because the record is not adequate to determine the value of the legal services Plaintiff rendered to Jaffrey that fall outside the Employment Agreement, this issue will be referred to the assigned Magistrate Judge for purposes of a damages inquest.

### a. New York Labor Law Section 193

"New York Labor Law § 193(1) prohibits employers from making 'any deduction from the wages of an employee' with certain exceptions that are not applicable here." Chenensky v. New York Life Ins. Co., No. 07 Civ. 11504 (WHP), 2012 WL 234374, at *4 (S.D.N.Y. Jan. 10, 2012) (citing N.Y. Lab. Law § 193(1)(a-b)). New York Labor Law defines "wages" as "the earnings of the employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Lab. Law § 190(1). It defines "employee" as "any person employed for hire by an employer in any employment." Id. § 190(2). It defines "employer" as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." Id. § 190(3). "[T]o determine whether [an individual is an employer under the New York Labor Law, courts consider] whether the alleged employer '(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; [and] (4) . . . maintained employment records.'" Karic v. Major Automotive Cos. Inc., 992 F. Supp. 2d 196, 203 (E.D.N.Y. 2014) (quoting Lauria v. Heffernan, 607 F. Supp. 2d 403, 409 (E.D.N.Y. 2009)).

42

Here, Plaintiff alleges that Defendants violated New York Labor Law § 193 "[b]y willfully and without justification deducting and failing to pay [Plaintiff] wages to which he was entitled." (Am. Cmplt. (Dkt. No. 19) ¶ 58) Plaintiff alleges that he was entitled to wages for (1) six months of labor or services in 2010; (2) twelve months of labor or services in 2011; (3) twelve months of labor or services in 2012, other than a $50,000 payment paid by Delta Search Labs; and (4) at least one full month of labor or services in 2013. (Id. ¶¶ 54-57) Plaintiff alleges that both Wingate and Jaffrey are "employers" as defined by the New York Labor Law, and that the Labor Law "imposes individual liability on Jaffrey as an employer with control over Wingate's employees and/or as an executive and owner of Wingate." (Id. ¶¶ 51-52)

Defendants do not dispute that both Wingate and Jaffrey constitute "employers" under the New York Labor Law. Nor do Defendants assert any particular defense to Plaintiff's New York Labor Law claim. Because "Plaintiff's cause of action under New York Labor Law is dependent upon the success of his breach of contract claim[]," Dreyfuss v. eTelecare Global Solutions-US, Inc., No. 08 Civ. 1115 (RJS), 2010 WL 4058143, at *4 n.8 (S.D.N.Y. Sept. 30, 2010), this Court assumes that Defendants assert the same defenses to the New York Labor Law claim as they assert to the breach of contract claim. As discussed above, this Court finds that none of those defenses are meritorious. Accordingly, Defendants Jaffrey and Wingate are liable on Plaintiff's New York Labor Law claim.

### b.    Conversion

The Amended Complaint also contains a cause of action is for conversion. Under New York law, "'[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 44 (1995) (internal quotation marks omitted)) (alteration in

original). "This includes a 'denial or violation of the plaintiff's dominion, rights, or possession' over her property." Id. (quoting Sporn v. MCA Records, Inc., 58 N.Y.2d 482, 487 (1983)). "It also requires that the defendant exclude the owner from exercising her rights over the goods." Id. (citing New York v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 259 (2002)).

Here, Plaintiff alleges that (1) "[d]uring the course of his employment [he] moved various personal items into his office at [the Wingate Offices], including but not limited to a teak desk, teak credenza, leather executive chair, Tiffany picture frame, wall art, and other accessories (the 'Office Furnishings')," which he owns; (2) "Defendants Jaffrey and Wingate have intentionally and without authority from Walpert, removed Walpert's Office Furnishing[s] and papers from the premises of Wingate's Executive Offices . . . to another location under their control"; and (3) Defendants "wrongfully exercise[d] dominion, custody or control over the Office Furnishings and papers, without authorization and in violation and interference of [Plaintiff's] right to possession and ownership of the Office Furnishings and papers." (Am. Cmplt. (Dkt. No. 19) ¶¶ 22, 30, 61-64) At the default judgment hearing, Plaintiff testified that Jaffrey removed these items from his office when Wingate was evicted from its Lexington Avenue office space for non-payment of rent. (Dec. 1, 2014 Hearing Tr. (Dkt. No 65) at 23.

Wingate can be held liable for Jaffrey's actions if Jaffrey "was acting within the scope of his employment" in removing Plaintiff's property from Wingate's offices. McGrath v. Nassau Health Care Corp., 217 F. Supp. 2d 319, 334 (E.D.N.Y. 2002) (citation omitted). "An employee's conduct is within the scope of his employment if the employer could have reasonably foreseen the employee's tortious conduct." Id. (citation omitted). Here, Jaffrey was acting within the scope of his employment with Wingate when he removed Plaintiff's personal property from Plaintiff's office, because he did so as a result of the fact that Wingate had been evicted as a result of Wingate's failure to pay rent. See Dec. 1, 2014 Hearing Tr. (Dkt. No. 65)

44

at 23. Accordingly, the evidence at the default judgment hearing establishes a prima facie case
of liability for conversion against both Jaffrey and Wingate based on Jaffrey's removal, and
exercise of control over, Plaintiff's property in Plaintiff's Wingate office.

Defendants have offered no defense to Plaintiff's conversion claim and do not
address the conversion claim in their papers. See Dkt. Nos. 57, 72. Although defense counsel
stated at the default judgment hearing that Defendants "dispute the eviction [from the Wingate
office space] altogether" (Dec. 1, 2014 Hearing Tr. (Dkt. No. 65) at 36), she neither cross-
examined Plaintiff on this point nor offered evidence rebutting Plaintiff's account. Although
Defendants need not establish a defense to the conversion claim at this stage, "[they] must
present some evidence beyond conclusory denials to support [their] defense." Enron Oil Corp.,
10 F.3d at 98. They have not done so. Accordingly, Jaffrey and Wingate are liable on Plaintiff's
conversion claim.

### c.     Defendant Wingate's Unjust Enrichment Counterclaim

Defendant Wingate has asserted a counterclaim against Plaintiff for unjust
enrichment based on Plaintiff's occupation of an office in Wingate's space at 601 Lexington
Avenue. (Answer to Am. Cmplt. with Counterclaim (Dkt. No. 21) ¶¶ 74-86) Wingate argues
that it is "entitled to commercial rents of $2,000.00 plus a reasonable facilities fee per month for
the thirty-six months of the [Employment Agreement]." (Def. Opp. Br. (Dkt. No. 57) at 19) It is
true that the Employment Agreement states that Plaintiff "may conduct his law practice at
[Wingate's] offices and may use such staff assistance and equipment as may be needed to do so,
and [Plaintiff] agrees to pay to [Wingate] a facilities fee of at least $2000 a month, no later than
the 10th of each month, to cover the cost thereof." (PX 1 at 2) "However, the factual record
regarding [this] counterclaim[] is simply too incomplete for the court to conclude one way or the
other whether [it] constitute[s] [a] meritorious defense[]." State St. Bank & Trust Co. v.

Inversiones Errazuriz, Limitada, 230 F. Supp. 2d 313, 324 (S.D.N.Y. 2002). And even if the counterclaim is meritorious, it would not constitute a complete defense; rather, it would merely reduce Plaintiff's damages. Accordingly, the counterclaim is "referred to the magistrate judge for further inquiry. After [D]efendant [Wingate has] been given an opportunity to flesh out the factual foundation for [the] counterclaim," the Magistrate Judge will decide whether Plaintiff's recovery should be reduced to account for damages owed on Wingate's counterclaim. See id.

*          *          *          *

Plaintiff is entitled to a default judgment against Defendants Jaffrey and Wingate on all five causes of action set forth in the Amended Complaint.[17]

---

[17] Plaintiff argues that, "[i]f this Court grants [Plaintiff's] motion for a default judgment, it should also enter a turnover order on Defendants' assets." (Def. Br. (Dkt. No. 54) at 17) Federal Rule of Civil Procedure 69(a) – which governs the execution of money judgments – provides that the "procedure on execution . . . must accord with the procedure of the state where the court is located. . . ." Fed. R. Civ. P. 69(a)(1). New York Civil Practice Law and Rules Section 5225(a) states that, "[u]pon motion of the judgment creditor, upon notice to the judgment debtor, where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff." N.Y. C.P.L.R. § 5225(a). Here, Plaintiff's request for a turnover order is premature. Although this Court has granted his motion for default judgment, the amount of the judgment is yet to be determined. Cf. Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., No. 88 Civ. 3931 (ILG), 2006 WL 297451, at *4 (E.D.N.Y. Feb. 8, 2006) (finding that the "prerequisites for the grant of a turn-over order [under Section 5225(a)] have been satisfied because[, inter alia]: [a] the Judgment has not been satisfied; [b] [defendant] has no money to satisfy the Judgment; and [c] adequate notice was given to [defendant] regarding this application"). Accordingly, Plaintiff's request for a turnover order is denied without prejudice. Plaintiff may renew his request if, once judgment is entered, Jaffrey and Wingate do not satisfy the judgment.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Amended Complaint is denied; Plaintiff's motion to drop USDFM as a defendant is granted; and Plaintiff's motion for a default judgment is granted as to Defendants Jaffrey and Wingate. Defendants' Answer to the Amended Complaint is stricken as to Defendants Jaffrey and Wingate on all five causes of action in the Amended Complaint, and this opinion and order constitutes an order of default on these causes of action as to these defendants. This case will be referred to the assigned Magistrate Judge for an inquest on damages concerning Plaintiff's claims, and for a determination as to whether Wingate is entitled to an offset based on its Counterclaim.

The Clerk of the Court is directed to terminate the motion (Dkt. No. 53).

Dated: New York, New York
       August 28, 2015

                              SO ORDERED.

                              Paul G. Gardephe
                              United States District Judge